



WESTERN MOTOR CARRIER SAFETY INSTITUTE, INC.

493 Main St., Quincy, CA 95971-9613
(530) 281-6565 • 1(800)-TRK-SFTY
E-mail: paulherbert@trucksafetyexpert.com • www.trucksafetyexpert.com

Safety!
*The Law Demands It*
*The Public Deserves It*
*Profits Depend on It*

June 24, 2024

Mr. Christopher M. FitzPatrick, Esq.
Morgan & Morgan (DC)
1901 Pennsylvania Avenue, NW Suite 300
Washington, DC 20006

*Re:      Expert Report of V. Paul Herbert, C.P.S.A. Towanda R. Futrell V. Daniel Cramer/AV Leasing LLC*

Dear Mr. FitzPatrick,

I have thoroughly reviewed the materials and depositions related to the case of Towanda R. Futrell v. Daniel L. Cramer, AV Leasing, LLC, Triton Logistics, Inc., and WDTC, LLC. This report provides an analysis of the collision, focusing on commercial motor vehicle industry standards of care, applicable Federal Motor Carrier Safety Regulations (FMCSR), and relevant Virginia state laws.

**Materials Reviewed:**
   1. **Deposition transcript of Daniel L. Cramer**
   2. **Deposition transcript of Andrew Voveris**
   3. **Amended complaint**
   4. **Virginia Police Crash Report**
   5. **Photos of International bus.**

**Understanding of Facts**:
It is my understanding that on December 16, 2021, at approximately 01:38 a.m., a severe collision occurred on Interstate 64 East in York County, Virginia, near Williamsburg. The incident involved a Freightliner truck operated by Daniel L. Cramer and a party bus driven by Antonio L. Wiggins.

As Daniel Cramer was driving eastbound on Interstate 64, he approached the party bus traveling in the same direction. For reasons yet to be fully ascertained but likely involving driver fatigue and possibly insufficient attention to the road, Cramer's Freightliner truck rear-ended the party bus at a high rate of speed. The impact was so severe that it propelled the party bus forward uncontrollably.

The force of the collision caused the party bus to veer off its lane, cross the median barrier, and enter the westbound lanes of Interstate 64. During this chaotic sequence, the rear cargo shell of the bus detached, resulting in catastrophic structural damage. The violent motion and structural failure of the bus led to multiple passengers being ejected from the vehicle.

Tragically, the ejection of passengers resulted in multiple fatalities and severe injuries. The scene of the accident was marked by chaos and devastation, as emergency responders arrived to find victims scattered across the roadway and median.


(Photo of the subject International 3400 Party bus before the collision)


(Photo of the subject International party bus at the collision scene)

# CRASH DIAGRAM



(Police Traffic Crash Report diagram)

**CRASH DESCRIPTION**

VEHICLE # 2 STRUCK VEHICLE # 1 IN THE REAR. VEHICLE # 1 ROTATED 60 DEGREES LOCKED WITH VEHICLE #2. BOTH VEHICLES RAN OFF THE ROADWAY ON THE LEFT SIDE OF ROAD. VEHICLE # 1, STRUCK THE GUARD RAIL, BEFORE ENTERING THE CENTER MEDIAN. UPON ENTERING THE CENTER MEDIAN, VEHICLE #1'S REAR CARGO SHELL DETACHED FROM THE VEHICLE EJECTING ALL PASSENGERS. VEHICLE # 2 CONTINUED MOVING FORWARD  CROSSING THROUGH THE CENTER MEDIAN AND THEN STRUCK THE GUARD RAIL ON THE WEST BOUND SIDE. THERE WERE APPROXIMATELY 200 FEET OF GUARD RAIL AND 30 POSTS DAMAGED.

(Police Traffic Crash Report Description of collision)

## <u>Qualifications</u>

I have been employed in the trucking industry for approximately 40 years in various capacities.  I started out as a dump truck driver in 1975 and have driven many different types of commercial motor vehicle combinations hauling a great variety of types of loads.  Most of my experience is in hauling aggregates, logs, lumber, pipe, fuels, and heavy equipment in tractor semi-trailer, tractor double trailer and straight truck double pull-trailer combinations (triples). Additionally, most of my experience is in pulling logging dollies, and dump, flatbed and tank trailers.  Over the duration of my 30+ year experience in the commercial motor vehicle industry I have regularly driven trucks of many different types and configurations hauling a variety of different loads. Throughout my career as a truck driver, I have been regularly employed as a "Driver Trainer" by trucking companies and given the responsibility to ride with and evaluate the driving habits of my fellow drivers.  Also,

while employed as a truck driver, I have been required to attend many regularly scheduled training sessions or "safety meetings" where we were

instructed in various principles and concepts of defensive and safe driving practices. In 1981 I went to work with the Nevada Highway Patrol as a State Trooper stationed in Reno, Nevada. Because of my background in trucking, I was given specialized training and assignments involving commercial motor vehicle accident investigation and enforcement. I also was able to participate in specific training opportunities concerning commercial motor vehicle inspection and operational standards including the Federal Motor Carrier Safety Regulations.

Since 1985 I have been employed in various capacities in the trucking industry having safety and compliance management responsibilities. I worked for two years as the Assistant Director of Safety and Maintenance Activities for the California Trucking Association in West Sacramento, California, for three years as the Director of Safety and Personnel for Kings County Truck Lines in Tulare, California, and for one year as General Manager for American Refrigerated Transport in Bakersfield, California.

In each one of the above referenced positions, I was regularly required to provide training to truck drivers concerning specific safe commercial motor vehicle training principles and practices. While at the California Trucking Association I was regularly asked by trucking companies belonging to the association to provide safety training to their truck drivers. While employed by Kings County Truck Lines and American Refrigerated Transport I was expected to provide safety training to each one of our truck drivers at a minimum frequency of four times per year. This required me to visit each one of our nine terminals within California and Oregon every three months. Driver's attendance at these training sessions was not mandatory, however, in order for them to qualify for their annual safety incentive award which was fairly substantial; they were required to attend a minimum of 3 training sessions per year.

Since 1990 I have been the owner of Western Motor Carrier Safety Institute, Inc. where I provide safety and compliance consulting services to several companies who operate fleets of commercial motor vehicles. Several of the companies which retain my quarterly driver safety training services are / were fairly small companies owning and operating only approximately a dozen trucks.

I have been retained by the North American Transportation Management Institute (formerly known as the National Committee for Motor Fleet Supervisor Training and Certification) to instruct several of their courses throughout the western United States. The most commonly taught course was a 3 day course entitled "Motor Fleet Safety Supervision: Principles and Practices". Another course I taught several times was a 2 day course entitled "Advanced Motor Fleet Safety". Another course I regularly taught was a 2 day course entitled "Motor Fleet Trainer". All of these courses possessed a major element of their curriculum pertaining to the topics of: What topics do I train my truck drivers in? How often do I train my truck drivers? What format (classroom, in-vehicle) training do I utilize and when? What industry resources (videos, computer based interactive training, consultants, defensive driving courses, etc.) are available to assist me in my training efforts? How often should I ride with and evaluate the driving practices and habits of my truck drivers? How do I handle and manage a truck driver who has a poor driving record? What do I do to train my truck drivers and when? What monitoring systems and services are available to the industry to monitor and control how my company's trucks are being operated?

During these courses, as the instructor, I had the opportunity of leading many meaningful discussions concerning the above referenced questions and topics. In this position I was able to gain an understanding from my students concerning what they considered as their obligation and the industry standard of care regarding what minimal training efforts and activities they owed to the motoring public who share the roadways with their trucks. I continue to attend regularly scheduled meetings of the California Trucking

Association and American Trucking Association's Safety Management Councils where such discussions regularly occur among the members pertaining to a motor carrier's responsibility to regularly and adequately train and evaluate their truck drivers.

Since 1985 I have regularly been called upon to audit and evaluate the adequacy of the safety management program of several hundred trucking companies either as an auditor for the California Trucking Association's Fleet Safety Contest or as a hired consultant. I evaluate the entirety of a company's fleet safety management program including the company safety policy manual, driver training records, driver qualification files, hours of service and log-keeping compliance, driver monitoring and supervision practices, accident reporting and evaluation procedures, vehicle maintenance procedures and record-keeping, etc.

Among numerous other courses I have attended, I have attended two 80-hour Traffic Collision Reconstruction courses, a 48 hour course entitled Advanced Commercial Motor Vehicle Accident Reconstruction, A Bus Accident Investigation and a couple of 40 hour courses entitled Inspection and Investigation of Commercial Motor Vehicle Accidents.

Beginning in 1994 through approximately 2014 I served on the American Trucking Association's "Accident Review Committee" where it was our mission to assist member motor carriers to properly classify collisions involving their vehicles as being "Preventable" or "Non-preventable".


**Publications Authored**

I have authored one publication. It was an article pertaining to driving trucks safely on Interstate 80 over Donner Summit in the winter and was published in the Jan. 1991 issue of a trucking trade journal entitled "Go-West".

**Prior Testimony**

I am also an experienced testifying expert who routinely testifies concerning the standard of care for the operation and maintenance of commercial motor vehicles and the applicable standard of care throughout the nation in the industry for administering an adequate motor fleet safety and compliance management program. I routinely provide expert testimony concerning these subjects in numerous State and Federal courts. Please refer to the accompanying CV[1] for a more complete description of my work experience, education, training and other qualifications. The last page of my CV also contains a current fee schedule.


I have provided expert testimony on the subject of commercial motor vehicle related safety standards in approximately 2,200 depositions and approximately 220 trials. Please refer to the attached list[2] of testimony for a listing of my prior testimony within the preceding 4 years.

**Industry Standards**

The Federal Motor Carrier Safety Administration says: "***Driving a Commercial Motor Vehicle (CMV) requires a higher level of knowledge, experience, skills, and physical abilities than that required to drive a non-commercial vehicle. In order to obtain a Commercial Driver's License (CDL), an applicant must pass both skills and knowledge testing geared to these higher standards. Additionally CDL holders are held to a higher standard when operating any type of motor vehicle on public roads. Serious traffic violations committed by a***

[1] Herbert CV & Fee schedule
[2] Herbert Testimony List

*CDL holder can affect their ability to maintain their CDL certification… Driving a commercial motor vehicle is a big responsibility. It requires special skills and knowledge."* [3]

Because of their large size and because of their heavy weight and disparate operational characteristics from regular private passenger motor vehicles, heavy commercial motor vehicles require a higher level of skill to safely operate them. Such vehicles also possess an increased capability to cause great bodily harm to others who must share the roadways with them. This exposure to harm to others when CMVs are operated in an unsafe manner especially impacts the safety to occupants of much smaller vehicles, to pedestrians, road workers, bicyclists and motorcyclists. Operators of commercial motor vehicles are required to be specially licensed. Possession of such a Commercial Driver License and accompanying required endorsements is considered to be evidence of a minimum level of "Required Knowledge" and "Required Skills" as laid out in 49 CFR 383.111 – Required Knowledge and 383.113 – Required Skills, which are formulated for the purpose of assisting truck and bus operators to operate such commercial motor vehicles in a safe manner.

These components of "Required Knowledge" and "Required Skill" are also laid out in the various state Commercial Driver Handbooks[4] which are patterned after "The Model Curriculum for Training Tractor-Trailer Drivers" which was published in the mid-eighties by the USDOT. This publication was then utilized in the development of a "Model Commercial Driver Handbook" which was published and distributed by the various state agencies which are given responsibility for the licensure of operators of CMVs which contain safe driving standards expected for CMV operators to follow while operating CMVs upon public roadways. Every such handbook which is issued by every state is patterned after a Model Commercial Driver's Handbook which was published in the mid 1980's by The Essex Corporation in Goleta, CA who was under contract with the USDOT for the development of a model manual which each state would pattern their respective individual Commercial Driver Handbooks as they came into compliance with the Commercial Motor Vehicle Safety Act of 1986 which required all states to begin licensing operators of commercial motor vehicles according to a national standard by April 1, 1992.

The safe truck driving principles and practices contained within this publication are accurately representative of the standard of care for the operation of such a commercial motor vehicle and serve as a guide to employers of truck drivers as to which standards are important and expected to be taught to truck drivers who are engaged in the operation of commercial motor vehicles upon public roadways. A few of these commercial motor vehicle operational safety standards which employers of CMV operators are expected to teach to their drivers and assure compliance with are contained in ***Section 2 – Driving Safely*** and are outlined below.

Additionally, operators of large and heavy commercial motor vehicles are expected to be instructed in and knowledgeable of the Federal Motor Carrier Safety Regulations (49 CFR 390.3 (e)). These regulations are specifically designed to assure that operators of large commercial motor vehicles are capable, knowledgeable, competent and proficient in the operational differences and safety standards expected of them as operators of commercial motor vehicles.

It is industry standard that a professional driver be knowledgeable and comply with state and federal rules of the road. For example, **Virginia Revised Statutes § 46.2-816, Following Too Closely[5]** states:

> *1. The driver of a motor vehicle shall not follow another vehicle, trailer, or semitrailer more closely than is reasonable and prudent, having due regard to the speed of both vehicles and the traffic on, and the conditions of, the highway at the time.*

---

[3] Herbert - Federal Motor Carrier Safety Administration
[4] Herbert - Virginia Commercial Driver Handbook
[5] Virginia Revised Statutes § 46.2-816

Additionally, the most commonly utilized defensive driving program in the trucking industry is "The Smith System" [6] which incorporates its "*Five Keys to Defensive Driving:*

1. ***Aim High in Steering,***
2. ***Get the Big Picture,***
3. ***Keep Your Eyes Moving,***
4. ***Leave Yourself an Out,***
5. ***Make Sure They See You.***

These 5 keys are also commonly called "*The 5 Seeing Habits*" which incorporate a system entitled "*Space Cushion Driving*" which incorporates driver training principles and concepts which require a CMV operator to always maintain a "Space Cushion of Safety" around their vehicles (especially in front of them) at all times.

Additionally, another very common defensive driving course is administered by the National Safety Council and is called their Defensive Driving Course (DDC).[7]  This course teaches its students that there are three main components to driving defensively.  They are:

1. ***Recognize the Hazard,***
2. ***Understand the Defense,***
3. ***React Appropriately in Time.***

This system essentially teaches drivers that they must be continually searching for "potential hazards", watching cautiously to observe if potential hazards may transition or advance into "hazards", and, if the potential hazards do transition into hazards, to understanding what action is necessary to best prevent a hazard from transitioning into an "emergency".  Once the appropriate "defense" is identified, under this system, the professional CMV operator is required to react appropriately by implementing the appropriate defense within an appropriate time frame in order to successfully prevent a hazard from transitioning into an emergency.

Another widely used publication in the industry which addresses the preventability of accidents is the "*Commercial Vehicle Preventable Accident Manual – A Guide to Countermeasures*".[8]  This manual was commissioned by the USDOT and intended to be used as a tool in the commercial vehicle industry to assist those who are employed in the industry and given specific responsibility for investigating company involved traffic collisions, determine the preventability of such collisions, and, to implement necessary countermeasures which are designed to prevent the occurrence of future such collisions.

For example and pertinent to this case, this *Typical Accident Situation*:

| Rear-ending | Following too closely | B1 | Defensive driving |
| --- | --- | --- | --- |
| | Aggressive or reckless driving attitude | A6 | Illness and fatigue |
| | Inattention or drowsiness | B8 | Using and changing lanes |
| | Illness or fatigue | C3 | Brake performance |

[6] Herbert - The Smith System
[7] Herbert - National Safety Council's DDC
[8] Herbert - Commercial Vehicle Preventable Accident Manual

Some Countermeasures listed in **B1, Defensive driving, Driving Tips** are:

- *Learn to recognize driving situations that can be hazardous*
- *Assume other drivers will make errors*
- *Adjust speed, position, direction and attention to be able to maneuver safely if a hazard develops.*
- *Scan far enough ahead to be able to react safely to approaching situations*

Utilizing those safe driving standards contained in the Commercial Driver Handbooks, "The Smith System", the National Safety Council's DDC program, and CVPAM, employers of truck drivers and truck drivers themselves are exposed to important commercial motor vehicle operational safety standards which, if routinely followed, will typically allow a CMV operator to prevent hazards from transitioning into emergencies by reacting appropriately to changing roadway, weather and traffic conditions. These are the standards which are applicable to all "professional drivers" and their employers and are representative of those safe CMV operational safety standards which they are expected to train and evaluate their drivers.

These industry standards of care are summarized as follows**:**

1.      **Seeing** – Professional drivers are trained and expected to be looking ahead a minimum of 12-15 seconds. Additionally, "The Smith System", the most commonly utilized defensive driver training program teaches a driver to "Aim High in Steering" (looking down the road ahead of you a minimum of 15 seconds). Looking sufficiently far enough down the road will allow drivers to watch situations developing in front of them and to accurately predict potential scenarios which may affect the safe operation of their vehicle. The Commercial Driver Handbook says " ***Not looking properly is a major cause of accidents… Look for Traffic – Look for vehicles coming onto the highway, into your lane, or turning. Watch for brake lights from slowing vehicles. By seeing these things far enough ahead, you can change your speed or change lanes if necessary to avoid a problem***."

By looking far enough ahead down the road, professional CMV operators will typically be able to identify hazards ahead of them such as brake lights activating, vehicles slowing, vehicles suddenly changing lanes or vehicles stopped in the roadway. This advance notice allows them to take the appropriate action such as slowing down, moving over, etc. to be able to avoid a conflict situation developing and sufficiently in advance of arriving at the location of the perceived or identified potential hazard. A commonly referred-to industry publication by the title of "**Bumper to Bumper: The Complete Guide to Tractor-trailer Operations**" [9] simply states "…*a safe driver never gets into trouble in the first place. Safe drivers are calm, cautious and respectful. They take the time to see what is going on all around them. Safe drivers are so alert, so observant and so well prepared that they don't get surprises. They can perform evasive maneuvers, but rarely have to. They see dangerous situations developing long before they happen and can take steps to avoid the danger. Safe drivers simply don't have surprises.*"

This is a very important driving safety standard for drivers to be regularly exposed to through initial orientation safety training, in-cab ride along safety training and subsequent periodic safety training sessions. Drivers who practice these "Seeing Habits" are typically not suddenly faced with an emergency situation.

2.      **Controlling Speed** – because of their limited ability to decelerate and because of the great potential for catastrophic harm possessed by CMV's, it is imperative that truck and bus drivers be taught to comply with the standard for controlling speed as contained in the handbooks, publications, defensive driver training courses, etc. The handbook says "*Driving too fast is a major cause of fatal crashes. You must adjust your speed depending on driving conditions. These include traction, curves, visibility, traffic, and hills…At 55 mph it will take about six seconds to stop and your vehicle will travel about the distance of a football field…**Whenever you double your speed, it takes about four times the distance to stop and your vehicle will have** **four times the destructive power***

---

[9] Herbert - Bumper to Bumper

*if it crashes.  High speeds increase stopping distances greatly.  By slowing down a little, you can gain a lot in reduced braking distance.*"



**Figure 2.11**

(Figure from *Section 2.6 Controlling Speed*)

By observing hazards such as changing traffic conditions ahead in sufficient time and by properly reacting to that developing situation, the professional CMV operator adjusts his or her driving to developing traffic situations. Simply put, ***when traffic ahead is slowing or stopping, when brake lights and turn signals are activating on vehicles ahead, especially vehicles traveling ahead of you in your lane, a prudent truck or bus driver will quickly reduce their speed and proceed with great caution until the reason for the brake lights and swerving, slowing, stopping vehicles ahead is evident.***

A professional driver of a heavy duty CMV must exercise the standard of controlling speed, especially when on a highway in traffic.

**3.**      **Managing Space** – The Commercial Driver Handbook says "*To be a safe driver, you need space all around your vehicle.  When things go wrong, space gives you time to think and to take action.  To have space available when something goes wrong, you need to manage space.  While this is true for all drivers, it is very important for large vehicles.  They take up more space and they require more space for stopping and turning.  Of all the space around your vehicle, it is the area ahead of the vehicle – the space you're driving into – that is most important.*"



**HEAVY VEHICLE FORMULA**
For timed interval following distance

- 1 second required for each 10 feet of vehicle length at speeds under 40 MPH
- Above 40 MPH use same formula, then add 1 second for the additional speed

40 foot truck (under 40 MPH) = 4 seconds

50 foot truck (above 40 MPH) = 6 seconds

60 foot truck (under 40 MPH) = 6 seconds

Figure 2.12

 The Smith System teaches drivers to be constantly providing for and assuring an adequate "space cushion of safety" all around their vehicles and also teaches the above formula for following distance based upon vehicle length.  CMV operators accomplish this "space cushion" ahead of them by being attentive to other vehicles and adjusting their speed on the roadway accordingly.  The manuals say "*It is imperative that drivers be taught by their employers to manage the space all around their vehicles.  When things go wrong, space gives you time to think and to take action.  To have space available when something goes wrong, you need to manage space.*"

The National Safety Council teaches all drivers of any vehicle to maintain a minimum following distance of at least 4 seconds.

The standard practice taught in the industry for professional drivers encountering vehicles when approaching an intersection is to operate their vehicles in an extremely cautious manner anticipating that vehicles will be slowing, stopping or otherwise responding to other vehicles negotiating the intersection.  This especially means creating and maintaining adequate space to the front of their vehicle.

**4.     Seeing Hazards** – concerning this very important commercial motor vehicle operation standard of care, professional drivers will have more time to act if they see hazards before they become emergencies.   The Commercial Driver Handbook says …"*A hazard is any road condition or other road user (driver, bicyclist, pedestrian) that is a possible danger…you will have more time to act if you see hazards before they become emergencies…You should always be looking for hazards – they may turn into emergencies.  Look for hazards and plan a way out of any emergency.  When you see a hazard, think about the emergencies that could develop and figure out what you would do.  Always be prepared to take action based on your plans.  In this way, you will be a prepared, defensive driver who will improve not only your own safety but the safety of all road users.*"

This concept is frequently reinforced in the industry by professional drivers being instructed to play "**What if**?" An example of this concept is, a reasonably attentive professional driver when approaching an intersection will ask themselves, "***What if the vehicle ahead of me slows significantly or brakes in response to another vehicle coming into the lane ahead of them?*** " Remember. "***Do I have enough defensive space to stop this hazard from becoming an emergency?*** " If the answer is not a clear "***Yes***", then a professional driver of a heavy-duty commercial motor vehicle must act immediately to create this vital defensive space.

**5.** **Distracted Driving -** Additionally, the Smith System teaches that one of the top ten causes of traffic collisions is in "***paying too much attention to too little***".  It is by keeping your eyes moving, scanning, and exercising proper visual search techniques that a driver can "get the big picture" and be able to see and react appropriately to everything they need to see and react to in appropriate time.  Seeing and reacting to the presence of a slower, slowing or stopped vehicle ahead would be a critical hazard for a professional driver to make sure that they are regularly paying attention to and to not allow their attention to be diverted for long periods of time away from a hazard which is available to be seen and recognized as a hazard.

In the commercial motor vehicle industry, it is imperative that drivers and companies adhere to strict standards of care to ensure public safety. These standards encompass proper training, adherence to driving hour regulations, and maintaining vehicle safety.

## Driver Training

- o Drivers must undergo thorough training programs that include both classroom instruction and practical, hands-on experience. This training should cover the operation of both automatic and standard transmission vehicles, ensuring drivers are proficient in handling all types of commercial motor vehicles.

  Drivers must be trained to understand and comply with electronic logging devices (ELDs) to track driving hours accurately. Proper use of ELDs is crucial for adhering to FMCSR regulations regarding maximum driving hours and mandatory rest breaks.

  To maintain high standards of safety, drivers should participate in ongoing education and periodic refresher courses. These courses should update drivers on the latest regulations, safety protocols, and best practices in the industry.

  Companies must evaluate the experience and skills of their drivers regularly. This includes assessments of their ability to handle various driving conditions, perform vehicle inspections, and respond to emergencies effectively.

## Driver Fitness and Fatigue Management

1. **Health and Fitness Programs**:
   - o Regular health and fitness assessments should be conducted to ensure drivers are physically capable of performing their duties safely. This includes monitoring for conditions such as sleep apnea, which can affect alertness and reaction times.
2. **Fatigue Management Plans**:
   - o Companies should implement fatigue management plans that go beyond FMCSR requirements. These plans could include measures such as controlled rest environments, scheduling practices that minimize long periods of consecutive driving, and encouraging drivers to report fatigue without fear of reprisal.

## Applicable FMCSR

The FMCSR provides a comprehensive regulatory framework for commercial motor vehicle operations. Key regulations applicable to this case include:

1. **49 CFR § 392.3**: Ill or Fatigued Operator - Prohibits driving a commercial motor vehicle when the driver is impaired by fatigue or illness.
2. **49 CFR § 395.3**: Maximum Driving Time - Limits driving hours to prevent fatigue-related accidents.
3. **49 CFR § 396.3**: Inspection, Repair, and Maintenance - Mandates systematic inspection, repair, and maintenance of commercial motor vehicles.

## Virginia State Laws

Virginia state laws also apply to the operation and regulation of commercial motor vehicles:

1. **Code of Virginia § 46.2-812**: Prohibits driving a commercial motor vehicle beyond the permissible driving hours.
2. **Code of Virginia § 46.2-341.20:2**: Requires the use of ELDs for accurate recording of duty status.

**Daniel L. Cramer**:
- **Driving Hours**:
  - The deposition reveals ambiguity regarding Mr. Cramer's adherence to the 11-hour driving limit. His logs indicated compliance, yet his inability to recall specifics suggests potential violations of FMCSR § 395.3. Additionally, his claim of using a co-driver, who was never physically present, raises significant concerns about the accuracy and integrity of his log records.
  - Cramer's testimony about his driving hours was inconsistent. He could not definitively state the number of hours he had been driving before the incident, which is critical under FMCSR § 395.3, requiring drivers to adhere strictly to regulated driving hours to prevent fatigue.
- **Training and Fatigue**:
  - Although Mr. Cramer received initial training, his knowledge and application of electronic logging devices (ELDs) and hours of service regulations appeared inadequate. He was unsure about the exact details of his driving hours, suggesting a lack of effective ongoing training and oversight by his employer.
  - Fatigue likely played a role in the incident. FMCSR § 392.3 prohibits operating a commercial vehicle while impaired by fatigue. Mr. Cramer's inability to remember key details, coupled with the timing of the accident (early morning hours), supports the likelihood of fatigue contributing to the collision.

**AV Leasing, LLC and Triton Logistics, Inc.**:
- **Oversight and Maintenance**:
  - These companies are responsible for ensuring that their drivers comply with FMCSR regulations and that vehicles are properly maintained as per FMCSR § 396.3. The deposition highlights potential gaps in supervision and training.
  - The use of a co-driver in logs without actual physical presence indicates a breach of regulatory compliance and company policies. This practice undermines the integrity of log records and raises questions about the company's adherence to safety standards.
  - The companies failed to enforce adequate supervision and oversight mechanisms. Despite Cramer's extensive driving history, there were lapses in ensuring he adhered to rest periods and accurately logged his hours, (otherwise referred to as log falsification) as evidenced by the inconsistencies in his testimony.

- **Training and Policies**:
  - Both AV Leasing and Triton Logistics have a duty to provide ongoing training and enforce strict policies regarding driving hours and logbook accuracy. The deficiencies in Mr. Cramer's understanding and application of these rules point to inadequate training and supervision.
  - The companies did not adequately monitor or enforce their fatigue management policies, as required by industry standards and FMCSR. Effective fatigue management plans should have been in place to prevent such incidents, including regular health assessments and adherence to driving hour limits.

**Summary**

Given the evidence, it is clear that multiple breaches of duty occurred, contributing to this collision. Mr. Cramer's failure to adhere to driving hours and potential fatigue, coupled with inadequate oversight by AV Leasing and Triton Logistics, demonstrates a lack of adherence to industry standards and FMCSRs.

The collision involving Daniel Cramer's Freightliner truck and the party bus driven by Antonio L. Wiggins was a catastrophic event resulting in significant loss of life and numerous injuries. Key factors contributing to this tragic accident include the failure to adhere to driving hour regulations, inadequate management of driver fatigue, and insufficient oversight by the responsible companies.

Respectfully submitted,

V. Paul Herbert, C.P.S.A.
President