EXHIBIT
D



# Transcript of Daniel L. Cramer

**Date:** May 8, 2024
**Case:** Futrell -v- Cramer

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

1        UNITED STATES DISTRICT COURT

2      FOR THE EASTERN DISTRICT OF VIRGINA

3            (ALEXANDRIA DIVISION)

4    ----------------------------x

5    TOWANDA R. FUTRELL,              :

6        Plaintiff,                   :    Case No.

7     vs.                             :    4:23-cv-00118-JKE-DEM

8    DANIEL L. CRAMER, et al.,        :

9        Defendants.                  :

10   ----------------------------x

11

12

13         Deposition of DANIEL L. CRAMER

14              Conducted Virtually

15            Wednesday, May 8, 2024

16                 2:11 p.m. EST

17

18

19

20   Job No.: 536847

21   Pages: 1 - 104

22   Recorded By: Richard Kurwitz

1          Deposition of DANIEL L. CRAMER, held virtually.

2

3

4

5

6

7

8

9

10

11

12

13        Pursuant to Notice, before Richard Kurwitz,

14   Notary Public, in and for the Commonwealth of

15   Virginia.

16

17

18

19

20

21

22

1                  A P P E A R A N C E S

2

3    ON BEHALF OF THE PLAINTIFF:

4         CHRISTOPHER M. FITZPATRICK, ESQUIRE

5         MORGAN & MORGAN (DC)

6         1901 Pennsylvania Avenue, NW

7         Suite 300

8         Washington, DC 20006

9         Phone: 202.772.0560

10        (Present via videoconference)

11

12   ON BEHALF OF PLAINTIFF AND THIRD-PARTY DEFENDANTS -

13   FUTRELL'S PARTY ADVENTURES AND WIGGINS:

14        ANGELA MACFARLANE, ESQUIRE

15        HARMAN CLAYTOR CORRIGAN WELLMAN

16        P.O. Box 70280

17        Richmond, Virginia 23255

18        Phone: 804.622.1125

19        (Present via videoconference)

20

21

22

1           A P P E A R A N C E S (Continued)

2

3   ON BEHALF OF THE DEFENDANT - DANIEL L. CRAMER:

4         SHAWN A. VOYLES, ESQUIRE

5         MCKENRY DANCIGERS DAWSON, P.C.

6         192 Ballard Court

7         Suite 305

8         Virginia Beach, Virginia 23462

9         Phone: 757.461.2500

10        (Present via videoconference)

11

12  ON BEHALF OF DEFENDANT - AV LEASING:

13        TERRENCE L. GRAVES, ESQUIRE

14        SAND ANDERSON

15        919 E Main Street

16        Suite 2300

17        Richmond, Virginia 23219

18        Phone: 804.783.7276

19        (Present via videoconference)

20

21

22

1                    C O N T E N T S

2    EXAMINATION OF DANIEL L. CRAMER              PAGE

3         By Mr. FitzPatrick                         6

4         By Mr. Graves                             91

5

6    RE-EXAMINATION OF DANIEL L. CRAMER           PAGE

7         By Mr. FitzPatrick                        96

8

9

10                   E X H I B I T S

11                    (None marked.)

12

13

14

15

16

17

18

19

20

21

22

1              P R O C E E D I N G S

2              THE REPORTER:  I am a notary authorized

3     to administer oaths and this deposition will be

4     recorded by electronic means.  All parties

5     understand and agree that any certified transcript

6     produced from the recording of this proceeding is

7     intended for all uses permitted under applicable

8     procedural and evidentiary rules and laws and

9     shall constitute written stipulation.

10             The parties stipulate to the use and

11    certification of this testimony consistent with

12    applicable law of such.  Hearing no objection, I

13    will now swear the witness.

14    Whereupon,

15                  DANIEL L. CRAMER,

16    being first duly sworn or affirmed to testify to

17    the truth, the whole truth, and nothing but the

18    truth, was examined and testified as follows:

19        EXAMINATION BY COUNSEL FOR THE PLAINTIFF

20    BY MR. FITZPATRICK:

21        Q    All right.  Good afternoon, Mr. Cramer.

22    My name is Chris -- Christopher FitzPatrick.  I'm

1  an attorney with Morgan & Morgan, and we represent

2  the Plaintiff, Towanda Futrell, with regard to

3  this lawsuit.

4       Today I'm going to be asking you a series of

5  questions regarding a very tragic incident that

6  occurred on December 16th, 2022.  And I'm going to

7  be asking you to keep your voice up and to listen

8  to the question that's asked.  And I want to

9  remind you that you're under oath under the

10  penalties of perjury; you understand that?

11      A    I do.

12      Q    Okay.  If at any time you want to take a

13  break because you're not feeling well or you have

14  to go to the bathroom, just let me know and I'll

15  stop the deposition; okay?

16      A    Okay.

17      Q    How old are you, sir?

18      A    62.  I just had a birthday in March, so

19  --

20      Q    Okay.  And where are you presently

21  employed?

22      A    Meadowview Rehab -- Health and Rehab.

1    Q    And what do you do for them?

2    A    I -- I work two jobs.  I'm also employed

3    at HCI, which is another -- it's a -- it's a

4    nursing home.  They're both nursing homes.

5    Q    And when did you start working for them?

6    A    I think back in December.

7    Q    December of 2023?

8    A    Correct.

9    Q    Okay.  And how long you -- were you

10   driving a vehicle before this incident in December

11   of 2022?

12   A    Approximately 15 years.

13   Q    And you were trained in how to drive a

14   tractor trailer?

15   A    Did you ask if I was trained?

16   Q    Yes.

17   A    Yes.

18   Q    Okay.  Who is AV Leasing?

19   A    I don't know.

20   Q    You don't -- they're the owner of the

21   car -- the owner of the truck?

22   A    That's unknown to me.

1          MR. VOYLES:  Objection.  Asked and

2   answered.

3   BY MR. FITZPATRICK:

4       Q    Okay.  You don't -- you don't know whose

5   truck you were driving; is that your testimony,

6   sir?

7       A    My testimony is that I was employed by

8   Triton and as far --

9       Q    Triton?

10      A    -- as I know, I was driving their truck.

11      Q    How do you spell that?

12      A    T-R-I-T-O-N.

13      Q    T-R-I-T-O-N.  Okay.  And how long were

14  you employed with Triton?

15      A    I think approximately two years.  I was

16  employed there and then left and then came back.

17      Q    Okay.  Let's go back to your training.

18  When did you receive training on how to drive an

19  18 wheeler?  I understand this was an 18 wheeler;

20  correct?

21      A    Yes.

22      Q    Okay.  When did you -- when did you

1    receive --

2         A    Back in --

3         Q    -- training?

4         A    -- in 2006.

5         Q    Okay.  And how old were you in 2006?

6         A    How old was I?

7         Q    Yes.

8         A    I'd have to do the math.  I was born in

9    '61, so --

10        Q    So 44, 45 -- 45 years old?

11        A    Yeah.  Whatever the math is.

12        Q    Okay.  About 45 years old.  And did you

13   ever drive a truck before 2006?

14        A    No.

15        Q    Okay.  What did you do before 2006?

16        A    I was a nurse.

17        Q    I -- I'm sorry?

18        A    I was a nurse.

19        Q    Nurse.  Okay.  And how long were you a

20   nurse for?

21        A    Approximately 15 years.

22        Q    Okay.  And where were you a nurse?

1       A      Lansing, Michigan.

2       Q      Where in Lansing, Michigan?  What --

3    what was the name of the company who worked for --

4    the healthcare organization that you were a nurse?

5       A      Well, I worked for several companies.

6    Most notably -- I'm trying to remember the

7    hospital that I worked at -- Lansing General.

8       Q      Lansing General?

9       A      Yeah.  And that was -- that was bought

10   out by Ingham Regional.

11      Q      Okay.  I want to get back to your

12   training in 2006; okay?  Can you explain to me

13   what training you had in 2006?

14      A      I went through ABC Testing & Training.

15      Q      What's that, I'm sorry?

16      A      ABC Testing & Training.

17      Q      Okay.

18      A      I -- as I recall, it was in Hoover,

19   Michigan.

20      Q      In where -- what -- can you keep up your

21   voice, sir?  Where in Michigan?

22      A      Hoover, H-O-O-V-E-R, if I remember

1   right.

2       Q    Okay.

3       A    And what type -- what did that training

4   consist of?  Can you be very -- more specific?

5       Q    Well, they teach you how to drive a semi

6   truck, you know, how to back up, how to go

7   forward, how to do the paperwork, you know, the --

8   how to manage your logbook.

9       A    Okay.  And explain to me what they did

10  with regard -- with an 18 wheeler, don't you have

11  a -- it's a -- it's a crankshaft?  It's a shift --

12  it's a shift?

13      Q    I'm sorry?

14      A    How do you operate the 18 wheeler?

15  Isn't there but -- gears?  Isn't there a

16  gearshift, a crankshaft type of thing?

17      Q    Well, those are -- those are two

18  different things.  If you're asking me if they had

19  an automatic transmission or if it has a standard

20  transmission; is that what you're asking?

21      A    I'm asking you that -- which -- back in

22  2006 and whether you were trained on both of them?

1      Q    I was trained on both.

2      A    Okay.  And you --

3      Q    I --

4      A    You were also trained that you could not

5  drive for a certain amount of time.  You could

6  only log in hours and only be on the road for a

7  certain amount of hours at a shift?

8      Q    Correct.

9      A    Okay.  And on the date of this incident,

10  is it true or not true that you were -- you

11  exceeded the hours that you were on -- that you

12  were allowed to drive that day?

13      Q    I'm -- I'm not -- I'm not sure about

14  that question.

15      A    Well, let me ask you this.  When you --

16  let's go -- go back to Triton.  You worked for

17  Triton, all right?  Did Triton have certain

18  policies when you became employed there two years

19  before this incident regarding only be on the road

20  for a certain amount of hours, and if so, what was

21  that amount of hours?

22      Q    I -- I followed Triton's policy to the

1    letter.

2        A    Okay.  Is it your testimony that you

3    followed the policies to the T and to the law in

4    this particular case in being on the -- at -- on

5    the road for a certain amount of hours?

6            MR. VOYLES:  Object to form.  Go ahead

7    and answer.

8            THE WITNESS:  I -- I'm still not

9    following the -- the question.  I -- I -- I -- I

10   just said --

11   BY MR. FITZPATRICK:

12       Q    I'll make it -- I'll make it easy for --

13   how many hours are you allowed to be on the road?

14   Let's make it easy.

15       A    11 hours.

16       Q    I'm talking per day.

17       A    Yeah.

18           MR. VOYLES:  Asked and answered.

19           THE WITNESS:  11 hours.

20   BY MR. FITZPATRICK:

21       Q    How many hours?

22       A    11.

1      Q    11 hours.  And on the day of this

2  incident, this happened kind of in the morning, it

3  was 1:30, police report it as 1:38 a.m.; correct?

4      A    Probably.

5      Q    Okay.  That's what the police report

6  says; have you reviewed the police report?

7           MR. VOYLES:  Object to form.

8           THE WITNESS:  I haven't seen it.

9  BY MR. FITZPATRICK:

10     Q    Okay.  So you received training also at

11 this company; correct?

12          MR. GRAVES:  Object to form.  That's

13 unclear as to --

14          MR. FITZPATRICK:  Well --

15          MR. GRAVES:  -- what you're talking

16 about --

17          MR. VOYLES:  Joined.

18 BY MR. FITZPATRICK:

19     Q    Well, let's go back.  What type of

20 training did you receive -- did you receive

21 similar training with this company that -- on how

22 to operate an 18 wheeler that you did back in

1  2006?

2       A    No.

3       Q    Okay.  You didn't receive any training?

4            MR. VOYLES:  Objection.

5  BY MR. FITZPATRICK:

6       Q    Did you -- did you receive training with

7  regard to how many hours that you could be on the

8  road and operate a vehicle -- a 18 wheeler?

9            MR. VOYLES:  Objection.  Asked and

10  answered.  Go ahead and answer.

11            THE WITNESS:  I -- I was -- I was

12  trained how to operate the -- the Qualcomm, the

13  electronic logbook.  I was -- I was trained on

14  that as -- if that's your -- that's your question.

15  BY MR. FITZPATRICK:

16       Q    All right.  Was there a policies and

17  procedures -- written procedures and policies as

18  to how long you could be on the road?  I think you

19  said 11 hours; correct?

20            MR. VOYLES:  Objection.  Asked and

21  answered.  Go ahead and answer.

22            THE WITNESS:  Correct.

1   BY MR. FITZPATRICK:

2       Q    Okay.  Where did you -- where were you

3   coming from that day?  Where was -- when did you

4   first -- when did you first start driving that

5   truck that day?

6       A    I -- it was -- I started that shift at

7   the rest area just east of the Pilot.

8       Q    No, I'm not asking that shift there.

9   I'm asking the day before, when did you start

10  driving that vehicle without an eight hour rest?

11          MR. GRAVES:  Objection.

12          MR. VOYLES:  Objection to form.

13          THE WITNESS:  I -- I'd have to look at

14  my logbook.  I -- I don't -- I don't recall any --

15  I mean, that's a year-and-a-half ago.

16  BY MR. FITZPATRICK:

17      Q    You don't remember stating to the police

18  that you were -- you were driving over the time

19  that you were supposed to be?

20          MR. VOYLES:  Object to form.

21          THE WITNESS:  I don't recall saying

22  that.

1   BY MR. FITZPATRICK:

2       Q    You don't recall saying that in any --

3   to your supervisors as well.  Is that --

4            MR. VOYLES:  Same objection.

5   BY MR. FITZPATRICK:

6       Q    Is that your testimony?

7       A    I didn't -- I didn't talk to my

8   supervisor.

9       Q    Okay.  So I'm asking you a specific

10  question, sir.  And I'm just going to ask you an

11  approximate time as to when you started driving

12  that day -- that -- the day before without a rest.

13  That's a simple question.  And you can give

14  general approximate times if you don't know.

15           MR. GRAVES:  Objection to form.

16           MR. VOYLES:  Same objection.  Go ahead

17  and answer.

18           THE WITNESS:  I never started driving

19  without a rest period.

20           MR. FITZPATRICK:  That's an a -- that's

21  -- that's -- move to strike as non-responsive.

22  BY MR. FITZPATRICK:

1      Q    I'm asking you an approximate time of

2   when for the first time you started driving that

3   truck and when did you have a rest before -- a

4   rest being more than around seven to eight hours

5   before this incident that happened at 1:00 -- 1:38

6   a.m.

7      A    I --

8           MR. GRAVES:  Objection.  Compound

9   question.  That two questions, Chris.  You -- you

10  got to break it down.

11  BY MR. FITZPATRICK:

12     Q    I'll just break it down.  When did you

13  -- when did you -- when -- first question is when

14  did you begin driving?  That's one question -- I'm

15  going to ask you to answer that approximately --

16  on the day of December 15th?

17     A    This happened on the 16th; right?

18     Q    Correct.  So I'm asking you on the 15th.

19  This happened at 1:38 a.m.

20     A    Yeah.  Again, I'd have to look at my

21  logbook.  I don't remember the -- the time on

22  that.

1      Q    All right.  You knew about this

2    deposition, sir.  You knew that this was going to

3    be a very important question that we would need to

4    know.

5              MR. VOYLES:  Objection to form there.

6    No.  Hold on.  There is no duty.

7              MR. FITZPATRICK:  This is --

8              MR. VOYLES:  And that -- that it --

9    first of all, it's not a question, that's a

10   comment, and it requires no response from my

11   client.

12             MR. FITZPATRICK:  Well, I'm going to --

13   I'm going to continue to ask him the question.

14             MR. VOYLES:  And he -- he has -- he has

15   -- he has no -- hold on.  He has no duty to --

16             MR. FITZPATRICK:  This is being evasive.

17   We've got to get the judge on the phone.  We have

18   to.  This is the whole crux of the case.  This is

19   the whole crux of his case.  He's giving evasive

20   answers and he's saying, I don't remember.  And

21   people were killed.  People were severely injured.

22   And he's got those answers.  He knows those

1  answers.  And -- and we're entitled to get those

2  answers and he's under oath.

3          MR. VOYLES:  That was all commentary

4  from you.

5          MR. FITZPATRICK:  It is.

6          MR. VOYLES:  I understand your -- I

7  understand your position.

8          MR. FITZPATRICK:  It is commentary.  I

9  have every right to have a comment.

10          MR. VOYLES:  My -- my client has

11  provided his best recollection and he has answered

12  the question.  If you feel the need to get the

13  judge on the phone --

14          MR. FITZPATRICK:  He hasn't answered any

15  -- he just says I don't remember.

16          MR. VOYLES:  Again --

17          MR. FITZPATRICK:  I got my logs.

18          MR. VOYLES:  That -- that is --

19          MR. FITZPATRICK:  That's not an answer.

20          MR. VOYLES:  Absolutely.  That's

21  absolutely --

22          MR. FITZPATRICK:  That's not an answer.

1            MR. VOYLES:  -- what he said and -- and

2    that is his answer.

3    BY MR. FITZPATRICK:

4        Q    You testified before, sir, that it was

5    11 hours; correct?  That is the policy, you cannot

6    be driving longer than 11 hours; correct?

7        A    Correct.

8        Q    All right.  What did you inform the

9    police at the accident scene?

10           MR. VOYLES:  Objection.  Go ahead and

11    answer.

12           THE WITNESS:  What -- what -- I -- I

13    don't -- you said what did I inform the police?

14    BY MR. FITZPATRICK:

15       Q    Yeah.

16       A    Regarding what?

17       Q    I'm going to ask you a general question

18    regarding -- I'm going to ask you a specific.

19    What -- what -- let's go back.  I'll move -- I'll

20    -- I'll withdraw that answer -- I mean, that

21    question.  When you spoke to the police after this

22    tragic incident, okay, did you ever inform them

1  that -- that you were driving more than 11 hours?

2          MR. VOYLES:  Objection.  Asked and

3  answered.

4          THE WITNESS:  I don't think so.

5  BY MR. FITZPATRICK:

6      Q    Okay.  You didn't tell anybody that;

7  correct?  Is that what your testimony is?

8          MR. VOYLES:  Objection to form.

9          THE WITNESS:  I can't recall it coming

10  up.

11          MR. FITZPATRICK:  Okay.

12          THE WITNESS:  Are -- are you --

13          MR. VOYLES:  Just answer --

14          THE WITNESS:  You're talking about the

15  police or are you talking about --

16          MR. FITZPATRICK:  All right so what did

17  you --

18          MR. VOYLES:  Just answer the question.

19          THE WITNESS:  Are you talking about the

20  police or are you talking about the safety bureau?

21  BY MR. FITZPATRICK:

22      Q    I'm talking about what -- what -- what

1  discussions -- what did you inform the police?

2  Did you inform the police that you were not

3  driving more than 11 hours or were -- did -- did

4  you inform that you were driving over 11 hours?

5         MR. VOYLES:  Objection to form.  This

6  has been asked and answered multiple.

7         MR. FITZPATRICK:  I know, but it's just

8  unacceptable with the tragic deaths of these

9  people and the tragic injuries of my client that

10 he's -- he's saying he doesn't remember anything.

11 That's --

12        MR. VOYLES:  Move to strike -- move to

13 strike this commentary.  I understand your

14 feelings, but he has provided his answers multiple

15 times.

16 BY MR. FITZPATRICK:

17    Q    Mr. Cramer, can you -- do you have your

18 logbooks with you?

19    A    No.

20    Q    Who has those logbooks?

21    A    Triton.

22    Q    Okay.  Have you ever asked them for a

1    copy of those -- those logbooks?

2        A    No.

3            MR. VOYLES:  Objection.  Form.

4    BY MR. FITZPATRICK:

5        Q    Okay.  You don't see -- you don't

6    remember where you were the day before; is that

7    what your testimony is, on December 15th?

8            MR. VOYLES:  Asked and -- asked and

9    answered.  Go ahead and answer again.

10           THE WITNESS:  No.  I don't remember the

11   -- the -- I -- I recall where I believe I picked

12   that load up in Missouri, if I remember right.

13   St.  Louis, as I recall.  But where I was the day

14   before at any certain exact time, no.

15   BY MR. FITZPATRICK:

16       Q    What did you review before your

17   deposition today?

18       A    I didn't review anything.

19       Q    Okay.  Don't you think it's important

20   before a deposition that you review your logs,

21   where you started and how long you were driving?

22           MR. VOYLES:  Objection.  These are --

1          MR. FITZPATRICK:  That's a fair --

2          MR. VOYLES:  -- these are -- these are

3    inappropriate questions.

4          MR. FITZPATRICK:  This is a fair

5    question.

6          MR. VOYLES:  These are -- no.  These are

7    -- these are --

8          MR. FITZPATRICK:  Then --

9          MR. VOYLES:  -- not designed --

10         MR. FITZPATRICK:  -- I'll withdraw the

11   question.  I'll ask --

12         MR. VOYLES:  These are not designed to

13   get facts.  These are just for commentary.

14   BY MR. FITZPATRICK:

15      Q    Okay.  When -- when was the last time

16   you ever looked at those logs, sir?

17      A    The date of the accident.

18      Q    Okay.  And what did they reflect?

19         MR. VOYLES:  Objection.  Go ahead and

20   answer.

21         THE WITNESS:  That I was legal, That I

22   was driving in accordance with DOT

1  responsibilities.

2  BY MR. FITZPATRICK:

3      Q    What do you mean you were legal?

4      A    I mean the electronic log showed that I

5  was legally driving.

6      Q    What do you mean legally driving?

7      A    I don't know how to explain it.  Legally

8  driving.

9      Q    What is -- legally driving within the

10 time frame of the amount of hours that you could

11 drive?  Is that what that the -- the logs would

12 reflect?

13     A    That's correct.

14          MR. VOYLES:  Objection.

15 BY MR. FITZPATRICK:

16     Q    That's correct, that the logs would

17 reflect that you were you were -- you were driving

18 within the 11-hour limitation; correct?  Is that

19 what you're saying?

20     A    Yes.

21     Q    Before you testified that you had -- you

22 can't -- you can't recollect at all about -- I

1    asked you three times about that, about the 11

2    hours.  And you said you couldn't recall, and you

3    couldn't recall what the log said.

4         A    Yeah.

5              MR. VOYLES:  No --

6              MR. FITZPATRICK:  Is that --

7              MR. VOYLES:  -- you don't --

8              MR. VOYLES:  -- mischaracterizes -- hold

9    on.  That mischaracterizes his testimony.

10             MR. FITZPATRICK:  So -- I don't think it

11   -- I'll ask the question clearly because that's

12   exactly what he testified to.  So --

13   BY MR. FITZPATRICK:

14        Q    Sir, I asked you before whether you had

15   been driving more than 11 hours.  So we'll go

16   back.  And you said you didn't recall; is that

17   correct?

18             MR. VOYLES:  Objection to form.  That

19   also mischaracterizes his testimony.

20             MR. FITZPATRICK:  But how does it?

21   Because that's exactly what he said.

22             THE WITNESS:  All right.  So I'll --

1    I'll -- let me clarify.

2    BY MR. FITZPATRICK:

3        Q    All right.

4        A    My electronic logs show that I was

5    driving legally.

6        Q    Okay.  But I asked you to define

7    legally, and I've gotten evasive answers.

8        A    I don't know -- I don't understand how I

9    could define it any more than legally.

10       Q    Okay.  Legally, those logs will show

11   that you were driving either 11 hours or less than

12   11 hours.  Yes or no?

13       A    That's correct.

14       Q    Okay.

15       A    Yes.

16       Q    So you didn't violate any policy at all

17   of driving more than 11 hours?

18       A    That's correct.  According --

19       Q    Haven't --

20       A    -- to -- according to my electronic

21   logs.

22       Q    Okay.  But you said that you never

1    reviewed the electronic logs.  And you haven't

2    reviewed them since the accident?  So --

3         A     I don't have to --

4         Q     -- do you remember --

5         A     -- review them to know that I was

6    driving legally.  You were asking me specific hour

7    questions, which I don't have the answers to.  But

8    I know that I was driving legally according to the

9    Triton's policy.

10        Q     Okay, but -- This testimony is

11   completely has continuously changed, three, four,

12   five different times.  And I just ask simple

13   questions, sir, just simple.  I'm going to ask

14   them again, so we go through this again; okay?

15             MR. VOYLES:  Let me -- hold on.  Let me

16   object here to, again, your commentary, Mr.

17   Fitzpatrick, is not designed to get at facts.  It

18   is simply your comments which are now bordering on

19   harassing the witness.

20             MR. FITZPATRICK:  No, my -- my thing --

21   my comments is to get facts, to make sure we ask

22   the right questions and the right facts.  So we're

1    going to go through it again; okay?  We're going

2    to go through it again because I've gotten

3    different answers for the same questions, and I've

4    rephrased them.

5    BY MR. FITZPATRICK:

6        Q    So Mr. Cramer, were you driving more

7    than 11 hours between December 15 and December 16?

8    Yes or no?

9             MR. VOYLES:  Objection to form.  Go

10   ahead and answer.  If you can.

11   BY MR. FITZPATRICK:

12       Q    Yes or no question.

13       A    First off, I could drive more than 11

14   hours and still be legal --

15       Q    You --

16       A    -- so --

17       Q    Let's go back again because you --

18            MR. VOYLES:  Please do not --

19            MR. FITZPATRICK:  -- testified before --

20            MR. VOYLES:  Please do not --

21            MR. FITZPATRICK:  All right.

22            MR. VOYLES:  -- interrupt the witness

1   when he's --

2              MR. FITZPATRICK:  All right.

3              MR. VOYLES:  -- giving an answer.

4              THE WITNESS:  So your -- your question,

5   I -- I'm not sure that you understand how logbooks

6   work.

7   BY MR. FITZPATRICK:

8        Q    Well, let's go back and I'll ask the

9   questions again.  Is it your company's policy,

10  which you previously stated, and if I'm -- if I'm

11  incorrect, let me know.  Isn't your -- your policy

12  of your company that you cannot be driving more

13  than 11 hours?  Yes or no?

14             MR. VOYLES:  Asked an answer.  Go ahead

15  an answer.

16  BY MR. FITZPATRICK:

17       Q    Just yes or no.

18       A    Our -- our electronic log --

19       Q    Just yes -- yes.  Just yes or no.

20             MR. VOYLES:  Do not tell --

21             MR. FITZPATRICK:  It's just --

22             MR. VOYLES:  -- my witness how to

1    answer.  He may answer how he chooses.

2              MR. FITZPATRICK:  It's a yes or no

3    question.

4              MR. VOYLES:  Go ahead and answer, Mr.

5    Cramer.

6              THE WITNESS:  Well, now, I forgot the

7    question.

8    BY MR. FITZPATRICK:

9        Q    Is it your company's policy that you

10   cannot drive or be on the road for more than 11

11   hours?  Yes or no?

12       A    Is it my company's policy that we can't

13   be on the road more than 11 hours?

14       Q    Without a rest, without a rest.

15       A    I was driving legally according to my

16   electronic logs.

17       Q    Yeah, but that's --

18             MR. FITZPATRICK:  Move to strike,

19   nonresponsive.

20   BY MR. FITZPATRICK:

21       Q    Is there a company policy that states --

22   which you testified, yes, there was, I just want

1  to make sure that's true -- whether you could not

2  be on the road for more than 11 hours without at

3  least a seven-hour to eight-hour rest?

4      A    Well, again, I -- I don't think you

5  understand logs.

6      Q    I'm not asking about logs.  I'm asking

7  about policies of the company.  Not logs,

8  policies.

9      A    Well, first off, with -- with split

10 logs, if you're driving as a team, you don't have

11 to have that kind of a break.  So you can drive

12 legally after only a five-hour or I -- break --

13     Q    I'm not asking --

14     A    -- so --

15     Q    -- hypotheticals.  I'm not asking -- I'm

16 asking --

17     A    I mean --

18     Q    -- in general.

19     A    You are asking a hypothetical --

20     Q    Okay.

21     A    -- because there's not one answer for

22 that.  Each driver --

1      Q     I'm not asking each driver.  I'm asking

2  you, sir.  You.

3      A     Each driver without using a split log,

4  can only drive 11 hours.

5      Q     Okay.  Did you have a split log.  And

6  can you define what a split log is?

7      A     A split log is if you have a codriver,

8  then you can drive with a smaller break and -- and

9  utilize those hours.

10     Q     Did you have a codriver that particular

11 day?

12     A     On my electronic log, I did.

13     Q     Okay.  And who was that codriver?

14     A     I think his name was David Sykes.

15     Q     Was David Sykes in the vehicle at the

16 time your vehicle made contact and crashed into

17 the party bus?

18     A     No.

19     Q     Okay.  When was the last time that Mr.

20 Sykes was in that vehicle?

21     A     Never.

22     Q     Never.  Okay.  And so then my next

1    question is: When -- approximately when, since you

2    said it's been two years -- approximately when did

3    you begin driving?  You said it was in Missouri

4    that you were driving on December 15.

5         Is that correct or not correct?

6         A    I didn't say that.

7         Q    All right.  Then what -- then -- then

8    please clarify.  Where did you start out on

9    December 15?

10        A    Again, you're asking me that question,

11   without looking at my logs, I couldn't tell you.

12   I -- I don't know.

13        Q    You don't remember what state you

14   started out at?

15        A    You're asking me if I started there on

16   the 15th.  I don't know if I started either on the

17   15th or the 14th.

18        Q    Well, where do you -- where do you

19   remember being?  A day before this accident?

20        A    You're -- you're -- you're asking me to

21   remember something I don't remember.

22        Q    Okay.  Sir --

1      A    I picked the load up, I believe, in St.

2  Louis, Missouri, either on the -- probably on the

3  14th, but I can't remember it.

4      Q    Okay.

5      A    It may have been --

6      Q    On the --

7      A    -- on the 14th, but --

8      Q    -- on the 14th, so on the --

9      A    -- I don't remember.

10      Q    -- on the 15th -- did you sleep at any

11  time the night of the 14th or on the 15th?

12      A    Yes.

13      Q    Okay.  And when did you sleep?  And

14  where did you sleep?

15      A    Well, I slept at the rest area that I

16  was referencing previously just before I started

17  my shift.  Or that's -- that's probably not the

18  only place I stopped.  I'm -- I'm surprised you

19  don't have my logbook.

20      Q    Where -- where -- where is -- where did

21  you stop, sir?

22      A    I stopped at the rest area just east of

1    the Pilot.  I -- I can't give you the exit number

2    anymore.  And I -- I slept there.

3         Q    Okay.  What state was that in?

4         A    In Virginia.  I was only on the road for

5    a half an hour --

6         Q    Okay.  So what time --

7              MR. VOYLES:  Please -- please stop

8    interrupting when he's is giving an answer.

9    BY MR. FITZPATRICK:

10        Q    What time did you approximately arrive

11   in Virginia and what time did you --

12   approximately, so you're not held any exact time.

13   Just approximately, what time did you arrive in

14   Virginia at that rest stop and go to sleep?  And

15   what time did you wake up to drive?

16        A    Probably -- I don't know 6:00 or 7:00,

17   probably.

18        Q    That -- 6:00 or 7:00 that evening?

19        A    Yes.

20        Q    Okay.  And when was the last time you

21   slept before that?

22        A    Again, I'd have to look at my logbook.

1      Q    Okay.  Well, what -- what is your normal

2  practice, to sleep during the day or at night?

3           MR. VOYLES:  Object to form.

4           THE WITNESS:  I don't really have a

5  normal practice.  It changes.  I -- I -- I pick

6  the safest route and the safest time to drive.

7  BY MR. FITZPATRICK:

8      Q    Okay.  Were you under the -- there was a

9  certain investigation that was done by the police

10 department regarding open prescription drugs that

11 were found in your truck.  Were you taking any

12 prescription drugs at the time of this incident?

13     A    No.

14     Q    Okay.  Were there any drugs in your car

15 at all at the -- any prescription drugs that were

16 -- that were in your vehicle.

17     A    Metformin.

18     Q    Not formally, I'm sorry?

19     A    Metformin.

20     Q    Metformin.  Okay.

21     A    Well, yeah --

22     Q    That's a -- that --

1       A       -- metformin.

2       Q       That's a drug for diabetes; correct?

3       A       That's one of its uses.

4       Q       Okay.  Was there any other types of

5  prescription drugs that you had in your -- in your

6  vehicle?

7       A       I can't remember.  I don't think so.  I

8  -- I -- I don't -- I don't think there was.

9       Q       Okay.  Who are the names of your doctors

10  that you're under the care of?

11      A       I can't remember the doctor --

12      Q       Back -- back in 2022.

13      A       Right.  I can't remember the doctor's

14  name.

15      Q       Do you remember the doctor who was

16  treating you?  What was he treating, for your

17  diabetes?

18      A       No.  I'm not diabetic.

19      Q       Okay.  What -- what was he prescribing

20  metformin for then?

21      A       I was taking testosterone replacement

22  therapy.

1        Q     Okay.  And --

2        A     And metformin has a lot of different

3   effects on your body, not just diabetes.

4        Q     Okay.  And what effects were occurring

5   to your body at that time?

6        A     I -- I stopped taking the -- the

7   metformin, which --

8        Q     But I'm asking what effects -- let me --

9   what condition did you have back in December 2022?

10       A     Low testosterone.

11       Q     Okay.  Was this for an enhanced sexual

12  performance?

13       A     Test --

14             MR. VOYLES:  Object --

15             THE WITNESS:  The testosterone?

16             MR. VOYLES:  Object to form.

17  BY MR. FITZPATRICK:

18       Q     When it was -- testosterone therapy.

19       A     It helps to rebuild your body.

20       Q     Okay.  Can you be more specific?

21       A     That's -- it helps to -- it helps to

22  rebuild your entire body.  That's what

1    testosterone does.

2         Q    Okay.  I understand.  So you had low

3    testosterone; correct?  Back in December 2022?

4         A    Yes.

5         Q    Who diagnosed you with that?

6         A    It's an online company, like a Viking.

7         Q    Okay.  What doctor diagnosed you?

8         A    Again, I don't recall.

9         Q    Okay.  This is only two years ago.  Let

10   me ask you this, how long -- how -- how long are

11   your treatment -- how long was your treatment for

12   testosterone therapy?

13        A    I think it was three months.

14        Q    Okay.  And you would still have those

15   records, or you would know where to find those

16   records; correct?

17        A    Probably.  I could probably get them

18   from the company.

19        Q    Okay.  Well, there's a doctor that

20   treated you; correct?

21        A    Yes.

22        Q    Okay.  Where did you -- who was your

1    internist, your internal medicine doctor back in

2    December of 2022?

3        A    I don't have a doctor.

4        Q    Okay.  Well, where do you go to see when

5    you're -- when you're -- when you're sick before

6    the --

7        A    I don't get sick.

8        Q    Well, let me ask you this: What medical

9    treatment did you ever have at all five years

10   before this accident?

11       A    I have a DOT physical that's required.

12       Q    Okay.  And what doctor do you go see --

13   do you go see for that?

14       A    You'd have to look at my DOT records.

15       Q    Okay.  So it's your testimony, sir,

16   under oath, that you don't go see any doctors at

17   all.  You can't remember the doctors, and if you

18   do, you just can't remember who they are.  Is that

19   -- is that your testimony for the last five years?

20   A year before this accident and even four years,

21   is that your testimony?  I just want to be clear.

22            MR. VOYLES:  Objection.  Asked and

1    answered.  Objection to form.  Go ahead and

2    answer.

3            THE WITNESS:  First, I'm a nurse.

4    Secondly, no, I don't have a general practitioner

5    physician or an internal medicine physician.  The

6    only physicians or nurse practitioners I've seen

7    for the five years prior to that was from my DOT

8    physicals.

9    BY MR. FITZPATRICK:

10        Q    Who prescribed the metformin?

11            MR. VOYLES:  Objection.  Asked and

12    answered.

13            THE WITNESS:  I -- I just -- I just told

14    you who.

15    BY MR. FITZPATRICK:

16        Q    What's the name of the doctor?  It'd be

17    on your --

18            MR. VOYLES:  Asked and answered.

19    BY MR. FITZPATRICK:

20        Q    It's on your prescriptions.

21        A    I have -- I have no access to any of

22    that.  It's all in my truck.

1      Q    Yeah.  So you said you were a nurse;

2   correct?  But nurses are treated by -- by doctors

3   or are also treated by other nurses; correct?

4      A    That's a statement.  I -- I -- what are

5   you asking?

6      Q    It's a -- it's -- it's a question.

7      A    What's your question?

8      Q    Well, you said you're -- are you

9   licensed to practice nursing in -- you're in

10  Alabama; correct?

11     A    Correct.

12     Q    Are you a licensed nurse in Alabama?

13     A    Correct.

14     Q    You are.  And when did you get your

15  license in nursing?

16     A    I got my -- my original nursing license,

17  so I think in '92 in Michigan, and I transferred

18  it down here.

19     Q    Okay.  So let me ask you this: Where did

20  you get the -- what pharmacy did you get the

21  metformin from?

22     A    What pharmacy?

1      Q      Yes.

2      A      I got it in the mail from the pharmacy

3   that they -- the online company uses.

4      Q      I know, but online company still have to

5   go through a pharmacy.  So I'm asking you what

6   pharmacy?  Was it Walgreens?  Was it CVS?  Was it

7   --

8      A      I don't -- I don't know.

9      Q      -- third -- third party?  Do you still

10  get that prescription?

11     A      No.

12     Q      When did you stop getting the

13  prescription?

14     A      That's the only prescription I ever got.

15     Q      You never received any prescriptions for

16  any -- any other thing that could cause fatigue or

17  any other mind altering or physical fatigue,

18  mental fatigue or causing you to be sleepy at all?

19            MR. VOYLES:  Objection to form.  Go

20  ahead and answer.

21  BY MR. FITZPATRICK:

22     Q      Back in -- back in December 2022.

1     A     I don't -- I don't even understand the

2     question.  You said any other -- you said any

3     other -- I don't take any prescriptions that cause

4     fatigue or -- or mental confusion or anything.

5     I'm -- I'm not sure what -- when you say other, I

6     don't understand the question.

7         Q     Have you ever taken pain killers at all

8     at least -- let's say a year before this accident?

9         A     When you say pain killers, do you mean

10    Tylenol --

11        Q     Pain killers that --

12        A     -- or an ibuprofen?

13        Q     -- that could -- that could make you

14    sleepy.  That's hydrocodone, Vicodin, things such

15    as that.

16        A     No.

17        Q     Okay.  And you've never taken those

18    drugs a year prior to this incident, and you

19    weren't under the influence of those at the time

20    of --

21        A     Correct.

22        Q     Okay.  And it's your testimony the only

1  drug that was prescribed to you that you don't

2  remember the doctor, you don't remember the

3  pharmacy, was metformin; correct?

4      A    That's correct.

5      Q    Okay.  Did the police ever question you

6  after this accident regarding prescriptions that

7  they found open in your -- in your truck?

8      A    No.

9      Q    Okay.  Did anybody ever investigate

10  that, either your insurance company, your

11  employer, or anybody?

12      A    No.

13      Q    Have you ever been treated for alcohol

14  or drug abuse?

15      A    No.

16      Q    Okay.  So I want to take you back to

17  this incident.  You said that you got to Virginia

18  at 6:00 or 7:00; correct?

19          MR. VOYLES:  Objection to form.

20          THE WITNESS:  You're -- you're -- you're

21  asking -- you're asking me a question that -- that

22  -- I didn't get to Virginia.  I got to the rest

1  stop.

2  BY MR. FITZPATRICK:

3      Q    Which you said was in Virginia.  I did

4  want to clarify.

5      A    Right.  But that's when I got into

6  Virginia.  That's when I got to the rest stop in

7  Virginia.

8      Q    Okay.  So you got to the rest stop in

9  Virginia approximately 6:00 to 7:00 p.m.; correct?

10 And where was that rest stop?  Once again, for the

11 record.

12     A    Well, I think it was about five miles

13 east of the Pilot where I circled around to get

14 fuel.

15     Q    Five mile east of the Pilot.  Okay.  And

16 you slept there for approximately how long?  Six

17 or five -- five, six hours?

18     A    Yeah.

19         MR. VOYLES:  Objection to form.  Asked

20 and answered.

21         THE WITNESS:  As I recall, that's --

22 that's --

1    BY MR. FITZPATRICK:

2         Q    And how long --

3         A    That's --

4              MR. VOYLES:  Please go ahead and answer.

5              THE WITNESS:  Yeah.  As I recall, that's

6    -- that's approximately how long.

7    BY MR. FITZPATRICK:

8         Q    And how long were you on the road prior

9    to that?  Prior to get to the rest stop over the

10   Virginia line with -- only very close to this

11   accident scene.

12        A    Yeah.

13        Q    How long prior to that were you on the

14   road for?

15        A    I -- I need to look at my log book.

16        Q    Do you remember when you started out?

17        A    No.

18        Q    Okay.  But do you think it was the day

19   before in Saint Louis?  So let me ask this: What

20   state did you --

21             MR. VOYLES:  Hold on.  Objection to

22   form.  I don't know if that was a question or --

1  or --

2          MR. FITZPATRICK:  It was.  I'm going to

3  ask him to clarify.

4  BY MR. FITZPATRICK:

5      Q    You started out in Saint Louis on the

6  14th; correct?

7          MR. VOYLES:  Objection to form.  It's

8  been asked and answered probably five times by

9  now.  Go ahead and answer again.

10         THE WITNESS:  What -- I'm not sure what

11 the question is.  Are you asking me what day I

12 picked up in Saint Louis?  Is that --

13 BY MR. FITZPATRICK:

14     Q    Yeah.  What was your -- what would --

15 what did you pick up in St.  Louis?

16     A    I picked up a load of alcohol.  I'm not

17 sure what -- what it was.  I picked it up -- I

18 think it was at the Budweiser plant, or a number.

19     Q    Okay.  And what states did you drive

20 through?

21     A    All.  Are -- are you -- on this -- on

22 this specific one or --

1      Q     Each state.  Which state did you --

2      A     -- or in general?

3      Q     From the time you started out, that's

4   late on the 14th or 15th, all the way to the time

5   you got to Virginia.  What states do you recall

6   driving?

7      A     I'd have to look at a map.  I'm sorry, I

8   -- I guess I probably took 70 across.  So that's a

9   lot, Illinois, Indiana, and then I probably

10  dropped down to --

11     Q     Kentucky?

12     A     Yeah.  Probably through Kentucky, and

13  then --

14           MR. VOYLES:  Don't -- don't guess.  If

15  you don't know, you don't know.

16           THE WITNESS:  Yeah.  Well, I -- I'm just

17  trying to mentally figure out the -- the route,

18  but yeah, I -- I couldn't.  I'd have to look at a

19  map.

20  BY MR. FITZPATRICK:

21     Q     You said you had a co-driver.  Was that

22  co-driver ever in that vehicle at any time from

1   the time you left --

2            MR. VOYLES:  Objection.

3   BY MR. FITZPATRICK:

4       Q   -- Saint Louis to the time you got to

5   that rest stop in Virginia?

6            MR. VOYLES:  Asked and answered.  Go

7   ahead and answer it.

8            THE WITNESS:  Yeah.  As I stated, he was

9   never in the truck.

10  BY MR. FITZPATRICK:

11      Q   Okay.  At any time between the time you

12  started in Saint Louis to the time of the

13  accident; correct?

14      A   At any time ever.

15      Q   Okay.  So I'm just curious as to why you

16  brought up a co-driver.  If he wasn't involved at

17  all, it wasn't picked up at all.

18      A   Because that's -- that's how Triton runs

19  their electronic logs.

20      Q   Okay.  Was there a specific time that

21  you were supposed to pick him up in Virginia or

22  someplace else?

1        A     I've never met him.  No.

2        Q     So you didn't have a specific time or

3    specific destination that he was going to start

4    driving your truck; right?

5        A     That's correct.

6        Q     So what time did you leave the rest stop

7    area?  Approximate.

8              MR. VOYLES:  Objection to form.  What

9    rest stop area are we talking about?

10             MR. FITZPATRICK:  The one in -- the one

11   he said that he slept in Virginia, and it was very

12   close to the accident scene and that he got up, he

13   rested, he slept, he got up, and then he left.

14             THE WITNESS:  I'm -- I'm -- I'm having

15   to mentally recreate the time here, but I'm going

16   to guess.

17             MR. VOYLES:  Hold on.  I -- I don't want

18   you to guess.  You -- testify as what you know.

19   BY MR. FITZPATRICK:

20       Q     Approximate.  The incident happened at

21   1:38 a.m.

22       A     Yeah.  I was -- I was driving for

1    approximately a half an hour.  So probably a half

2    an hour before that.

3          Q    Around 1:00 a.m. or about -- between

4    1:00 a.m. and 1:10 a.m.; correct?  Somewhere

5    around that time.  What were the weather

6    conditions?

7          A    Perfect.

8          Q    Perfect.  It wasn't sleeting or raining

9    or anything like that.

10         A    Correct.

11         Q    Okay.  And at 1:00 a.m., 1:38 a.m.,

12   you're saying that it was perfect; correct?

13         A    Yes.

14         Q    Okay.  And if your question -- withdraw

15   it.

16         A    I'm sorry?

17         Q    Withdraw -- I withdraw the question.

18   That evening, my client informed me that it was

19   severely raining and sleeting and icing that

20   night, just at the time shortly before this

21   incident.  Would she be wrong about that, sir?

22               MR. VOYLES:  Objection to form.  Asked

1  and answered.

2          THE WITNESS:  That's not how I recall

3  it.

4  BY MR. FITZPATRICK:

5      Q    Yeah.  Your -- your recollection, it was

6  perfect weather.  That's what you said, perfect

7  weather; right?

8      A    Correct.

9      Q    Okay.  And at the time of this incident,

10  you were saying that it was perfect weather too;

11  correct?

12          MR. VOYLES:  Asked and answered multiple

13  times, no.

14  BY MR. FITZPATRICK:

15      Q    What was your visibility?  Was it clear?

16      A    Yes.

17      Q    Was it raining and sleeting prior to

18  this incident that you recall?  You went to -- at

19  the time, you went to bed or got up?

20      A    Well, if it had been raining or sleeting

21  while I was asleep, I wouldn't know that.

22      Q    I'm asking you at the time you went to

1    bed or time you got up.

2        A    I don't recall weather being an issue.

3        Q    Okay.  If I told you that the police

4    report checks off number right next to fog and

5    mist, he checks off -- the police officer checks

6    it off.  Would he be wrong, the police officer?

7            MR. VOYLES:  Objection to form.

8    Improper question.  Asked and answered.

9    BY MR. FITZPATRICK:

10       Q    Have you reviewed the police report,

11   sir?

12           MR. VOYLES:  Asked and answered.

13           THE WITNESS:  I haven't -- I've never

14   seen the police report.

15   BY MR. FITZPATRICK:

16       Q    Oh, I'm going to show it.  I'm going to

17   show it to you.  We're going to through it.

18           MR. VOYLES:  Objection to the sort of

19   line of questioning.

20   BY MR. FITZPATRICK:

21       Q    I'm going to share my screen.  And hold

22   on a second.  Okay.  Do you see that?

1          MR. VOYLES:  So for the record, I'm

2    going to object to any questions regarding a

3    report.  That is not admissible.  That should not

4    be asked to the witness and that the witness did

5    not author, nor has he never seen it.

6          MR. FITZPATRICK:  I'm just asking

7    whether he's reviewed it.  And --

8          MR. VOYLES:  He's already answered that.

9          MR. FITZPATRICK:  And whether he's

10   disagreed -- whether he disagrees with the fact of

11   -- let me see this.

12   BY MR. FITZPATRICK:

13     Q    Where it says, roadway surface

14   condition.  Police officer checks off wet.  Okay.

15   A weather condition, he checks off looks like

16   mist, either fog or mist.  Okay.  I just want to

17   be sure that you've looked at that, and from your

18   recollection, it was perfectly clear there wasn't

19   -- weather wasn't a factor at all; correct?

20         MR. VOYLES:  Asked and answered multiple

21   times.

22   BY MR. FITZPATRICK:

1      Q      I'm going to ask him to answer it again.

2      A      Weather was not a consideration.

3      Q      Okay.  How far was it from the rest stop

4   to the point of the incident?

5      A      From the -- from the rest stop?

6      Q      Yes.  How many miles?

7      A      Approximately 30 or 25, I'm -- I'm going

8   to guess.

9      Q      Okay.  When you -- when you were

10  working, you were working within the -- the

11  permission, the scope of employment of your

12  employer; correct?  And that was Triton,

13  T-R-I-T-O-N; correct?

14     A      Correct.

15     Q      Where is their corporate headquarter?

16     A      I believe it's in Romeoville, Illinois.

17     Q      Romeoville, where's that?

18     A      Near Chicago.

19     Q      It's called Romeo -- how do you spell

20  that?

21     A      R-O-M-E-O-V-I-L-L-E.

22     Q      R-O-M-E-V-I-L-L-E, Romeville, Illinois.

1      A      Like as in Romeo and Juliet, Romeoville.

2      Q      Romeoville.  Got it.  And you were

3 working within the permission scope of employment

4 of that; correct?

5      A      Correct.

6      Q      And you don't know whether they -- did

7 they lease this company -- lease this truck from

8 AV Leasing?  Do you know that?

9           MR. VOYLES:  Objection.  Asked and

10 answered.

11           THE WITNESS:  I -- I don't -- I don't

12 know that.

13 BY MR. FITZPATRICK:

14      Q      All right.  Aren't you supposed to know

15 everything about the vehicle that you're

16 operating?

17      A      The --

18           MR. VOYLES:  Objection.  Improper --

19 hold on a second.  It's an improper question.

20 It's not seeking any type of fact for this case.

21           MR. FITZPATRICK:  Did you look at the --

22           MR. VOYLES:  Go ahead and answer.

1    BY MR. FITZPATRICK:

2          Q     Did you look at the registration?

3          A     The registration was to Triton.

4          Q     Was with Triton -- Triton.

5          A     Triton.

6          Q     Okay.

7          A     Yeah, as far --

8          Q     So I want to get back.  Do you remember

9    what roads you took to -- just before getting to

10   the incident scene?

11         A     What was the question?

12         Q     Do you remember what roads, what

13   highways, you -- you were on say about five miles

14   out from the incident scene?

15         A     I was on I-64.

16         Q     Okay.  And how long were you on I-64

17   for?

18         A     From the moment I left the Pilot.

19         Q     Okay.  And where is I-64 -- what -- what

20   town -- I'm sorry, if I -- town or city, was that

21   rest stop area at?  Do you recall?

22         A     No.

1        Q    Okay.  Do you recall where you were --

2   withdrawn.  You were on I-64.  In what direction

3   were you going, sir?

4        A    East.

5        Q    And how many lanes of traffic of I-64

6   East?

7        A    There are three lane -- three lanes are

8   -- where -- where the accident occurred, is that

9   what you're asking or --

10       Q    Well, I'm asking just before the

11  accident occurred.  Let's say a mile out of --

12  outside of the accident scene?

13       A    Well, it -- at some point, it goes from

14  two to three lanes.

15       Q    Okay.  At the accident scene -- at the

16  accident scene, were there three lanes of traffic?

17       A    Correct.  It was a three-lane.

18       Q    Okay.  And what lane of traffic were you

19  in?

20       A    The right lane.

21       Q    Which is the -- the -- the entrance --

22  the lane as you exit to get off?  I mean, right

1     lane, or was it closest to the -- to the divider?

2        A    The -- are you talking about the divide

3     between oncoming traffic?

4        Q    Well, if you want me to put the police

5     report on, maybe that will help you.  The police

6     report's back up, so may refresh your

7     recollection.

8             MR. VOYLES:  Continue to object any

9     reference or -- or evidence provided by the police

10    report.  Go ahead and testify.

11           MR. FITZPATRICK:  Okay.  Your Honor --

12           MR. VOYLES:  Answer the questions based

13    upon your recollection, Mr. Cramer.

14           THE WITNESS:  That was --

15    BY MR. FITZPATRICK:

16        Q    I--684 [sic] East, which you said you

17    were gone for about five miles, it goes two lanes

18    into three.  This is three lanes.  The police

19    report indicates that contact was made what you're

20    describing as the -- the right lane; correct?

21    Then there's a middle, and then there's one

22    closest to the divider over here.

```
1         A     Right.

2         Q     So my question to you is --

3               MR. VOYLES:  Object to form.

4    BY MR. FITZPATRICK:

5         Q     -- did the -- did the collision occur in

6    the right lane?

7         A     As I recall.

8         Q     Okay.  And what was the flow of traffic?

9    Was it light, medium, or heavy at that time?

10        A     There was no traffic.

11        Q     There was no traffic.  And how fast was

12   your vehicle going?  Approximately how fast was

13   your vehicle going?

14              MR. VOYLES:  Are you there, Mr. Cramer?

15              THE WITNESS:  Yeah.  Didn't -- didn't I

16   answer it?

17              MR. VOYLES:  All right.  I didn't hear

18   it.

19   BY MR. FITZPATRICK:

20        Q     I haven't -- I haven't heard an answer

21   yet.  How -- how fast were you --

22        A     Oh, I'm sorry.  I -- I said between 65
```

1    and 70.

2         Q    Okay.  And what was the first time that

3    -- what was the first time that your vehicle made

4    impact with the party bus?

5              MR. VOYLES:  Objection to form.

6              THE WITNESS:  What's the question?

7    BY MR. FITZPATRICK:

8         Q    Okay.  Was there any trucks in front of

9    -- I'll withdraw that question.  Were there any

10   trucks in front of your truck at the time two to

11   three seconds before impact?

12        A    No.

13             MR. VOYLES:  Objection to form.

14   BY MR. FITZPATRICK:

15        Q    No, there was no other trucks; correct?

16        A    Correct.

17        Q    Were there any -- any trucks at all in

18   front of you between you and the party bus ten

19   seconds before impact?

20        A    I don't believe so.

21        Q    Okay.  So my question to you, sir, is,

22   if you had, what you're saying is clear vision and

1  normal weather conditions according to you, and

2  you're going over 60 miles an hour, why did you

3  not see the party bus directly in front of me?

4          MR. VOYLES:  Objection to form.  Go

5  ahead and answer.

6          THE WITNESS:  That's unknown.

7  BY MR. FITZPATRICK:

8      Q    What do you mean unknown?

9      A    I mean, I don't understand why I didn't

10  see it.

11     Q    Were you sleeping at the time?  Did you

12  fall asleep at the wheel at the time of this

13  incident?  Yes or no?

14     A    No.

15     Q    You're under oath, and you're saying no;

16  correct?

17     A    Correct.

18          MR. VOYLES:  Objection to form.  Asked

19  and answered.

20  BY MR. FITZPATRICK:

21     Q    All right.  So explain to me how a party

22  bus that's very large, very long in normal

1   conditions and is unknown how you don't see that?

2           MR. VOYLES:  Objection to form.  Asked

3   and answered.  Go ahead and answer.

4           THE WITNESS:  Again, I -- I can't

5   explain it.  I don't know.

6   BY MR. FITZPATRICK:

7       Q    Sir, my client's the grandmother of one

8   of the individuals father's who was killed in that

9   -- on that bus that night.  And she's been looking

10  for answers for two years now as to what happened.

11          And I'm going to ask you, why can't you have

12  any explanation as -- at all as to how your

13  vehicle -- how you did not see a large vehicle

14  such as that with perfect weather -- according to

15  you, with normal weather conditions, no other

16  truck impairing your visibility.  Is -- your

17  testimony is it's still unknown; correct?

18          MR. VOYLES:  Objection to form.  We're

19  not at trial here, Mr. Fitzpatrick.  So we don't

20  need the commentary about -- about the

21  grandmother.

22          MR. FITZPATRICK:  I want make sure --

1        MR. VOYLES:  My client has provided his

2    answer multiple times.

3        MR. FITZPATRICK:  Okay.

4        MR. VOYLES:  And this is again, the

5    third or fourth time, the same question has been

6    asked.

7    BY MR. FITZPATRICK:

8    Q    Okay.  But the answer is unknown;

9    correct?  Asked and answered.  Did the party bus

10   at all -- was it just moving forward straight,

11   sir, at the time?

12   A    I -- when I saw it, I thought it was

13   stopped.  I saw it seconds before I -- before

14   impact.  And when I saw it, I thought it was

15   stopped on the road.

16   Q    Okay.  And how many feet was between

17   your vehicle and the back of the bus at the time

18   that you first saw it?

19   A    I -- I can't guess, but very few.

20   Q    Very few feet?

21   A    Correct.

22   Q    Are we talking less than 50 feet?

1      A    I didn't have time to apply my brakes or

2  swerve.

3      Q    So was the party plus moving or was it

4  stopped in a stationary position according to your

5  testimony.

6           MR. GRAVES:  Before you go further, I

7  want to make sure I heard him right.  But he said

8  or slow or -- or swerve?

9           MR. VOYLES:  He said swerve.

10          MR. GRAVES:  Swerve.  Okay.  Thank you.

11          THE WITNESS:  I'm sorry.  What was that?

12          MR. GRAVES:  No.  I -- I just need a

13  clarification of what you said, what your

14  testimony was.

15          THE WITNESS:  What -- what I said?

16          MR. GRAVES:  Yes, sir.  Your counsel

17  gave it to me.

18          THE WITNESS:  I -- I -- okay.  I -- I

19  said that it was either -- when I -- when I saw

20  it, it appeared either to be stopped or going very

21  slowly.

22          MR. GRAVES:  Yes, sir.  Thank you.

1  BY MR. FITZPATRICK:

2      Q    Okay.  Did it have any signals on?  Any

3  turn signals on?

4      A    Not that I saw.

5      Q    Did it have any flashes on?

6      A    Not that I saw.

7      Q    Okay.  Was it moving prior to when you

8  claim stopped?

9      A    That's the first time I saw it.

10     Q    Okay.  And that was only a distance of

11 50 feet.  My question to you is, from your

12 training as a truck driver, isn't your training to

13 keep a certain safe distance between your vehicle

14 and the vehicle in front of you in normal traffic

15 conditions as opposed to stop and go?

16          MR. GRAVES:  Well, before you answer,

17 I'm going to object to form because I don't recall

18 him saying it was only 50 feet.  He never gave a

19 measurement.  So I object to form.  You can answer

20 the question, Mr. Cramer.

21          MR. FITZPATRICK:  So I'll -- I'll

22 establish it.

1   BY MR. FITZPATRICK:

2       Q    How many feet was it?  Was it less than

3   50 or more than 50 feet?

4       A    Again, I can't characterize that.  The

5   -- it -- it was -- it was maybe a second, maybe

6   two seconds, that I -- that I saw it before the

7   crash.

8       Q    But it was a very close distance;

9   correct?

10      A    Yes.

11           MR. VOYLES:  Objection to form.

12  BY MR. FITZPATRICK:

13      Q    So isn't your training that you received

14  since 2006 always to make sure that you keep a

15  safe distance between your vehicle and the vehicle

16  in front of you?

17      A    Yes.

18      Q    And that didn't occur here; correct?

19           MR. VOYLES:  Objection to form.

20           THE WITNESS:  Correct.

21  BY MR. FITZPATRICK:

22      Q    Did the police issue a ticket at the

1    accident scene?

2          A    No.

3          Q    Did they -- did you inform the police

4    exactly what you're testifying here today, that

5    the vehicle, you believe, was stopped, and you

6    only saw it at a short distance?

7                MR. VOYLES:  Objection to form.

8                THE WITNESS:  Yes.

9    BY MR. FITZPATRICK:

10         Q    Okay.

11         A    Yes, I did.

12         Q    Was a field sobriety test administered

13   to you?

14         A    I -- I don't recall.

15         Q    You don't recall if the police asked you

16   to -- to -- to engage in a field sobriety test

17   with walking a straight line or blowing into a

18   breathalyzer?

19         A    I went from the truck into the

20   ambulance.  I don't recall.

21         Q    Prior to this incident, were you ever

22   arrested or convicted of DWI or driving under the

1   -- while impaired under the influence of drugs?

2       A    No.

3       Q    Have you ever been charged or convicted

4   of a felony?

5       A    No.

6       Q    You ever been charged or convicted of a

7   misdemeanor?

8       A    Yes.

9           MR. VOYLES:  Objection to form.

10  BY MR. FITZPATRICK:

11      Q    What misdemeanor were you convicted of?

12          MR. VOYLES:  Objection to form.

13          THE WITNESS:  I believe it was loud in

14  public.|

15  BY MR. FITZPATRICK:

16      Q    And when was that?

17          MR. VOYLES:  Same objection.

18          THE WITNESS:  I don't -- I don't

19  remember.  Probably around 2010, something around

20  there.

21  BY MR. FITZPATRICK:

22      Q    Was that disorderly -- was it disorderly

1    conduct or just loud in public?

2         A    I don't -- I don't recall the exact

3    charge.  It was in Marion, Indiana.

4         Q    Had nothing to do with driving a truck?

5         A    It had nothing to do with drugs or

6    alcohol.

7         Q    Okay.  That wasn't my question.  Did it

8    have something to do with driving a truck?

9         A    Did it what?

10        Q    Did it have anything to do with driving

11   or operating a truck?

12        A    No.

13        Q    Okay.  After impact occurred, what

14   happened to the party bus?  Did it go towards the

15   -- the center and the left -- and the left lane

16   towards the wall of the Interstate?

17        A    I have no idea.

18        Q    What do you mean you don't have any

19   idea?

20             MR. VOYLES:  Objection.

21             THE WITNESS:  I have no idea.

22   BY MR. FITZPATRICK:

1      Q     Okay.  Why not?

2      A     My windshield shattered.  I couldn't see

3  anything.  I -- I wound up at the -- in the ravine

4  and was there, basically, until the fire

5  department came.

6      Q     Okay.  Did EMS give you -- assist you at

7  the scene, extricate you from the truck?

8      A     No.  I was able to get out of the

9  passenger side door.

10     Q     Did you go to the hospital?

11     A     Yes.

12     Q     What hospital did you go to?

13     A     I can't really remember.

14     Q     You can't remember what hospital you

15  went to?

16           MR. VOYLES:  Asked and answered.  This

17  is all a matter of record.

18           MR. FITZPATRICK:  Just -- I'm -- I'm

19  asking you, though.

20           MR. VOYLES:  He's answered the question.

21  BY MR. FITZPATRICK:

22     Q     Okay.  So are you aware of that Montia

1    Bouie (phonetic), Xavier Evans (phonetic), and

2    Jontae Kaalib Russell (phonetic) were killed?

3            MR. VOYLES:  Objection.  What is the

4    relevance to this lawsuit --

5            MR. FITZPATRICK:  I want to know what he

6    -- whether he knows --

7            MR. VOYLES:  -- with regard to -- let me

8    finish.  What is the relevance to that fact to

9    this personal injury lawsuit?

10           MR. FITZPATRICK:  It's very relevant

11   because I'm going to ask him --

12   BY MR. FITZPATRICK:

13      Q    The next question is: When you hit the

14   back of the -- the party bus, okay, when you hit

15   that -- that -- what was the speed you were going?

16   You testified just prior to that, you were going

17   about 60 miles an hour.  Was it about 60 to 65

18   miles an hour that you crashed and you killed

19   these three individuals?

20           MR. VOYLES:  Objection to form.  This,

21   again, is a harassing question --

22           MR. FITZPATRICK:  It's not harassing.

```
 1          MR. VOYLES:  -- completely irrelevant --
 2   completely irrelevant to your client's personal
 3   injury case.
 4          MR. FITZPATRICK:  I've got -- I've got a
 5   client that's severely injured.  She lost people
 6   in this, and I've got a witness here who says that
 7   he has no idea how this accident happened.  He
 8   can't recall how it happened.  I think I'm
 9   entitled to a certain leeway as to what -- how
10   fast he was going at the time he tragically killed
11   three people and severely injured many, many more.
12          MR. VOYLES:  And he has answered your
13   question as to what speed --
14          MR. FITZPATRICK:  He hasn't answered
15   that question.
16          MR. VOYLES:  -- he was going.  He told
17   you --
18          MR. FITZPATRICK:  I'm going to ask him
19   --
20          MR. VOYLES:  -- that -- he told you
21   exactly in response to your prior question what
22   speed he was going before the accident.
```

1    BY MR. FITZPATRICK:

2        Q    Now, before -- I'm asking right at

3    impact now.  What was your speed right at impact?

4        A    Well, sir, my -- that truck is governed.

5    I can't drive it more than 68 miles an hour.

6        Q    Okay.  So were you approximately going

7    between 60 and 68 miles an hour?

8            MR. VOYLES:  Objection.  Asked and

9    answered.

10           THE WITNESS:  What I said earlier was

11   between 65 and 70.

12   BY MR. FITZPATRICK:

13       Q    Okay.  65 and 70.  That was the -- the

14   rate of speed you were going at the time of this

15   impact; correct?

16           MR. VOYLES:  Objection to form.  Go

17   ahead and answer.

18           THE WITNESS:  Well, I -- I don't recall

19   the exact speed, but yeah, that's approximately.

20   Again, the truck is governed.  It can't go over 68

21   miles an hour.

22   BY MR. FITZPATRICK:

1          Q      Okay.  And who would have knowledge of

2     that, that it can't go over 68 knowledge?  Who was

3     your supervisor at the time of this incident?

4          A      Well, they have the truck.  They can

5     just check it.

6          Q      I'm asking you, who was -- what was the

7     name of your supervisor at the time of the

8     incident?

9          A      Well, my dispatcher was Rob (phonetic),

10    but the head of the maintenance department would

11    know that.

12         Q      Well, what was Rob's last name?

13         A      I don't recall.

14         Q      Who are the people that you had to

15    report to?  This was only less than two -- this is

16    -- this -- this only occurred only a

17    year-and-a-half ago, 17 months ago.

18         A      His -- his name is Lithuanian, and so

19    it's a -- it's not a common name that I would -- I

20    would easily recall.

21         Q      Were you fired as a result of this

22    incident?

1        A     Yes.

2        Q     Why were you fired, sir?

3        A     I -- I'm -- I'm not actually sure.

4        Q     Was there a hearing or any -- any

5    disciplinary review board on this or any hearing

6    that you had or did you --

7        A     No.

8        Q     -- have a discussion with HR or

9    anything?

10        A     No.

11        Q     Okay.  Who informed you that you were

12    being terminated?

13        A     I was actually never informed of being

14    terminated.  I -- I asked if I could come back and

15    they said, no.  But this was -- I think this

16    occurred in February.

17        Q     Did you give the same statements that

18    you're giving to me that you gave to your

19    employer?

20        A     I'm sorry?

21             MR. VOYLES:  Objection.  Objection to

22    form.

1          THE WITNESS:  What was your question?

2     BY MR. FITZPATRICK:

3          Q     Did -- did you give the same statements

4     that you're giving today under oath, did you give

5     those same statements to your employer?

6          A     They never asked.

7          Q     They never asked?  They just terminated

8     you; correct?

9          A     Well, they -- they terminated me after

10    whatever it was, eight weeks.

11         Q     Eight weeks that you were out on -- for

12    medical leave?

13         A     I wasn't out on medical leave.

14         Q     What was the eight weeks that you were

15    out on?  Were you just -- were you on some kind of

16    administrative suspension?  What was the eight

17    weeks?

18         MR. VOYLES:  Objection to form.

19         THE WITNESS:  Well, approximate.  I

20    don't know what the exact time period was.  And

21    then I couldn't drive, I was injured.

22    BY MR. FITZPATRICK:

1      Q    Okay.  So after eight weeks of recovery,

2  you contacted them about returning and they said

3  no?

4      A    Again, I don't know that it was eight

5  weeks.

6      Q    Approximately eight weeks.  You said

7  eight weeks before.  I'm going to ask you

8  approximately eight?

9      A    Well --

10          MR. VOYLES:  I believe -- hold on.  Hold

11  on.  I don't know where the eight weeks came from.

12  He said February.

13  BY MR. FITZPATRICK:

14      Q    Okay.  So February is about eight weeks;

15  right?

16      A    Yeah.  And, you know, again, you're --

17  you're trying to pin an exact time on me and I --

18      Q    I'm not.  I'm not.  If it's nine weeks

19  --

20      A    Okay, good.

21      Q    So you're saying eight to ten weeks,

22  somewhere in there?  Seven to ten weeks; correct?

1       A    Yeah, somewhere in that time period they

2    informed me that -- prior to that, I had

3    anticipated coming back.

4       Q    Did they send you a letter?

5       A    No.

6       Q    They never sent you a letter?

7       A    No.

8       Q    Did you ever contest your termination?

9       A    No.

10       Q    Did you have a prior driving record at

11    all, this was speeding, reckless driving?  Failing

12    to --

13            MR. VOYLES:  Objection.  Objection to

14    form.

15    BY MR. FITZPATRICK:

16       Q    -- have proper maintenance on your

17    vehicle or anything else?

18       A    I'd have to look at my driving record.

19    I -- I've driven millions of miles, so --

20       Q    Have you gotten speeding tickets?

21            MR. VOYLES:  Objection to form.

22            THE WITNESS:  I don't recall getting a

1  speeding ticket, but again, over 15 years,

2  millions of miles, I may have.

3  BY MR. FITZPATRICK:

4      Q    What about reckless driving?

5           MR. VOYLES:  Objection to form.

6           THE WITNESS:  No.

7  BY MR. FITZPATRICK:

8      Q    Okay.

9      A    I don't -- I don't believe so.

10     Q    All right.  What about issues,

11 violations with issues with operating your truck,

12 maintenance, safety issues with your truck?

13          MR. VOYLES:  Objection to form.  Go

14 ahead and answer.

15          THE WITNESS:  I -- I may have gotten a

16 safety violation.  But it's -- again, I'd have to

17 refer to my -- my driving record.

18 BY MR. FITZPATRICK:

19     Q    Were there any safety violations at all

20 regarding this particular truck a week before this

21 accident or a month before this?

22     A    No.  In fact, it had just -- it had just

1    been through the shop.

2         Q    Okay.  What shop was it -- was it last

3    repaired at?

4         A    The -- Triton maintains its own repair

5    shop.

6         Q    Okay.  Were you conscious after this

7    accident?

8         A    Yes.

9         Q    Okay.  And the police were -- the police

10   were questioning you on the scene?

11           MR. VOYLES:  Objection to form.  You can

12   answer.

13           THE WITNESS:  No.  I don't recall them

14   questioning me at the scene.

15   BY MR. FITZPATRICK:

16        Q    When did they question you?

17        A    At the hospital.

18        Q    Okay.  And do you remember what officer

19   questioned you?

20        A    No.

21        Q    How many officers were there?

22        A    Two.

1        Q     What did you state to the police?

2        A     Pardon?

3        Q     What did you state to the police?

4        A     I -- you mean, what was my statement?

5        Q     Yeah, what did you state to them?

6        A     Regarding what?

7        Q     How the incident occurred?

8        A     I told them the same thing I just told

9   you.

10       Q     That you had no idea how the incident

11  occurred just prior, you didn't recall ever seeing

12  him; is that correct?

13       A     Correct.

14       Q     And it's unknown as to what happened;

15  right?

16       A     Correct.

17       Q     Did you tell the police it's unknown,

18  quote, unquote, it's unknown as to how this

19  happened?

20       A     I --

21             MR. VOYLES:  Objection to form.

22             THE WITNESS:  -- I don't know the

1    terminology I used.

2    BY MR. FITZPATRICK:

3        Q     Did you take photographs of your truck

4    at all at the -- after this accident or a day or

5    two later?

6        A     No.

7        Q     You never took one photograph?

8        A     The police kept my phone.

9        Q     Okay.  Were you texting at all prior to

10   this incident?

11       A     No.

12       Q     Who's your -- who was your cell phone

13   provider?

14       A     Verizon, I believe.

15       Q     Were you on the phone prior to this at

16   --

17       A     No.

18       Q     -- right at the time, a minute or two

19   before impact?

20       A     No.

21       Q     Was anyone in your vehicle at all, in

22   your truck?

1       A    No.

2       Q    Do you recall what the party bus looked

3  like before impact?

4       A    I -- I know it was black.

5       Q    Did you have your windshield wipers on?

6       A    I don't recall.

7       Q    It wasn't wet?  It wasn't misty or

8  foggy?

9            MR. VOYLES:  Asked and answered.

10  BY MR. FITZPATRICK:

11       Q    Okay.  Was -- was the -- was the truck

12  totaled?  Do you have any knowledge of that?

13       A    I -- I have no knowledge of that.

14       Q    And the last time you worked for this

15  company was that -- that day, December 16th;

16  correct?

17       A    Correct.

18       Q    Were you paid out after December 16th?

19       A    As I recall, yes.

20       Q    Did you receive workers' compensation?

21       A    I received the equivalent of that.

22       Q    What do you mean by the equivalent?  Was

1    it direct pay by your company or was it a workers'

2    compensation care?

3        A    It was workmen's comp for self-employed

4    people.  It's not specifically workmen's comp.

5    It's -- it's something that's similar to that, but

6    it's for -- for contracted labor.

7        Q    And you were paid sometime until

8    February; correct?

9        A    I believe so.  I don't know the exact

10   dates.

11       Q    Do you know the weight, how -- of your

12   vehicle?

13       A    You'll have to be more specific.  The --

14       Q    Well --

15       A    -- the weight --

16       Q    What --

17       A    -- empty or the weight loaded?

18       Q    Were you carrying alcohol and -- and you

19   said a load of alcohol was picked up in Saint

20   Louis.  Is that what you're carrying?

21       A    Correct.

22       Q    And how many -- what was the weight of

1  that?

2      A    Again, a -- are you talking about the --

3  the -- the total weight or the weight of the load

4  --

5      Q    Of the --

6      A    Or the weight of the vehicle?

7      Q    The weight of the load, the weight of

8  the vehicle.  Start with the weight of the vehicle

9  and then the weight of the vehicle, then the

10  weight of the load.

11      A    The -- the weight of the load was

12  approximately, I think it was -- I don't want to

13  guess.  I -- I can't recall.  I think the -- I

14  think my gross weight was -- I don't want to

15  guess.

16      Q    Well, I don't want you to guess.  Do you

17  know who would have that information?  Would your

18  logs have that information, regarding the weight?

19      A    Yeah.  I -- I scaled the load, so I know

20  it was a legal load.

21      Q    And the only supervisors you remember

22  was a -- a gentleman by the name of Rob?

1      A      He was my dispatcher, correct.

2      Q      Well, who was your direct truck

3  supervisor?

4      A      My interface with the company was

5  through Rob.  He may have had a boss.  I don't

6  know the name of -- of his boss.  If you're asking

7  me the name of the person who terminated me, I --

8  I would assume it was the owner of the company.

9  But I don't -- I don't really know that.

10     Q      Who's the owner of the company?

11     A      I can't remember his name.

12     Q      He's the owner and president.

13     A      I can't -- I can't remember his name.

14            MR. FITZPATRICK:  All right, I have no

15  further questions.  Subject to Terrance's

16  questions or Angela's questions.

17  EXAMINATION BY COUNSEL FOR THE DEFENDANT - AV LEASING

18  BY MR. GRAVES:

19     Q      My name is Terrence Graves, and I

20  represent AV Leasing in -- in this litigation.

21  Just got a couple of questions for you.

22     A      Yes, sir.

1      Q     Then, you said you were employed by

2  Triton and as far as you know, you were driving

3  their truck; is that -- is that accurate?

4      A     Yes, sir.

5      Q     All right.  Were you a 1099 employee or

6  a W-2 employee?

7      A     1099.

8      Q     All right, so -- so you got a 1099 as a

9  self-ins -- I'm sorry, as a self-employed driver;

10 is that correct?

11     A     Yes, sir.

12     Q     Okay.  Did you have an entity that you

13 utilized to get your 1099 through?

14     A     Are you asking me if I had an LLC?

15     Q     Yeah, an LLC or -- or -- or an S

16 corporation or some sort of other entity?

17     A     Yes.  Yes, sir.  I have an LLC.

18     Q     What was the name of your LLC?

19     A     WDTC.

20     Q     WDTC.  Okay.  Does that --

21     A     That --

22     Q     -- stand for anything?

1      A     Yeah.  You're going to laugh, but it's

2  World Domination Trucking Company.  My -- my kids

3  name -- came up with the name.

4      Q     I like it.  Okay.

5            MR. FITZPATRICK:  That's WDEC, LLC?

6            THE WITNESS:  Yes.

7  BY MR. GRAVES:

8      Q     And what state is that in?

9      A     Texas.

10     Q     Is that it in Alabama?

11     A     No, it's in Texas.

12     Q     In Texas?  Okay.  All right.  Did you

13  pay your own -- did -- did -- were you responsible

14  for paying your own taxes?

15     A     That's correct.

16     Q     And did you also pay for your own fuel?

17     A     Yes, sir.

18     Q     How about insurance?  Did you pay for

19  that or did Triton pay for it?

20     A     When you say your insurance, which --

21     Q     Let me be more --

22     A     -- which --

1      Q     -- more -- more clear about that.  You

2   mentioned a workers' comp-like policy.  Did you

3   pay for that policy or did Triton pay for it?

4      A     Because I was a, you know, a contract,

5   it -- it came -- it came out of my settlement.  In

6   other words, I -- I paid for the -- paid for

7   that policy.

8      Q     Okay.  So, it may have been something

9   that Triton sent in, but it came out of your

10  money; is that fair?

11     A     That -- that's correct.  In other words,

12  I got paid by the load, X number of dollars, and

13  then any of the expenses, fuel, or the insurance

14  came out of that settlement.

15     Q     What other expenses were -- were taken

16  out of that settlement?

17     A     The -- I -- I believe the rental on the

18  electronic logbook was -- was -- was taken out.  I

19  -- I can't recall, specifically.  I'd have to --

20  I'd have to look at one of my settlement checks,

21  but -- statements, but I think that was -- that

22  was, I think, that was the only thing, as I

1    recall.

2        Q    Okay.  You know, you mentioned Rob and

3    you didn't remember his last name, but you

4    mentioned him a couple times during your

5    testimony.  Did Rob do anything other than tell

6    you where to pick up loads and where you needed to

7    take them?

8        A    I'm sorry.  Say that again.

9        Q    Sure.  Did Rob, who was your dispatcher,

10   did he tell you anything other than what loads you

11   needed to pick -- pick up, where they were

12   located, and where you needed to take them?

13       A    If you're asking me if we had personal

14   conversations, we did.  If you're asking me if --

15   if he gave me other business, that was his

16   function -- was to dispatch me, you know, in the

17   truck.

18       Q    When -- when he dispatched you, did he

19   tell you what route to take to get to your final

20   destination?

21       A    No.

22       Q    All right.  That was up to you, how you

1    got there; that fair?

2        A    Correct.  That's correct.

3        Q    That's all the questions I have for you,

4    Mr. Cramer.  Thank you.

5        A    You're welcome.

6        MR. FITZPATRICK:  Angela, do you have

7    any questions?  Is she there?

8            THE WITNESS:  Yeah.  Are --

9            MS. MACFARLANE:  I apologize at having an

10   electronic issue on -- over here.  I do not have

11   any questions.  And did just want to clarify for

12   the record, I apologize.  Earlier, I had said that

13   we represent Ms. Futrell.  I also should have

14   mentioned that we represent the third party

15   defendants, Futrell's Party Adventures and

16   Wiggins.  So I just want to put that on the

17   record.  My apologies.  But no, I don't have any

18   questions for Mr. Cramer.  Thank you.

19       RE-EXAMINATION BY COUNSEL FOR THE PLAINTIFF

20   BY MR. FITZPATRICK:

21       Q    I just have a couple more follow-ups.

22   Mr. Cramer, WTC, LLC [sic], what is that corporate

1  address, and who's the registered agent for that?

2      A    It's WDTC.

3      Q    I'm sorry, WDTC?

4      A    Yeah.

5      Q    That's W as in William, D as in David, T

6  as in Thomas, C as in cat, okay.

7      A    Yeah.

8      Q    LLC and that's --

9      A    Yes.

10     Q    -- what's the corporate address?  And

11 what's the registered agent's address?

12     A    1527 West State Highway 114, Grapevine,

13 Texas.

14     Q    What's the zip code?

15     A    76051.

16     Q    And who is the registered agent?

17     A    Are you asking who the -- the CEO is or

18 the president?

19     Q    No.  I'm asking you if the company gets

20 sued, who accepts service of process?

21     A    It's just my wife and I, so --

22     Q    So, it's you at your address, then;

1    correct?

2         A    That's the address site that we used

3    when we organized it.

4         Q    Okay.  And that's registered in Texas;

5    correct?  But you live in Alabama?  Was it also

6    registered in Virginia?

7         A    I have no association with Virginia.

8         Q    You don't do any business in Virginia?

9         A    Correct.

10        Q    But you were delivering in Virginia;

11   correct?

12        A    Correct.

13        Q    Where was your final destination in

14   Virginia?

15        A    It was in Virginia.  We have a -- we

16   have a drop yard or Triton has a drop yard there,

17   and that's where I was going.

18        Q    Do you have any insurance?  Who's your

19   insurance --

20        A    No.

21        Q    Who's your insurance company?

22        A    I don't -- the only insurance that I had

1    was through Triton.

2         Q    Okay.  So, WT -- WDTC, LLC has no

3    liability insurance company?

4         A    That's correct.

5         Q    Have you ever had an insurance company?

6              MR. VOYLES:  Objection to form.  Go

7    ahead and answer.

8              THE WITNESS:  Not through the company.

9    BY MR. FITZPATRICK:

10        Q    Well, for who?

11        A    Well, personal insurance.

12        Q    Well, I'm asking you liability insurance

13   on the truck.  When you drive trucks -- this is

14   the only truck you were driving or you were

15   driving other trucks?

16        A    This is the only truck I was driving.

17        Q    What kind of assets does WDTC, LLC have?

18   In terms of -- is it a -- I'm not asking about

19   this particular case, or any judgments about this

20   particular case.  I'm just asking, is this a

21   viable company right now?  Does it have cash right

22   now?

1      A     It has no cash and no assets.

2      Q     Okay.  And how long has that gone on

3  for?  With no cash, no assets?

4            MR. VOYLES:  Objection to form.  Go

5  ahead and answer.

6            THE WITNESS:  It's a -- it's just a

7  flow-through LLC.

8  BY MR. FITZPATRICK:

9      Q     And that's one -- I'm sorry, 1327 West

10 State --

11     A     15 -- 1527.

12     Q     1527 West State Highway, Suite 114?

13     A     No.  One -- that's Highway 114.

14     Q     Highway 114.  I'm sorry.

15     A     Right.  And it's number 292, but it's

16 just -- it's just a a box at a -- at a UPS

17 business office.

18     Q     Are you authorized to accept service on

19 behalf of WT -- WDTC, LLC, service of process?

20           MR. VOYLES:  Objection to form.  Go

21 ahead and answer.

22           THE WITNESS:  My -- my wife is -- the --

1   the answer is no.

2   BY MR. FITZPATRICK:

3       Q    Okay.  All right.  I have no further

4   questions.  Anybody else have any questions?

5              MR. GRAVES:  Nothing from me.

6              MS. MACFARLANE:  Nothing from me.

7              MR. VOYLES:  All right.  We'll read and

8   sign.

9              MR. FITZPATRICK:  I'm just going to want

10  to hang on and speak to counsel.  We're going to

11  dismiss Mr. Cramer and the court reporters can be

12  dismissed, as well.  I would just ask for an

13  electronic, as well as a hard copy.  And if Planet

14  Depos usually sends both, I'm asking you to e-mail

15  me an electronic copy and kindly send me a hard

16  copy as well.  And that's it.

17             THE REPORTER:  Okay.  Mr. Voyles --

18             MR. FITZPATRICK:  I just want to speak

19  to counsel.

20             THE REPORTER:  Mr. Voyles.

21             MR. VOYLES:  All right.  If Mr.

22  Fitzpatrick is ordering, I will take a copy, PDF

1  only, please.

2           THE REPORTER:  Mr. Graves?

3           MR. GRAVES:  I'll also take a copy.

4           THE REPORTER:  Ms. MacFarlane --

5           MR. GRAVES:  Yeah, make -- make mine an

6  E-Tran, please.

7           THE REPORTER:  E-Tran?  Yep.  Ms.

8  MacFarlane, did you need a copy?

9           MS. MACFARLANE:  Not at this time.  Thank

10 you.

11          THE REPORTER:  Okay.  Thank you.

12          (Off the record at 3:45 p.m.)

13

14

15

16

17

18

19

20

21

22

1    CERTIFICATE OF COURT REPORTER - NOTARY PUBLIC

2              I, Richard Kurwitz, the officer before

3    whom the foregoing proceedings were taken, do

4    hereby certify that any witness(es) in the

5    foregoing proceedings were fully sworn; that

6    the proceedings were recorded by me and

7    thereafter reduced to typewriting by a

8    qualified transcriptionist; that said digital

9    audio recording of said proceedings are a true

10   and accurate record to the best of my knowledge,

11   skills, and ability; and that I am neither

12   counsel for, related to, nor employed by any

13   of the parties to this case and have no

14   interest, financial or otherwise, in its outcome.

15

16   Notary Registration No.:  7978184

17   My Commission Expires:  12/31/2026

18   _____

19   _____

20   Richard Kurwitz, Notary Public, for

21   the Commonwealth of Virginia

22   May 20, 2024

```
1              CERTIFICATE OF TRANSCRIBER

2         I, Krystin Spolar, CET, do hereby certify

3   that this transcript was prepared from the digital

4   audio recording of the foregoing proceeding; that

5   said proceedings were reduced to typewriting under

6   my supervision; that said transcript is a true and

7   accurate record of the proceedings to the best of

8   my knowledge, skills, and ability; and that I am

9   neither counsel for, related to, nor employed by any

10  of the parties to the case and have no interest,

11  financial or otherwise, in its outcome.

12

13

14

15  _____

16  Krystin Spolar, CET

17  Planet Depos, LLC

18  May 20, 2024

19

20

21

22
```

*Krystin Spolar*

## A

**abc**
11:14, 11:16
**ability**
103:11, 104:8
**able**
75:8
**about**
10:12, 13:13,
15:16, 20:1,
23:14, 23:15,
23:19, 23:20,
23:22, 27:22,
28:1, 34:6,
34:7, 49:12,
54:9, 55:3,
55:21, 60:15,
61:13, 63:2,
63:17, 67:20,
76:17, 82:2,
82:14, 84:4,
84:10, 90:2,
93:18, 94:1,
99:18, 99:19
**absolutely**
21:20, 21:21
**abuse**
48:14
**accept**
100:18
**accepts**
97:20
**access**
44:21
**accident**
22:9, 26:17,
30:2, 36:19,
43:10, 43:20,
47:8, 48:6,
50:11, 53:13,
54:12, 62:8,
62:11, 62:12,
62:15, 62:16,
72:1, 77:7,
77:22, 84:21,
85:7, 87:4
**accordance**
26:22

**according**
29:18, 29:20,
30:8, 33:15,
66:1, 67:14,
69:4
**accurate**
92:3, 103:10,
104:7
**across**
52:8
**actually**
80:3, 80:13
**address**
97:1, 97:10,
97:11, 97:22,
98:2
**administer**
6:3
**administered**
72:12
**administrative**
81:16
**admissible**
58:3
**adventures**
3:13, 96:15
**affirmed**
6:16
**after**
22:21, 34:12,
48:6, 74:13,
81:9, 82:1,
85:6, 87:4,
88:18
**afternoon**
6:21
**again**
19:20, 21:16,
25:9, 30:14,
30:16, 31:1,
31:2, 31:17,
32:9, 34:4,
36:10, 38:22,
42:8, 49:10,
51:9, 59:1,
67:4, 68:4,
71:4, 76:21,
78:20, 82:4,

**agent**
82:16, 84:1,
84:16, 90:2,
95:8
**agent**
97:1, 97:16
**agent's**
97:11
**ago**
17:15, 42:9,
79:17
**agree**
6:5
**ahead**
14:6, 16:10,
16:21, 18:16,
22:10, 25:9,
26:19, 31:10,
32:14, 33:4,
44:1, 46:20,
50:4, 51:9,
53:7, 60:22,
63:10, 66:5,
67:3, 78:17,
84:14, 99:7,
100:5, 100:21
**al**
1:8
**alabama**
45:10, 45:12,
93:10, 98:5
**alcohol**
48:13, 51:16,
74:6, 89:18,
89:19
**alexandria**
1:3
**all**
6:4, 6:7, 6:21,
13:17, 16:16,
20:1, 20:9,
21:3, 22:8,
23:16, 27:22,
28:22, 29:3,
29:16, 31:21,
32:2, 36:7,
39:15, 43:9,
43:17, 44:22,
46:18, 47:7,

**allowed**
51:21, 52:4,
53:17, 58:19,
60:14, 64:17,
65:17, 66:21,
67:12, 68:10,
75:10, 83:11,
84:10, 84:19,
87:4, 87:9,
87:21, 91:14,
92:5, 92:8,
93:12, 95:22,
96:3, 101:3,
101:7, 101:21
**allowed**
13:12, 14:13
**already**
58:8
**also**
8:2, 13:4,
15:10, 28:19,
45:3, 93:16,
96:13, 98:5,
102:3
**altering**
46:17
**always**
71:14
**ambulance**
72:20
**amount**
13:5, 13:7,
13:20, 13:21,
14:5, 27:10
**anderson**
4:14
**angela**
3:14, 96:6
**angela's**
91:16
**another**
8:3
**answer**
14:7, 16:10,
16:21, 18:17,
19:15, 21:19,
21:22, 22:2,
22:11, 22:20,
23:13, 23:18,

25:9, 26:20,
31:10, 32:3,
32:14, 32:15,
33:1, 33:4,
34:21, 38:8,
44:2, 46:20,
50:4, 51:9,
53:7, 59:1,
60:22, 63:12,
64:16, 64:20,
66:5, 67:3,
68:2, 68:8,
70:16, 70:19,
78:17, 84:14,
85:12, 99:7,
100:5, 100:21,
101:1

**answered**
9:2, 14:18,
16:10, 16:21,
21:11, 21:14,
23:3, 24:6,
25:9, 44:1,
44:12, 44:18,
49:20, 51:8,
53:6, 56:1,
56:12, 57:8,
57:12, 58:8,
58:20, 60:10,
66:19, 67:3,
68:9, 75:16,
75:20, 77:12,
77:14, 78:9,
88:9

**answers**
20:20, 20:22,
21:1, 21:2,
24:14, 29:7,
30:7, 31:3,
67:10

**anticipated**
83:3

**any**
6:5, 7:12,
16:3, 17:14,
18:2, 21:14,
25:14, 29:9,
29:16, 37:10,

38:12, 39:11,
39:14, 39:15,
40:4, 43:16,
44:21, 46:15,
46:16, 46:17,
47:2, 47:3,
52:22, 53:11,
53:14, 58:2,
60:20, 63:8,
65:8, 65:9,
65:17, 67:12,
70:2, 70:5,
74:18, 80:4,
80:5, 84:19,
88:12, 94:13,
96:7, 96:11,
96:17, 98:8,
98:18, 99:19,
101:4, 103:4,
103:12, 104:9

**anybody**
23:6, 48:9,
48:11, 101:4

**anymore**
38:2

**anyone**
87:21

**anything**
24:10, 25:18,
47:4, 55:9,
74:10, 75:3,
80:9, 83:17,
92:22, 95:5,
95:10

**apologies**
96:17

**apologize**
96:9, 96:12

**appeared**
69:20

**applicable**
6:7, 6:12

**apply**
69:1

**approximate**
18:11, 18:14,
19:1, 54:7,
54:20, 81:19

**approximately**
8:12, 9:15,
10:21, 19:15,
36:1, 36:2,
38:10, 38:12,
38:13, 49:9,
49:16, 50:6,
55:1, 59:7,
64:12, 78:6,
78:19, 82:6,
82:8, 90:12

**area**
17:7, 37:15,
37:22, 54:7,
54:9, 61:21

**aren't**
60:14

**around**
19:4, 49:13,
55:3, 55:5,
73:19

**arrested**
72:22

**arrive**
38:10, 38:13

**asked**
7:8, 9:1,
14:18, 16:9,
16:20, 23:2,
24:6, 24:22,
25:8, 28:1,
28:14, 29:6,
32:14, 43:22,
44:11, 44:18,
49:19, 51:8,
53:6, 55:22,
56:12, 57:8,
57:12, 58:4,
58:20, 60:9,
66:18, 67:2,
68:6, 68:9,
72:15, 75:16,
78:8, 80:14,
81:6, 81:7, 88:9

**asking**
7:4, 7:7,
12:18, 12:20,
12:21, 17:8,

17:9, 18:9,
19:1, 19:18,
30:6, 34:6,
34:13, 34:15,
34:16, 34:19,
35:1, 36:10,
36:15, 36:20,
41:8, 45:5,
46:5, 48:21,
51:11, 56:22,
58:6, 62:9,
62:10, 75:19,
78:2, 79:6,
91:6, 92:14,
95:13, 95:14,
97:17, 97:19,
99:12, 99:18,
99:20, 101:14

**asleep**
56:21, 66:12

**assets**
99:17, 100:1,
100:3

**assist**
75:6

**association**
98:7

**assume**
91:8

**attorney**
7:1

**audio**
103:9, 104:4

**author**
58:5

**authorized**
6:2, 100:18

**automatic**
12:19

**av**
4:12, 8:18,
60:8, 91:17,
91:20

**avenue**
3:6

**aware**
75:22

**B**

**back**
8:6, 9:16,

9:17, 10:2,
11:11, 12:6,
12:21, 13:16,
15:19, 15:22,
22:19, 28:16,
31:17, 32:8,
40:12, 41:9,
42:3, 43:1,
46:22, 48:16,
61:8, 63:6,
68:17, 76:14,
80:14, 83:3
**ballard**
4:6
**based**
63:12
**basically**
75:4
**bathroom**
7:14
**beach**
4:8
**became**
13:18
**because**
7:13, 28:11,
28:21, 31:2,
31:17, 34:21,
53:18, 70:17,
76:11, 94:4
**bed**
56:19, 57:1
**been**
24:6, 28:15,
36:2, 37:5,
48:13, 51:8,
56:20, 67:9,
68:5, 73:3,
73:6, 85:1, 94:8
**before**
2:13, 8:10,
10:13, 10:15,
13:19, 17:9,
18:12, 19:3,
19:5, 22:4,
25:6, 25:14,
25:16, 25:20,
27:21, 28:14,

31:19, 36:19,
37:16, 38:21,
43:5, 43:10,
43:20, 47:8,
50:19, 55:2,
55:20, 61:9,
62:10, 65:11,
65:19, 68:13,
69:6, 70:16,
71:6, 77:22,
78:2, 82:7,
84:20, 84:21,
87:19, 88:3,
103:2
**begin**
19:14, 36:3
**behalf**
3:3, 3:12, 4:3,
4:12, 100:19
**being**
6:16, 14:4,
19:4, 20:16,
36:19, 57:2,
80:12, 80:13
**believe**
25:11, 37:1,
59:16, 65:20,
72:5, 73:13,
82:10, 84:9,
87:14, 89:9,
94:17
**best**
21:11, 103:10,
104:7
**between**
31:7, 53:11,
55:3, 63:3,
64:22, 65:18,
68:16, 70:13,
71:15, 78:7,
78:11
**birthday**
7:18
**black**
88:4
**blowing**
72:17
**board**
80:5

**body**
41:3, 41:5,
41:19, 41:22
**book**
50:15
**bordering**
30:18
**born**
10:8
**boss**
91:5, 91:6
**both**
8:4, 12:22,
13:1, 101:14
**bought**
11:9
**bouie**
76:1
**box**
3:16, 100:16
**brakes**
69:1
**break**
7:13, 19:10,
19:12, 34:11,
34:12, 35:8
**breathalyzer**
72:18
**brought**
53:16
**budweiser**
51:18
**bureau**
23:20
**bus**
35:17, 65:4,
65:18, 66:3,
66:22, 67:9,
68:9, 68:17,
74:14, 76:14,
88:2
**business**
95:15, 98:8,
100:17

---
**C**

**called**
59:19

**came**
9:16, 75:5,
82:11, 93:3,
94:5, 94:9,
94:14
**can't**
23:9, 27:22,
33:12, 37:3,
38:1, 40:7,
40:11, 40:13,
43:17, 43:18,
67:4, 67:11,
68:19, 71:4,
75:13, 75:14,
77:8, 78:5,
78:20, 79:2,
90:13, 91:11,
91:13, 94:19
**cannot**
22:5, 32:12,
33:10
**car**
8:21, 39:14
**care**
40:10, 89:2
**carrying**
89:18, 89:20
**case**
1:6, 14:4,
20:18, 20:19,
60:20, 77:3,
99:19, 99:20,
103:13, 104:10
**cash**
99:21, 100:1,
100:3
**cat**
97:6
**cause**
46:16, 47:3
**causing**
46:18
**cell**
87:12
**center**
74:15
**ceo**
97:17

| | | | |
|---|---|---|---|
| certain | clarify | common | consideration |
| 13:5, 13:7, | 29:1, 36:8, | 79:19 | 59:2 |
| 13:17, 13:20, | 49:4, 51:3, | commonwealth | consist |
| 14:5, 25:14, | 96:11 | 2:14, 103:21 | 12:4 |
| 39:9, 70:13, | claytor | comp | consistent |
| 77:9 | 3:15 | 89:3, 89:4 | 6:11 |
| certificate | clear | comp-like | constitute |
| 103:1, 104:1 | 43:21, 56:15, | 94:2 | 6:9 |
| certification | 58:18, 65:22, | companies | contact |
| 6:11 | 94:1 | 11:5 | 35:16, 63:19 |
| certified | clearly | company | contacted |
| 6:5 | 28:11 | 11:3, 15:11, | 82:2 |
| certify | client | 15:21, 32:12, | contest |
| 103:4, 104:2 | 20:11, 21:10, | 33:21, 34:7, | 83:8 |
| cet | 24:9, 55:18, | 42:6, 42:18, | continue |
| 104:2, 104:16 | 68:1, 77:5 | 46:3, 46:4, | 20:13, 63:8 |
| changed | client's | 48:10, 60:7, | continued |
| 30:11 | 67:7, 77:2 | 88:15, 89:1, | 4:1 |
| changes | close | 91:4, 91:8, | continuously |
| 39:5 | 50:10, 54:12, | 91:10, 93:2, | 30:11 |
| characterize | 71:8 | 97:19, 98:21, | contract |
| 71:4 | closest | 99:3, 99:5, | 94:4 |
| charge | 63:1, 63:22 | 99:8, 99:21 | contracted |
| 74:3 | co-driver | company's | 89:6 |
| charged | 52:21, 52:22, | 32:9, 33:9, | conversations |
| 73:3, 73:6 | 53:16 | 33:12 | 95:14 |
| check | code | compensation | convicted |
| 79:5 | 97:14 | 88:20, 89:2 | 72:22, 73:3, |
| checks | codriver | completely | 73:6, 73:11 |
| 57:4, 57:5, | 35:7, 35:10, | 30:11, 77:1, | copy |
| 58:14, 58:15, | 35:13 | 77:2 | 25:1, 101:13, |
| 94:20 | collision | compound | 101:15, 101:16, |
| chicago | 64:5 | 19:8 | 101:22, 102:3, |
| 59:18 | come | condition | 102:8 |
| chooses | 80:14 | 41:9, 58:14, | corporate |
| 33:1 | coming | 58:15 | 59:15, 96:22, |
| chris | 17:3, 23:9, | conditions | 97:10 |
| 6:22, 19:9 | 83:3 | 55:6, 66:1, | corporation |
| christopher | comment | 67:1, 67:15, | 92:16 |
| 3:4, 6:22 | 20:10, 21:9 | 70:15 | correct |
| circled | commentary | conduct | 8:8, 9:20, |
| 49:13 | 21:3, 21:8, | 74:1 | 13:8, 15:3, |
| city | 24:13, 26:13, | conducted | 15:11, 16:19, |
| 61:20 | 30:16, 67:20 | 1:14 | 16:22, 19:18, |
| claim | comments | confusion | 22:5, 22:6, |
| 70:8 | 30:18, 30:21 | 47:4 | 22:7, 23:7, |
| clarification | commission | conscious | 27:13, 27:16, |
| 69:13 | 103:17 | 85:6 | 27:18, 28:17, |

29:13, 29:18,
36:5, 40:2,
42:3, 42:16,
42:20, 45:2,
45:3, 45:10,
45:11, 45:13,
47:21, 48:3,
48:4, 48:18,
49:9, 51:6,
53:13, 54:5,
55:4, 55:10,
55:12, 56:8,
56:11, 58:19,
59:12, 59:13,
59:14, 60:4,
60:5, 62:17,
63:20, 65:15,
65:16, 66:16,
66:17, 67:17,
68:9, 68:21,
71:9, 71:18,
71:20, 78:15,
81:8, 82:22,
86:12, 86:13,
86:16, 88:16,
88:17, 89:8,
89:21, 91:1,
92:10, 93:15,
94:11, 96:2,
98:1, 98:5,
98:9, 98:11,
98:12, 99:4
**corrigan**
3:15
**could**
13:4, 13:5,
16:7, 16:18,
27:10, 29:9,
31:13, 34:1,
42:17, 46:16,
47:13, 80:14
**couldn't**
28:2, 28:3,
36:11, 52:18,
75:2, 81:21
**counsel**
6:19, 69:16,
91:17, 96:19,

101:10, 101:19,
103:12, 104:9
**couple**
91:21, 95:4,
96:21
**court**
1:1, 4:6,
101:11, 103:1
**cramer**
1:8, 1:13, 2:1,
4:3, 5:2, 5:6,
6:15, 6:21,
24:17, 31:6,
33:5, 63:13,
64:14, 70:20,
96:4, 96:18,
96:22, 101:11
**crankshaft**
12:11, 12:16
**crash**
71:7
**crashed**
35:16, 76:18
**crux**
20:18, 20:19
**curious**
53:15
**cvs**
46:6

---

**D**

**dancigers**
4:5
**daniel**
1:8, 1:13, 2:1,
4:3, 5:2, 5:6,
6:15
**date**
13:9, 26:17
**dates**
89:10
**david**
35:14, 35:15,
97:5
**dawson**
4:5
**day**
13:12, 14:16,

15:1, 17:3,
17:5, 17:9,
18:12, 19:16,
25:6, 25:13,
35:11, 36:19,
39:2, 50:18,
51:11, 87:4,
88:15
**dc**
3:5, 3:8
**deaths**
24:8
**december**
7:6, 8:6, 8:7,
8:10, 19:16,
25:7, 31:7,
36:4, 36:9,
41:9, 42:3,
43:2, 46:22,
88:15, 88:18
**defendant**
4:3, 4:12,
91:17
**defendants**
1:9, 3:12,
96:15
**define**
29:6, 29:9,
35:6
**delivering**
98:10
**department**
39:2, 75:5,
79:10
**depos**
101:14, 104:17
**deposition**
1:13, 2:1, 6:3,
7:15, 20:2,
25:17, 25:20
**describing**
63:20
**designed**
26:9, 26:12,
30:17
**destination**
54:3, 95:20,
98:13

**diabetes**
40:2, 40:17,
41:3
**diabetic**
40:18
**diagnosed**
42:5, 42:7
**different**
12:18, 30:12,
31:3, 41:2
**digital**
103:8, 104:3
**direct**
89:1, 91:2
**direction**
62:2
**directly**
66:3
**disagreed**
58:10
**disagrees**
58:10
**disciplinary**
80:5
**discussion**
80:8
**discussions**
24:1
**dismiss**
101:11
**dismissed**
101:12
**disorderly**
73:22
**dispatch**
95:16
**dispatched**
95:18
**dispatcher**
79:9, 91:1,
95:9
**distance**
70:10, 70:13,
71:8, 71:15,
72:6
**district**
1:1, 1:2
**divide**
63:2

**divider**
63:1, 63:22
**division**
1:3
**doctor**
40:11, 40:15,
42:7, 42:19,
43:1, 43:3,
43:12, 44:16,
48:2
**doctor's**
40:13
**doctors**
40:9, 43:16,
43:17, 45:2
**dollars**
94:12
**domination**
93:2
**done**
39:9
**door**
75:9
**dot**
26:22, 43:11,
43:14, 44:7
**down**
19:10, 19:12,
45:18, 52:10
**drive**
8:13, 9:18,
10:13, 12:5,
13:5, 13:12,
27:11, 31:13,
33:10, 34:11,
35:4, 35:8,
38:15, 39:6,
51:19, 78:5,
81:21, 99:13
**driven**
83:19
**driver**
34:22, 35:1,
35:3, 70:12,
92:9
**driving**
8:10, 9:5,
9:10, 17:4,

17:10, 17:18,
18:11, 18:18,
19:2, 19:14,
22:6, 23:1,
24:3, 24:4,
25:21, 26:22,
27:5, 27:6,
27:8, 27:9,
27:17, 28:15,
29:5, 29:11,
29:17, 30:6,
30:8, 31:6,
32:12, 33:15,
34:10, 36:3,
36:4, 52:6,
54:4, 54:22,
72:22, 74:4,
74:8, 74:10,
83:10, 83:11,
83:18, 84:4,
84:17, 92:2,
99:14, 99:15,
99:16
**drop**
98:16
**dropped**
52:10
**drug**
40:2, 48:1,
48:14
**drugs**
39:10, 39:12,
39:14, 39:15,
40:5, 47:18,
73:1, 74:5
**duly**
6:16
**during**
39:2, 95:4
**duty**
20:6, 20:15
**dwi**
72:22

**E**

**e-mail**
101:14
**e-tran**
102:6, 102:7

**each**
34:22, 35:1,
35:3, 52:1
**earlier**
78:10, 96:12
**easily**
79:20
**east**
17:7, 37:22,
49:13, 49:15,
62:4, 62:6,
63:16
**eastern**
1:2
**easy**
14:12, 14:14
**effects**
41:3, 41:4,
41:8
**eight**
17:10, 19:4,
81:10, 81:11,
81:14, 81:16,
82:1, 82:4,
82:6, 82:7,
82:8, 82:11,
82:14, 82:21
**eight-hour**
34:3
**either**
29:11, 36:16,
37:2, 48:10,
58:16, 69:19,
69:20
**electronic**
6:4, 16:13,
27:4, 29:4,
29:20, 30:1,
32:18, 33:16,
35:12, 53:19,
94:18, 96:10,
101:13, 101:15
**else**
53:22, 83:17,
101:4
**employed**
7:21, 8:2, 9:7,
9:14, 9:16,

13:18, 92:1,
103:12, 104:9
**employee**
92:5, 92:6
**employer**
48:11, 59:12,
80:19, 81:5
**employment**
59:11, 60:3
**empty**
89:17
**ems**
75:6
**engage**
72:16
**enhanced**
41:11
**entire**
41:22
**entitled**
21:1, 77:9
**entity**
92:12, 92:16
**entrance**
62:21
**equivalent**
88:21, 88:22
**esquire**
3:4, 3:14, 4:4,
4:13
**est**
1:16
**establish**
70:22
**et**
1:8
**evans**
76:1
**evasive**
20:16, 20:19,
29:7
**even**
43:20, 47:1
**evening**
38:18, 55:18
**ever**
10:13, 22:22,
24:22, 26:16,

| | | | |
|---|---|---|---|
| 43:9, 46:14,<br>47:7, 48:5,<br>48:9, 48:13,<br>52:22, 53:14,<br>72:21, 73:3,<br>73:6, 83:8,<br>86:11, 99:5 | 76:8, 84:22<br>**factor**<br>58:19<br>**facts**<br>26:13, 30:17,<br>30:21, 30:22 | **financial**<br>103:14, 104:11<br>**find**<br>42:15<br>**finish**<br>76:8 | **form**<br>14:6, 15:7,<br>15:12, 17:12,<br>17:20, 18:15,<br>20:5, 23:8,<br>24:5, 25:3, |
| **every**<br>21:9 | **failing**<br>83:11 | **fire**<br>75:4 | 28:18, 31:9,<br>39:3, 41:16, |
| **everything**<br>60:15 | **fair**<br>26:1, 26:4, | **fired**<br>79:21, 80:2 | 44:1, 46:19,<br>48:19, 49:19, |
| **evidence**<br>63:9 | 94:10, 96:1 | **first**<br>6:16, 17:4, | 50:22, 51:7,<br>54:8, 55:22, |
| **evidentiary**<br>6:8 | **fall**<br>66:12 | 19:2, 19:13,<br>20:9, 31:13, | 57:7, 64:3,<br>65:5, 65:13, |
| **exact**<br>25:14, 38:12, | **far**<br>9:8, 59:3,<br>61:7, 92:2 | 34:9, 44:3,<br>65:2, 65:3, | 66:4, 66:18,<br>67:2, 67:18, |
| 74:2, 78:19,<br>81:20, 82:17, | **fast**<br>64:11, 64:12, | 68:18, 70:9<br>**five** | 70:17, 70:19,<br>71:11, 71:19, |
| 89:9<br>**exactly** | 64:21, 77:10<br>**father's** | 30:12, 43:9,<br>43:19, 44:7, | 72:7, 73:9,<br>73:12, 76:20, |
| 28:12, 28:21,<br>72:4, 77:21 | 67:8<br>**fatigue** | 49:12, 49:15,<br>49:17, 51:8, | 78:16, 80:22,<br>81:18, 83:14, |
| **examination**<br>5:2, 6:19, | 46:16, 46:17,<br>46:18, 47:4 | 61:13, 63:17<br>**five-hour** | 83:21, 84:5,<br>84:13, 85:11, |
| 91:17<br>**examined** | **february**<br>80:16, 82:12, | 34:12<br>**flashes** | 86:21, 99:6,<br>100:4, 100:20 |
| 6:18<br>**exceeded** | 82:14, 89:8<br>**feel** | 70:5<br>**flow** | **formally**<br>39:18 |
| 13:11<br>**exit** | 21:12<br>**feeling** | 64:8<br>**flow-through** | **forward**<br>12:7, 68:10 |
| 38:1, 62:22<br>**expenses** | 7:13<br>**feelings** | 100:7<br>**fog** | **found**<br>39:11, 48:7 |
| 94:13, 94:15<br>**expires** | 24:14<br>**feet** | 57:4, 58:16<br>**foggy** | **four**<br>30:11, 43:20 |
| 103:17<br>**explain** | 68:16, 68:20,<br>68:22, 70:11, | 88:8<br>**follow-ups** | **fourth**<br>68:5 |
| 11:12, 12:9,<br>27:7, 66:21, | 70:18, 71:2,<br>71:3 | 96:21<br>**followed** | **frame**<br>27:10 |
| 67:5<br>**explanation** | **felony**<br>73:4 | 13:22, 14:3<br>**following** | **front**<br>65:8, 65:10, |
| 67:12<br>**extricate** | **few**<br>68:19, 68:20 | 14:9<br>**follows** | 65:18, 66:3,<br>70:14, 71:16 |
| 75:7 | **field**<br>72:12, 72:16 | 6:18<br>**foregoing** | **fuel**<br>49:14, 93:16, |
| **F** | **figure**<br>52:17 | 103:3, 103:5,<br>104:4 | 94:13<br>**fully** |
| **fact**<br>58:10, 60:20, | **final**<br>95:19, 98:13 | **forgot**<br>33:6 | 103:5<br>**function**<br>95:16 |

**further**
69:6, 91:15,
101:3
**futrell**
1:5, 7:2, 96:13
**futrell's**
3:13, 96:15

**G**

**gave**
69:17, 70:18,
80:18, 95:15
**gears**
12:15
**gearshift**
12:16
**general**
11:7, 11:8,
18:14, 22:17,
34:18, 44:4,
52:2
**gentleman**
90:22
**getting**
46:12, 61:9,
83:22
**give**
18:13, 38:1,
75:6, 80:17,
81:3, 81:4
**giving**
20:19, 32:3,
38:8, 80:18,
81:4
**go**
7:14, 9:17,
12:6, 13:16,
14:6, 15:19,
16:10, 16:21,
18:16, 22:10,
22:19, 25:9,
26:19, 28:15,
30:14, 31:1,
31:2, 31:9,
31:17, 32:8,
32:14, 33:4,
38:14, 43:4,
43:12, 43:13,

43:16, 44:1,
46:5, 46:19,
50:4, 51:9,
53:6, 60:22,
63:10, 66:4,
67:3, 69:6,
70:15, 74:14,
75:10, 75:12,
78:16, 78:20,
79:2, 84:13,
99:6, 100:4,
100:20
**goes**
62:13, 63:17
**going**
7:4, 7:6,
18:10, 19:15,
20:2, 20:12,
20:13, 22:17,
22:18, 30:13,
31:1, 51:2,
54:3, 54:15,
57:16, 57:17,
57:21, 58:2,
59:1, 59:7,
62:3, 64:12,
64:13, 66:2,
67:11, 69:20,
70:17, 76:11,
76:15, 76:16,
77:10, 77:16,
77:18, 77:22,
78:6, 78:14,
82:7, 93:1,
98:17, 101:9,
101:10
**gone**
63:17, 100:2
**good**
6:21, 82:20
**gotten**
29:7, 31:2,
83:20, 84:15
**governed**
78:4, 78:20
**grandmother**
67:7, 67:21
**grapevine**
97:12

**graves**
4:13, 5:4,
15:12, 15:15,
17:11, 18:15,
19:8, 69:6,
69:10, 69:12,
69:16, 69:22,
70:16, 91:18,
91:19, 93:7,
101:5, 102:2,
102:3, 102:5
**gross**
90:14
**guess**
52:8, 52:14,
54:16, 54:18,
59:8, 68:19,
90:13, 90:15,
90:16

**H**

**h-o-o-v-e-r**
11:22
**half**
38:5, 55:1
**hang**
101:10
**happened**
15:2, 19:5,
19:17, 19:19,
54:20, 67:10,
74:14, 77:7,
77:8, 86:14,
86:19
**harassing**
30:19, 76:21,
76:22
**hard**
101:13, 101:15
**harman**
3:15
**hci**
8:3
**head**
79:10
**headquarter**
59:15
**health**
7:22

**healthcare**
11:4
**hear**
64:17
**heard**
64:20, 69:7
**hearing**
6:12, 80:4,
80:5
**heavy**
64:9
**held**
2:1, 38:12
**help**
63:5
**helps**
41:19, 41:21
**here**
30:16, 45:18,
54:15, 63:22,
67:19, 71:18,
72:4, 77:6,
96:10
**hereby**
103:4, 104:2
**highway**
97:12, 100:12,
100:13, 100:14
**highways**
61:13
**hit**
76:13, 76:14
**hold**
20:6, 20:15,
28:8, 30:15,
50:21, 54:17,
57:21, 60:19,
82:10
**home**
8:4
**homes**
8:4
**honor**
63:11
**hoover**
11:18, 11:22
**hospital**
11:7, 75:10,

75:12, 75:14,
85:17
**hour**
17:10, 27:18,
30:6, 38:5,
55:1, 55:2,
66:2, 76:17,
76:18, 78:5,
78:7, 78:21
**hours**
13:6, 13:7,
13:11, 13:20,
13:21, 14:5,
14:13, 14:15,
14:19, 14:21,
15:1, 16:7,
16:19, 19:4,
22:5, 22:6,
23:1, 24:3,
24:4, 27:10,
28:2, 28:15,
29:11, 29:12,
29:17, 31:7,
31:14, 32:13,
33:11, 33:13,
34:2, 35:4,
35:9, 49:17
**hr**
80:8
**hydrocodone**
47:14
**hypothetical**
34:19
**hypotheticals**
34:15

**I**

**i-**
63:16
**ibuprofen**
47:12
**icing**
55:19
**idea**
74:17, 74:19,
74:21, 77:7,
86:10
**illinois**
52:9, 59:16,

59:22
**impact**
65:4, 65:11,
65:19, 68:14,
74:13, 78:3,
78:15, 87:19,
88:3
**impaired**
73:1
**impairing**
67:16
**important**
20:3, 25:19
**improper**
57:8, 60:18,
60:19
**inappropriate**
26:3
**incident**
7:5, 8:10,
13:9, 13:19,
15:2, 19:5,
22:22, 39:12,
47:18, 48:17,
54:20, 55:21,
56:9, 56:18,
59:4, 61:10,
61:14, 66:13,
72:21, 79:3,
79:8, 79:22,
86:7, 86:10,
87:10
**incorrect**
32:11
**indiana**
52:9, 74:3
**indicates**
63:19
**individuals**
67:8, 76:19
**influence**
47:19, 73:1
**inform**
22:8, 22:13,
22:22, 24:1,
24:2, 24:4, 72:3
**information**
90:17, 90:18

**informed**
55:18, 80:11,
80:13, 83:2
**ingham**
11:10
**injured**
20:21, 77:5,
77:11, 81:21
**injuries**
24:9
**injury**
76:9, 77:3
**insurance**
48:10, 93:18,
93:20, 94:13,
98:18, 98:19,
98:21, 98:22,
99:3, 99:5,
99:11, 99:12
**intended**
6:7
**interest**
103:14, 104:10
**interface**
91:4
**internal**
43:1, 44:5
**internist**
43:1
**interrupt**
31:22
**interrupting**
38:8
**interstate**
74:16
**investigate**
48:9
**investigation**
39:9
**involved**
53:16
**irrelevant**
77:1, 77:2
**issue**
57:2, 71:22,
96:10
**issues**
84:10, 84:11,

84:12
**it'd**
44:16

**J**

**job**
1:20
**jobs**
8:2
**joined**
15:17
**jontae**
76:2
**judge**
20:17, 21:13
**judgments**
99:19
**juliet**
60:1

**K**

**kaalib**
76:2
**keep**
7:7, 11:20,
70:13, 71:14
**kentucky**
52:11, 52:12
**kept**
87:8
**kids**
93:2
**killed**
20:21, 67:8,
76:2, 76:18,
77:10
**killers**
47:7, 47:9,
47:11
**kind**
15:2, 34:11,
81:15, 99:17
**kindly**
101:15
**knew**
20:1, 20:2
**know**
7:14, 8:19,

9:4, 9:10, 12:6,
12:7, 18:14,
20:4, 24:7,
27:7, 29:8,
30:5, 30:8,
32:11, 36:12,
36:16, 38:16,
42:15, 46:4,
46:8, 50:22,
52:15, 54:18,
56:21, 60:6,
60:8, 60:12,
60:14, 67:5,
76:5, 79:11,
81:20, 82:4,
82:11, 82:16,
86:22, 88:4,
89:9, 89:11,
90:17, 90:19,
91:6, 91:9,
92:2, 94:4,
95:2, 95:16

**knowledge**
79:1, 79:2,
88:12, 88:13,
103:10, 104:8

**knows**
20:22, 76:6

**krystin**
104:2, 104:16

**kurwitz**
1:22, 2:13,
103:2, 103:20

**L**

**labor**
89:6

**lane**
62:7, 62:18,
62:20, 62:22,
63:1, 63:20,
64:6, 74:15

**lanes**
62:5, 62:7,
62:14, 62:16,
63:17, 63:18

**lansing**
11:1, 11:2,

11:7, 11:8

**large**
66:22, 67:13

**last**
26:15, 35:19,
38:20, 43:19,
79:12, 85:2,
88:14, 95:3

**late**
52:4

**later**
87:5

**laugh**
93:1

**law**
6:12, 14:3

**laws**
6:8

**lawsuit**
7:3, 76:4, 76:9

**lease**
60:7

**leasing**
4:12, 8:18,
60:8, 91:17,
91:20

**least**
34:3, 47:8

**leave**
54:6, 81:12,
81:13

**leeway**
77:9

**left**
9:16, 53:1,
54:13, 61:18,
74:15

**legal**
26:21, 27:3,
31:14, 90:20

**legally**
27:5, 27:6,
27:7, 27:9,
29:5, 29:7,
29:9, 29:10,
30:6, 30:8,
33:15, 34:12

**less**
29:11, 68:22,

71:2, 79:15

**let's**
9:17, 13:16,
14:14, 15:19,
22:19, 31:17,
32:8, 47:8,
62:11

**letter**
14:1, 83:4,
83:6

**liability**
99:3, 99:12

**license**
45:15, 45:16

**licensed**
45:9, 45:12

**light**
64:9

**limitation**
27:18

**line**
50:10, 57:19,
72:17

**listen**
7:7

**lithuanian**
79:18

**litigation**
91:20

**live**
98:5

**llc**
92:14, 92:15,
92:17, 92:18,
93:5, 96:22,
97:8, 99:2,
99:17, 100:7,
100:19, 104:17

**load**
25:12, 37:1,
51:16, 89:19,
90:3, 90:7,
90:10, 90:11,
90:19, 90:20,
94:12

**loaded**
89:17

**loads**
95:6, 95:10

**located**
95:12

**log**
13:6, 27:4,
28:3, 32:18,
35:3, 35:5,
35:6, 35:7,
35:12, 50:15

**logbook**
12:8, 16:13,
17:14, 19:21,
37:19, 38:22,
94:18

**logbooks**
24:18, 24:20,
25:1, 32:5

**logs**
21:17, 25:20,
26:16, 27:11,
27:16, 29:4,
29:10, 29:21,
30:1, 33:16,
34:5, 34:6,
34:7, 34:10,
36:11, 53:19,
90:18

**long**
8:9, 9:13,
10:19, 16:18,
25:21, 42:10,
42:11, 49:16,
50:2, 50:6,
50:8, 50:13,
61:16, 66:22,
100:2

**longer**
22:6

**look**
17:13, 19:20,
38:22, 43:14,
50:15, 52:7,
52:18, 60:21,
61:2, 83:18,
94:20

**looked**
26:16, 58:17,
88:2

**looking**
36:11, 67:9

looks
58:15
lost
77:5
lot
41:2, 52:9
loud
73:13, 74:1
louis
25:13, 37:2,
50:19, 51:5,
51:12, 51:15,
53:4, 53:12,
89:20
low
41:10, 42:2

**M**

macfarlane
3:14, 96:9,
101:6, 102:4,
102:8, 102:9
made
35:16, 63:19,
65:3
mail
46:2
main
4:15
maintains
85:4
maintenance
79:10, 83:16,
84:12
make
14:12, 14:14,
30:21, 34:1,
47:13, 67:22,
69:7, 71:14,
102:5
manage
12:8
many
14:13, 14:21,
16:7, 59:6,
62:5, 68:16,
71:2, 77:11,
85:21, 89:22

map
52:7, 52:19
march
7:18
marion
74:3
marked
5:11
math
10:8, 10:11
matter
75:17
maybe
63:5, 71:5
mckenry
4:5
meadowview
7:22
mean
17:15, 22:20,
27:3, 27:4,
27:6, 34:17,
47:9, 62:22,
66:8, 66:9,
74:18, 86:4,
88:22
means
6:4
measurement
70:19
medical
43:8, 81:12,
81:13
medicine
43:1, 44:5
medium
64:9
mental
46:18, 47:4
mentally
52:17, 54:15
mentioned
94:2, 95:2,
95:4, 96:14
met
54:1
metformin
39:17, 39:19,

39:20, 40:1,
40:20, 41:2,
41:7, 44:10,
45:21, 48:3
michigan
11:1, 11:2,
11:19, 11:21,
45:17
middle
63:21
mile
49:15, 62:11
miles
49:12, 59:6,
61:13, 63:17,
66:2, 76:17,
76:18, 78:5,
78:7, 78:21,
83:19, 84:2
millions
83:19, 84:2
mind
46:17
mine
102:5
minute
87:18
mischaracterizes
28:8, 28:9,
28:19
misdemeanor
73:7, 73:11
missouri
25:12, 36:3,
37:2
mist
57:5, 58:16
misty
88:7
moment
61:18
money
94:10
month
84:21
months
42:13, 79:17
montia
75:22

more
12:4, 19:4,
23:1, 24:3,
28:15, 29:9,
29:17, 31:6,
31:13, 32:12,
33:10, 33:13,
34:2, 41:20,
71:3, 77:11,
78:5, 89:13,
93:21, 94:1,
96:21
morgan
3:5, 7:1
morning
15:2
most
11:6
move
18:21, 22:19,
24:12, 33:18
moving
68:10, 69:3,
70:7
multiple
24:6, 24:14,
56:12, 58:20,
68:2

**N**

name
6:22, 11:3,
35:14, 40:14,
44:16, 79:7,
79:12, 79:18,
79:19, 90:22,
91:6, 91:7,
91:11, 91:13,
91:19, 92:18,
93:3, 95:3
names
40:9
near
59:18
need
20:3, 21:12,
50:15, 67:20,
69:12, 102:8

**needed**
95:6, 95:11,
95:12
**neither**
103:11, 104:9
**never**
18:18, 29:22,
35:21, 35:22,
46:15, 47:17,
53:9, 54:1,
57:13, 58:5,
70:18, 80:13,
81:6, 81:7,
83:6, 87:7
**next**
35:22, 57:4,
76:13
**night**
37:11, 39:2,
55:20, 67:9
**nine**
82:18
**non-responsive**
18:21
**none**
5:11
**nonresponsive**
33:19
**normal**
39:1, 39:5,
66:1, 66:22,
67:15, 70:14
**notably**
11:6
**notary**
2:14, 6:2,
103:1, 103:16,
103:20
**nothing**
6:17, 74:4,
74:5, 101:5,
101:6
**notice**
2:13
**number**
38:1, 51:18,
57:4, 94:12,
100:15

**nurse**
10:16, 10:18,
10:19, 10:20,
10:22, 11:4,
44:3, 44:6,
45:1, 45:12
**nurses**
45:2, 45:3
**nursing**
8:4, 45:9,
45:15, 45:16
**nw**
3:6

## O

**oath**
7:9, 21:2,
43:16, 66:15,
81:4
**oaths**
6:3
**object**
14:6, 15:7,
15:12, 17:20,
30:16, 39:3,
41:14, 41:16,
58:2, 63:8,
64:3, 70:17,
70:19
**objection**
6:12, 9:1,
16:4, 16:9,
16:20, 17:11,
17:12, 18:4,
18:15, 18:16,
19:8, 20:5,
22:10, 23:2,
23:8, 24:5,
25:3, 25:22,
26:19, 27:14,
28:18, 31:9,
43:22, 44:1,
44:11, 46:19,
48:19, 49:19,
50:21, 51:7,
53:2, 54:8,
55:22, 57:7,
57:18, 60:9,

60:18, 65:5,
65:13, 66:4,
66:18, 67:2,
67:18, 71:11,
71:19, 72:7,
73:9, 73:12,
73:17, 74:20,
76:3, 76:20,
78:8, 78:16,
80:21, 81:18,
83:13, 83:21,
84:5, 84:13,
85:11, 86:21,
99:6, 100:4,
100:20
**occur**
64:5, 71:18
**occurred**
7:6, 62:8,
62:11, 74:13,
79:16, 80:16,
86:7, 86:11
**occurring**
41:4
**office**
100:17
**officer**
57:5, 57:6,
58:14, 85:18,
103:2
**officers**
85:21
**oh**
57:16, 64:22
**old**
7:17, 10:5,
10:6, 10:10,
10:12
**once**
49:10
**oncoming**
63:3
**one**
19:14, 34:21,
40:3, 51:22,
54:10, 63:21,
67:7, 87:7,
94:20, 100:9,

100:13
**online**
42:6, 46:3,
46:4
**only**
13:6, 13:19,
34:12, 35:4,
37:18, 38:4,
42:9, 44:6,
46:14, 47:22,
50:10, 70:10,
70:18, 72:6,
79:15, 79:16,
90:21, 94:22,
98:22, 99:14,
99:16, 102:1
**open**
39:10, 48:7
**operate**
12:14, 15:22,
16:8, 16:12
**operating**
60:16, 74:11,
84:11
**opposed**
70:15
**ordering**
101:22
**organization**
11:4
**organized**
98:3
**original**
45:16
**other**
40:4, 45:3,
46:16, 46:17,
47:2, 47:3,
47:5, 65:15,
67:15, 92:16,
94:6, 94:11,
94:15, 95:5,
95:10, 95:15,
99:15
**otherwise**
103:14, 104:11
**out**
11:10, 36:8,

36:14, 50:16,
51:5, 52:3,
52:17, 61:14,
62:11, 75:8,
81:11, 81:13,
81:15, 88:18,
94:5, 94:9,
94:14, 94:16,
94:18
**outcome**
103:14, 104:11
**outside**
62:12
**over**
17:18, 24:4,
50:9, 63:22,
66:2, 78:20,
79:2, 84:1,
96:10
**own**
85:4, 93:13,
93:14, 93:16
**owner**
8:20, 8:21,
91:8, 91:10,
91:12

**P**

**page**
5:2, 5:6
**pages**
1:21
**paid**
88:18, 89:7,
94:6, 94:12
**pain**
47:7, 47:9,
47:11
**paperwork**
12:7
**pardon**
86:2
**particular**
14:4, 35:10,
84:20, 99:19,
99:20
**parties**
6:4, 6:10,

103:13, 104:10
**party**
3:13, 35:17,
46:9, 65:4,
65:18, 66:3,
66:21, 68:9,
69:3, 74:14,
76:14, 88:2,
96:14, 96:15
**passenger**
75:9
**pay**
89:1, 93:13,
93:16, 93:18,
93:19, 94:3
**paying**
93:14
**pdf**
101:22
**penalties**
7:10
**pennsylvania**
3:6
**people**
20:21, 24:9,
77:5, 77:11,
79:14, 89:4
**perfect**
55:7, 55:8,
55:12, 56:6,
56:10, 67:14
**perfectly**
58:18
**performance**
41:12
**period**
18:19, 81:20,
83:1
**perjury**
7:10
**permission**
59:11, 60:3
**permitted**
6:7
**person**
91:7
**personal**
76:9, 77:2,

95:13, 99:11
**pharmacy**
45:20, 45:22,
46:2, 46:5,
46:6, 48:3
**phone**
3:9, 3:18, 4:9,
4:18, 20:17,
21:13, 87:8,
87:12, 87:15
**phonetic**
76:1, 76:2,
79:9
**photograph**
87:7
**photographs**
87:3
**physical**
43:11, 46:17
**physicals**
44:8
**physician**
44:5
**physicians**
44:6
**pick**
39:5, 51:15,
53:21, 95:6,
95:11
**picked**
25:11, 37:1,
51:12, 51:16,
51:17, 53:17,
89:19
**pilot**
17:7, 38:1,
49:13, 49:15,
61:18
**pin**
82:17
**place**
37:18
**plaintiff**
1:6, 3:3, 3:12,
6:19, 7:2, 96:19
**planet**
101:13, 104:17
**plant**
51:18

**please**
31:18, 31:20,
36:8, 38:7,
50:4, 102:1,
102:6
**plus**
69:3
**point**
59:4, 62:13
**police**
15:3, 15:5,
15:6, 17:17,
22:9, 22:13,
22:21, 23:15,
23:20, 24:1,
24:2, 39:9,
48:5, 57:3,
57:5, 57:6,
57:10, 57:14,
58:14, 63:4,
63:5, 63:9,
63:18, 71:22,
72:3, 72:15,
85:9, 86:1,
86:3, 86:17,
87:8
**policies**
13:18, 14:3,
16:16, 16:17,
34:7, 34:8
**policy**
13:22, 22:5,
29:16, 30:9,
32:9, 32:11,
33:9, 33:12,
33:21, 94:2,
94:3, 94:7
**position**
21:7, 69:4
**practice**
39:2, 39:5,
45:9
**practitioner**
44:4
**practitioners**
44:6
**prepared**
104:3

| | | | |
|---|---|---|---|
| **prescribed** 44:10, 48:1 | **produced** 6:6 | 76:21, 77:13, 77:15, 77:21, 81:1, 85:16 | 28:3, 28:16, 42:8, 49:21, 50:5, 52:5, |
| **prescribing** 40:19 | **proper** 83:16 | **questioned** 85:19 | 56:2, 56:18, 57:2, 61:21, |
| **prescription** 39:10, 39:12, 39:15, 40:5, 46:10, 46:13, 46:14 | **provided** 21:11, 24:14, 63:9, 68:1 | **questioning** 57:19, 85:10, 85:14 | 62:1, 64:7, 70:17, 72:14, 72:15, 72:20, 74:2, 77:8, |
| | **provider** 87:13 | **questions** 7:5, 19:9, | 78:18, 79:13, 79:20, 83:22, |
| **prescriptions** 44:20, 46:15, 47:3, 48:6 | **public** 2:14, 73:14, 74:1, 103:1, 103:20 | 26:3, 30:7, 30:13, 30:22, 31:3, 32:9, 58:2, 63:12, | 85:13, 86:11, 88:2, 88:6, 88:19, 90:13, 94:19, 95:1 |
| **present** 3:10, 3:19, 4:10, 4:19 | **pursuant** 2:13 | 91:15, 91:16, 91:21, 96:3, 96:7, 96:11, | **receive** 9:18, 10:1, 15:20, 16:3, |
| **presently** 7:20 | **put** 63:4, 96:16 | 96:18, 101:4 | 16:6, 88:20 |
| **president** 91:12, 97:18 | **Q** | **quote** 86:18 | **received** 15:10, 46:15, 71:13, 88:21 |
| **previously** 32:10, 37:16 | **qualcomm** 16:12 | **R** | **reckless** 83:11, 84:4 |
| **prior** 44:7, 47:18, 50:8, 50:9, 50:13, 56:17, 70:7, 72:21, 76:16, 77:21, 83:2, 83:10, 86:11, 87:9, 87:15 | **qualified** 103:8 | **r-o-m-e-o-v-i-l--l-e** 59:21 | **recollect** 27:22 |
| | **question** 7:8, 13:14, 14:9, 16:14, 18:10, 18:13, 19:9, 19:13, 19:14, 20:3, 20:9, 20:13, 21:12, 22:17, 22:21, 23:18, 26:5, 26:11, 28:11, 31:12, 32:4, 33:3, 33:7, 36:1, 36:10, 45:6, 45:7, 47:2, 47:6, 48:5, 48:21, 50:22, 51:11, 55:14, 55:17, 57:8, 60:19, 61:11, 64:2, 65:6, 65:9, 65:21, 68:5, 70:11, 70:20, 74:7, 75:20, 76:13, | **r-o-m-e-v-i-l-l-e** 59:22 | **recollection** 21:11, 56:5, 58:18, 63:7, 63:13 |
| | | **raining** 55:8, 55:19, 56:17, 56:20 | **record** 49:11, 58:1, 75:17, 83:10, 83:18, 84:17, 96:12, 96:17, 102:12, 103:10, 104:7 |
| **probably** 15:4, 37:2, 37:17, 38:16, 38:17, 42:17, 51:8, 52:8, 52:9, 52:12, 55:1, 73:19 | | **rate** 78:14 | |
| | | **ravine** 75:3 | |
| | | **re-examination** 5:6, 96:19 | |
| | | **read** 101:7 | **recorded** 1:22, 6:4, 103:6 |
| **procedural** 6:8 | | **really** 39:4, 75:13, 91:9 | **recording** 6:6, 103:9, 104:4 |
| **procedures** 16:17 | | **rebuild** 41:19, 41:22 | **records** 42:15, 42:16, 43:14 |
| **proceeding** 6:6, 104:4 | | **recall** 11:18, 17:14, 17:21, 18:2, 23:9, 25:11, 25:13, 28:2, | |
| **proceedings** 103:3, 103:5, 103:6, 103:9, 104:5, 104:7 | | | **recovery** 82:1 |
| **process** 97:20, 100:19 | | | |

recreate
54:15
reduced
103:7, 104:5
refer
84:17
reference
63:9
referencing
37:16
reflect
26:18, 27:12,
27:17
refresh
63:6
regard
7:2, 12:10,
16:7, 76:7
regarding
7:5, 13:19,
22:16, 22:18,
39:10, 48:6,
58:2, 84:20,
86:6, 90:18
regional
11:10
registered
97:1, 97:11,
97:16, 98:4,
98:6
registration
61:2, 61:3,
103:16
rehab
7:22
related
103:12, 104:9
relevance
76:4, 76:8
relevant
76:10
remember
11:6, 11:22,
17:17, 19:21,
20:20, 21:15,
24:10, 25:6,
25:10, 25:12,
30:4, 36:13,

36:19, 36:21,
37:3, 37:9,
40:7, 40:11,
40:13, 40:15,
43:17, 43:18,
48:2, 50:16,
61:8, 61:12,
73:19, 75:13,
75:14, 85:18,
90:21, 91:11,
91:13, 95:3
remind
7:9
rental
94:17
repair
85:4
repaired
85:3
rephrased
31:4
replacement
40:21
report
15:3, 15:5,
15:6, 57:4,
57:10, 57:14,
58:3, 63:5,
63:10, 63:19,
79:15
report's
63:6
reporter
6:2, 101:17,
101:20, 102:2,
102:4, 102:7,
102:11, 103:1
reporters
101:11
represent
7:1, 91:20,
96:13, 96:14
required
43:11
requires
20:10
response
20:10, 77:21

responsibilities
27:1
responsible
93:13
rest
17:7, 17:10,
18:12, 18:19,
19:3, 19:4,
33:14, 34:3,
37:15, 37:22,
38:14, 48:22,
49:6, 49:8,
49:10, 50:9,
53:5, 54:6,
54:9, 59:3,
59:5, 61:21
rested
54:13
result
79:21
returning
82:2
review
25:16, 25:18,
25:20, 30:5,
80:5
reviewed
15:6, 30:1,
30:2, 57:10,
58:7
richard
1:22, 2:13,
103:2, 103:20
richmond
3:17, 4:17
right
6:21, 12:1,
13:17, 16:16,
19:17, 20:1,
21:9, 22:8,
23:16, 25:12,
28:22, 29:3,
30:22, 31:21,
32:2, 36:7,
40:13, 49:5,
54:4, 56:7,
57:4, 60:14,
62:20, 62:22,

63:20, 64:1,
64:6, 64:17,
66:21, 69:7,
78:2, 78:3,
82:15, 84:10,
86:15, 87:18,
91:14, 92:5,
92:8, 93:12,
95:22, 99:21,
100:15, 101:3,
101:7, 101:21
road
13:6, 13:19,
14:5, 14:13,
16:8, 16:18,
33:10, 33:13,
34:2, 38:4,
50:8, 50:14,
68:15
roads
61:9, 61:12
roadway
58:13
rob
79:9, 90:22,
91:5, 95:2,
95:5, 95:9
rob's
79:12
romeo
59:19, 60:1
romeoville
59:16, 59:17,
60:1, 60:2
romeville
59:22
route
39:6, 52:17,
95:19
rules
6:8
runs
53:18
russell
76:2

**S**

safe
70:13, 71:15

| | | | |
|---|---|---|---|
| **safest** | **send** | | **57:16, 57:17** |
| 39:6 | 83:4, 101:15 | | **showed** |
| **safety** | **sends** | | 27:4 |
| 23:20, 84:12, | 101:14 | | **sic** |
| 84:16, 84:19 | **sent** | | 63:16, 96:22 |
| **said** | 83:6, 94:9 | | **sick** |
| 14:10, 16:19, | **series** | | 43:5, 43:7 |
| 22:1, 22:13, | 7:4 | | **side** |
| 28:2, 28:3, | **service** | | 75:9 |
| 28:16, 28:21, | 97:20, 100:18, | | **sign** |
| 29:22, 36:2, | 100:19 | | 101:8 |
| 36:3, 45:1, | **settlement** | | **signals** |
| 45:8, 47:2, | 94:5, 94:14, | | 70:2, 70:3 |
| 48:17, 49:3, | 94:16, 94:20 | | **signature-b7fzp** |
| 52:21, 54:11, | **seven** | | 103:18 |
| 56:6, 63:16, | 19:4, 82:22 | | **signature-bi6ds** |
| 64:22, 69:7, | **seven-hour** | | 104:14 |
| 69:9, 69:13, | 34:3 | | **similar** |
| 69:15, 69:19, | **several** | | 15:21, 89:5 |
| 78:10, 80:15, | 11:5 | | **simple** |
| 82:2, 82:6, | **severely** | | 18:13, 30:12, |
| 82:12, 89:19, | 20:21, 55:19, | | 30:13 |
| 92:1, 96:12, | 77:5, 77:11 | | **simply** |
| 103:8, 103:9, | **sexual** | | 30:18 |
| 104:5, 104:6 | 41:11 | | **since** |
| **saint** | **shall** | | 30:2, 36:1, |
| 50:19, 51:5, | 6:9 | | 71:14 |
| 51:12, 53:4, | **share** | | **sir** |
| 53:12, 89:19 | 57:21 | | 7:17, 9:6, |
| **same** | **shattered** | | 11:21, 18:10, |
| 18:4, 18:16, | 75:2 | | 20:2, 22:4, |
| 31:3, 68:5, | **shawn** | | 26:16, 28:14, |
| 73:17, 80:17, | 4:4 | | 30:13, 35:2, |
| 81:3, 81:5, 86:8 | **shift** | | 36:22, 37:21, |
| **sand** | 12:11, 12:12, | | 43:15, 55:21, |
| 4:14 | 13:7, 17:6, | | 57:11, 62:3, |
| **saw** | 17:8, 37:17 | | 65:21, 67:7, |
| 68:12, 68:13, | **shop** | | 68:11, 69:16, |
| 68:14, 68:18, | 85:1, 85:2, | | 69:22, 78:4, |
| 69:19, 70:4, | 85:5 | | 80:2, 91:22, |
| 70:6, 70:9, | **short** | | 92:4, 92:11, |
| 71:6, 72:6 | 72:6 | | 92:17, 93:17 |
| **say** | **shortly** | | **site** |
| 36:6, 47:5, | 55:20 | | 98:2 |
| 47:8, 47:9, | **should** | | **six** |
| 61:13, 62:11, | 58:3, 96:13 | | 49:16, 49:17 |
| 93:20, 95:8 | **show** | | **skills** |
| **saying** | 29:4, 29:10, | | 103:11, 104:8 |
| 17:21, 18:2, | | | |

Middle-left column:

| |
|---|
| 20:20, 24:10, |
| 27:19, 55:12, |
| 56:10, 65:22, |
| 66:15, 70:18, |
| 82:21 |
| **says** |
| 15:6, 21:15, |
| 58:13, 77:6 |
| **scaled** |
| 90:19 |
| **scene** |
| 22:9, 50:11, |
| 54:12, 61:10, |
| 61:14, 62:12, |
| 62:15, 62:16, |
| 72:1, 75:7, |
| 85:10, 85:14 |
| **scope** |
| 59:11, 60:3 |
| **screen** |
| 57:21 |
| **second** |
| 57:22, 60:19, |
| 71:5 |
| **secondly** |
| 44:4 |
| **seconds** |
| 65:11, 65:19, |
| 68:13, 71:6 |
| **see** |
| 25:5, 43:4, |
| 43:12, 43:13, |
| 43:16, 57:22, |
| 58:11, 66:3, |
| 66:10, 67:1, |
| 67:13, 75:2 |
| **seeing** |
| 86:11 |
| **seeking** |
| 60:20 |
| **seen** |
| 15:8, 44:6, |
| 57:14, 58:5 |
| **self-employed** |
| 89:3, 92:9 |
| **self-ins** |
| 92:9 |
| **semi** |
| 12:5 |

**sleep**
37:10, 37:13, 37:14, 38:14, 39:2
**sleeping**
66:11
**sleepy**
46:18, 47:14
**sleeting**
55:8, 55:19, 56:17, 56:20
**slept**
37:15, 38:2, 38:21, 49:16, 54:11, 54:13
**slow**
69:8
**slowly**
69:21
**smaller**
35:8
**sobriety**
72:12, 72:16
**some**
62:13, 81:15, 92:16
**someplace**
53:22
**something**
36:21, 73:19, 74:8, 89:5, 94:8
**sometime**
89:7
**somewhere**
55:4, 82:22, 83:1
**sorry**
10:17, 11:15, 12:13, 39:18, 52:7, 55:16, 61:20, 64:22, 69:11, 80:20, 92:9, 95:8, 97:3, 100:9, 100:14
**sort**
57:18, 92:16
**speak**
101:10, 101:18

**specific**
12:4, 18:9, 22:18, 30:6, 41:20, 51:22, 53:20, 54:2, 54:3, 89:13
**specifically**
89:4, 94:19
**speed**
76:15, 77:13, 77:22, 78:3, 78:14, 78:19
**speeding**
83:11, 83:20, 84:1
**spell**
9:11, 59:19
**split**
34:9, 35:3, 35:5, 35:6, 35:7
**spoke**
22:21
**spolar**
104:2, 104:16
**st**
25:13, 37:1, 51:15
**stand**
92:22
**standard**
12:19
**start**
8:5, 17:4, 17:9, 36:8, 54:3, 90:8
**started**
17:6, 18:11, 18:18, 19:2, 21:21, 36:14, 36:15, 36:16, 37:16, 50:16, 51:5, 52:3, 53:12
**state**
36:13, 38:3, 50:20, 52:1, 86:1, 86:3, 86:5, 93:8,

97:12, 100:10, 100:12
**stated**
32:10, 53:8
**statement**
45:4, 86:4
**statements**
80:17, 81:3, 81:5, 94:21
**states**
1:1, 33:21, 51:19, 52:5
**stating**
17:17
**stationary**
69:4
**still**
14:8, 31:14, 42:14, 46:4, 46:9, 67:17
**stipulate**
6:10
**stipulation**
6:9
**stop**
7:15, 37:21, 38:7, 38:14, 46:12, 49:1, 49:6, 49:8, 49:10, 50:9, 53:5, 54:6, 54:9, 59:3, 59:5, 61:21, 70:15
**stopped**
37:18, 37:22, 41:6, 68:13, 68:15, 69:4, 69:20, 70:8, 72:5
**straight**
68:10, 72:17
**street**
4:15
**strike**
18:21, 24:12, 24:13, 33:18
**subject**
91:15

**sued**
97:20
**suite**
3:7, 4:7, 4:16, 100:12
**supervision**
104:6
**supervisor**
18:8, 79:3, 79:7, 91:3
**supervisors**
18:3, 90:21
**supposed**
17:19, 53:21, 60:14
**sure**
13:13, 30:21, 32:5, 34:1, 47:5, 51:10, 51:17, 58:17, 67:22, 69:7, 71:14, 80:3, 95:9
**surface**
58:13
**surprised**
37:18
**suspension**
81:16
**swear**
6:13
**swerve**
69:2, 69:8, 69:9, 69:10
**sworn**
6:16, 103:5
**sykes**
35:14, 35:15, 35:20

| T |
|---|

**t-r-i-t-o-n**
9:12, 9:13, 59:13
**take**
7:12, 47:3, 48:16, 87:3, 95:7, 95:12,

95:19, 101:22,
102:3

**taken**
47:7, 47:17,
94:15, 94:18,
103:3

**taking**
39:11, 40:21,
41:6

**talk**
18:7

**talking**
14:16, 15:15,
23:14, 23:15,
23:19, 23:20,
23:22, 54:9,
63:2, 68:22,
90:2

**taxes**
93:14

**teach**
12:5

**team**
34:10

**tell**
23:6, 32:20,
36:11, 86:17,
95:5, 95:10,
95:19

**ten**
65:18, 82:21,
82:22

**terminated**
80:12, 80:14,
81:7, 81:9, 91:7

**termination**
83:8

**terminology**
87:1

**terms**
99:18

**terrance's**
91:15

**terrence**
4:13, 91:19

**test**
41:13, 72:12,
72:16

**testified**
6:18, 22:4,
27:21, 28:12,
31:19, 33:22,
76:16

**testify**
6:16, 54:18,
63:10

**testifying**
72:4

**testimony**
6:11, 9:5, 9:7,
14:2, 18:6,
23:7, 25:7,
28:9, 28:19,
30:10, 43:15,
43:19, 43:21,
47:22, 67:17,
69:5, 69:14,
95:5

**testing**
11:14, 11:16

**testosterone**
40:21, 41:10,
41:15, 41:18,
42:1, 42:3,
42:12

**texas**
93:9, 93:11,
93:12, 97:13,
98:4

**texting**
87:9

**th**
7:6, 19:16,
19:17, 19:18,
25:7, 36:16,
36:17, 37:3,
37:7, 37:8,
37:10, 37:11,
51:6, 52:4,
88:15, 88:18

**thank**
69:10, 69:22,
96:4, 96:18,
102:9, 102:11

**therapy**
40:22, 41:18,

42:12

**thereafter**
103:7

**thing**
12:16, 30:20,
46:16, 86:8,
94:22

**things**
12:18, 47:14

**think**
8:6, 9:15,
16:18, 23:4,
25:19, 28:10,
34:4, 35:14,
40:7, 40:8,
42:13, 45:17,
49:12, 50:18,
51:18, 77:8,
80:15, 90:12,
90:13, 90:14,
94:21, 94:22

**third**
46:9, 68:5,
96:14

**third-party**
3:12

**thomas**
97:6

**thought**
68:12, 68:14

**three**
28:1, 30:11,
42:13, 62:7,
62:14, 62:16,
63:18, 65:11,
76:19, 77:11

**three-lane**
62:17

**through**
11:14, 30:14,
31:1, 31:2,
46:5, 51:20,
52:12, 57:17,
85:1, 91:5,
92:13, 99:1,
99:8

**ticket**
71:22, 84:1

**tickets**
83:20

**time**
7:12, 13:5,
17:18, 18:11,
19:1, 19:2,
19:21, 25:14,
26:15, 27:10,
35:16, 35:19,
37:11, 38:6,
38:10, 38:11,
38:12, 38:13,
38:15, 38:20,
39:6, 39:12,
41:5, 47:19,
52:3, 52:4,
52:22, 53:1,
53:4, 53:11,
53:12, 53:14,
53:20, 54:2,
54:6, 54:15,
55:5, 55:20,
56:9, 56:19,
56:22, 57:1,
64:9, 65:2,
65:3, 65:10,
66:11, 66:12,
68:5, 68:11,
68:17, 69:1,
70:9, 77:10,
78:14, 79:3,
79:7, 81:20,
82:17, 83:1,
87:18, 88:14,
102:9

**times**
18:14, 24:15,
28:1, 30:12,
51:8, 56:13,
58:21, 68:2,
95:4

**today**
7:4, 25:17,
72:4, 81:4

**told**
44:13, 57:3,
77:16, 77:20,
86:8

took
52:8, 61:9,
87:7
total
90:3
totaled
88:12
towanda
1:5, 7:2
towards
74:14, 74:16
town
61:20
tractor
8:14
traffic
62:5, 62:16,
62:18, 63:3,
64:8, 64:10,
64:11, 70:14
tragic
7:5, 22:22,
24:8, 24:9
tragically
77:10
trailer
8:14
trained
8:13, 8:15,
12:22, 13:1,
13:4, 16:12,
16:13
training
9:17, 9:18,
10:3, 11:12,
11:13, 11:14,
11:16, 12:3,
15:10, 15:20,
15:21, 16:3,
16:6, 70:12,
71:13
transcriber
104:1
transcript
6:5, 104:3,
104:6
transcriptionist
103:8

transferred
45:17
transmission
12:19, 12:20
treated
42:20, 45:2,
45:3, 48:13
treating
40:16
treatment
42:11, 43:9
trial
67:19
triton
9:8, 9:9, 9:14,
13:16, 13:17,
24:21, 53:18,
59:12, 61:3,
61:4, 61:5,
85:4, 92:2,
93:19, 94:3,
94:9, 98:16,
99:1
triton's
13:22, 30:9
truck
8:21, 9:5,
9:10, 10:13,
12:6, 17:5,
19:3, 39:11,
44:22, 48:7,
53:9, 54:4,
60:7, 65:10,
67:16, 70:12,
72:19, 74:4,
74:8, 74:11,
75:7, 78:4,
78:20, 79:4,
84:11, 84:12,
84:20, 87:3,
87:22, 88:11,
91:2, 92:3,
95:17, 99:13,
99:14, 99:16
trucking
93:2
trucks
65:8, 65:10,

65:15, 65:17,
99:13, 99:15
true
13:10, 34:1,
103:9, 104:6
truth
6:17, 6:18
trying
11:6, 52:17,
82:17
turn
70:3
two
8:2, 9:15,
12:17, 13:18,
19:9, 36:2,
42:9, 62:14,
63:17, 65:10,
67:10, 71:6,
79:15, 85:22,
87:5, 87:18
tylenol
47:10
type
12:3, 12:16,
15:19, 60:20
types
40:4
typewriting
103:7, 104:5

**U**

unacceptable
24:8
unclear
15:13
under
6:7, 7:9, 21:2,
39:8, 40:10,
43:16, 47:19,
66:15, 72:22,
73:1, 81:4,
104:5
understand
6:5, 7:10,
9:19, 21:6,
21:7, 24:13,
29:8, 32:5,

34:5, 42:2,
47:1, 47:6, 66:9
united
1:1
unknown
8:22, 66:6,
66:8, 67:1,
67:17, 68:8,
86:14, 86:17,
86:18
unquote
86:18
until
75:4, 89:7
ups
100:16
use
6:10
uses
6:7, 40:3, 46:3
using
35:3
usually
101:14
utilize
35:9
utilized
92:13

**V**

vehicle
8:10, 16:8,
17:10, 35:15,
35:16, 35:20,
39:16, 40:6,
52:22, 60:15,
64:12, 64:13,
65:3, 67:13,
68:17, 70:13,
70:14, 71:15,
72:5, 83:17,
87:21, 89:12,
90:6, 90:8, 90:9
verizon
87:14
via
3:10, 3:19,
4:10, 4:19

viable
99:21
vicodin
47:14
videoconference
3:10, 3:19,
4:10, 4:19
viking
42:6
violate
29:16
violation
84:16
violations
84:11, 84:19
virgina
1:2
virginia
2:15, 3:17,
4:8, 4:17, 38:4,
38:11, 38:14,
48:17, 48:22,
49:3, 49:6,
49:7, 49:9,
50:10, 52:5,
53:5, 53:21,
54:11, 98:6,
98:7, 98:8,
98:10, 98:14,
98:15, 103:21
virtually
1:14, 2:1
visibility
56:15, 67:16
vision
65:22
voice
7:7, 11:21
vs
1:7

**W**

w-2
92:6
wake
38:15
walgreens
46:6

walking
72:17
wall
74:16
want
7:8, 7:12,
11:11, 33:22,
43:21, 48:16,
49:4, 54:17,
58:16, 61:8,
63:4, 67:22,
69:7, 76:5,
90:12, 90:14,
90:16, 96:11,
96:16, 101:9,
101:18
washington
3:8
way
52:4
wdec
93:5
wdtc
92:19, 92:20,
97:2, 97:3,
99:2, 99:17,
100:19
we'll
28:15, 101:7
we're
21:1, 30:22,
31:1, 57:17,
67:18, 101:10
we've
20:17
weather
55:5, 56:6,
56:7, 56:10,
57:2, 58:15,
58:19, 59:2,
66:1, 67:14,
67:15
wednesday
1:15
week
84:20
weeks
81:10, 81:11,

81:14, 81:17,
82:1, 82:5,
82:6, 82:7,
82:11, 82:14,
82:18, 82:21,
82:22
weight
89:11, 89:15,
89:17, 89:22,
90:3, 90:6,
90:7, 90:8,
90:9, 90:10,
90:11, 90:14,
90:18
welcome
96:5
wellman
3:15
went
11:14, 56:18,
56:19, 56:22,
72:19, 75:15
weren't
47:19
west
97:12, 100:9,
100:12
wet
58:14, 88:7
whatever
10:11, 81:10
wheel
66:12
wheeler
9:19, 12:10,
12:14, 15:22,
16:8
whereupon
6:14
whether
12:22, 28:14,
34:1, 58:7,
58:9, 58:10,
60:6, 76:6
whole
6:17, 20:18,
20:19
wife
97:21, 100:22

wiggins
3:13, 96:16
william
97:5
windshield
75:2, 88:5
wipers
88:5
withdraw
22:20, 26:10,
55:14, 55:17,
65:9
withdrawn
62:2
within
27:9, 27:18,
59:10, 60:3
without
17:10, 18:12,
18:19, 33:14,
34:2, 35:3,
36:11
witness
6:13, 14:8,
14:19, 15:8,
16:11, 16:22,
17:13, 17:21,
18:18, 22:12,
23:4, 23:9,
23:12, 23:14,
23:19, 25:10,
26:21, 28:22,
30:19, 31:22,
32:4, 32:22,
33:6, 39:4,
41:15, 44:3,
44:13, 48:20,
49:21, 50:5,
51:10, 52:16,
53:8, 54:14,
56:2, 57:13,
58:4, 60:11,
63:14, 64:15,
65:6, 66:6,
67:4, 69:11,
69:15, 69:18,
71:20, 72:8,
73:13, 73:18,

74:21, 77:6,
78:10, 78:18,
81:1, 81:19,
83:22, 84:6,
84:15, 85:13,
86:22, 93:6,
96:8, 99:8,
100:6, 100:22
**witness(es**
103:4
**words**
94:6, 94:11
**work**
8:2, 32:6
**worked**
11:3, 11:5,
11:7, 13:16,
88:14
**workers**
88:20, 89:1,
94:2
**working**
8:5, 59:10,
60:3
**workmen's**
89:3, 89:4
**world**
93:2
**wouldn't**
56:21
**wound**
75:3
**written**
6:9, 16:17
**wrong**
55:21, 57:6
**wt**
99:2, 100:19
**wtc**
96:22

**X**

**xavier**
76:1

**Y**

**yard**
98:16

**yeah**
10:11, 11:9,
14:17, 19:20,
22:15, 28:4,
33:17, 39:21,
45:1, 49:18,
50:5, 50:12,
51:14, 52:12,
52:16, 52:18,
53:8, 54:22,
56:5, 61:7,
64:15, 78:19,
82:16, 83:1,
86:5, 90:19,
92:15, 93:1,
96:8, 97:4,
97:7, 102:5
**year**
43:20, 47:8,
47:18
**year-and-a-half**
17:15, 79:17
**years**
8:12, 9:15,
10:10, 10:12,
10:21, 13:18,
36:2, 42:9,
43:9, 43:19,
43:20, 44:7,
67:10, 84:1
**yep**
102:7

**Z**

**zip**
97:14

**.**

**.0560**
3:9
**.1125**
3:18
**.2500**
4:9
**.7276**
4:18

**0**

**00**
19:5, 38:16,

38:18, 48:18,
49:9, 55:3,
55:4, 55:11
**00118**
1:7

**1**

**1**
15:3, 19:5,
19:19, 54:21,
55:3, 55:4,
55:11
**10**
55:4
**104**
1:21
**1099**
92:5, 92:7,
92:8, 92:13
**11**
1:16, 14:15,
14:19, 14:22,
15:1, 16:19,
22:5, 22:6,
23:1, 24:3,
24:4, 27:18,
28:1, 28:15,
29:11, 29:12,
29:17, 31:7,
31:13, 32:13,
33:10, 33:13,
34:2, 35:4
**114**
97:12, 100:12,
100:13, 100:14
**12**
103:17
**1327**
100:9
**14**
36:17, 37:3,
37:7, 37:8,
37:11, 51:6,
52:4
**15**
8:12, 10:21,
19:16, 19:18,
25:7, 31:7,

36:4, 36:9,
36:16, 36:17,
37:10, 37:11,
52:4, 84:1,
100:11
**1527**
97:12, 100:11,
100:12
**16**
7:6, 19:17,
31:7, 88:15,
88:18
**17**
79:17
**18**
9:19, 12:10,
12:14, 15:22,
16:8
**1901**
3:6
**192**
4:6

**2**

**2**
1:16
**20**
103:22, 104:18
**20006**
3:8
**2006**
10:4, 10:5,
10:13, 10:15,
11:12, 11:13,
12:22, 16:1,
71:14
**2010**
73:19
**202.772**
3:9
**2022**
7:6, 8:11,
40:12, 41:9,
42:3, 43:2,
46:22
**2023**
8:7
**2024**
1:15, 103:22,

| | | | |
|---|---|---|---|
| 104:18 | 70:18, 71:3 | **804.783** | |
| **2026** | **536847** | 4:18 | |
| 103:17 | 1:20 | **9** | |
| **23** | **6** | **91** | |
| 1:7 | **6** | 5:4 | |
| **2300** | 38:16, 38:18, | **919** | |
| 4:16 | 48:18, 49:9 | 4:15 | |
| **23219** | **60** | **92** | |
| 4:17 | 66:2, 76:17, | 45:17 | |
| **23255** | 78:7 | **96** | |
| 3:17 | **61** | 5:7 | |
| **23462** | 10:9 | | |
| 4:8 | **62** | | |
| **24** | 7:18 | | |
| 103:22, 104:18 | **64** | | |
| **25** | 61:15, 61:16, | | |
| 59:7 | 61:19, 62:2, | | |
| **27** | 62:5 | | |
| 100:11 | **65** | | |
| **292** | 64:22, 76:17, | | |
| 100:15 | 78:11, 78:13 | | |
| **3** | **68** | | |
| **3** | 78:5, 78:7, | | |
| 102:12 | 78:20, 79:2 | | |
| **30** | **684** | | |
| 15:3, 59:7 | 63:16 | | |
| **300** | **7** | | |
| 3:7 | **7** | | |
| **305** | 38:16, 38:18, | | |
| 4:7 | 49:9 | | |
| **31** | **70** | | |
| 103:17 | 52:8, 65:1, | | |
| **38** | 78:11, 78:13 | | |
| 15:3, 19:5, | **70280** | | |
| 19:19, 54:21, | 3:16 | | |
| 55:11 | **757.461** | | |
| **4** | 4:9 | | |
| **44** | **76051** | | |
| 10:10 | 97:15 | | |
| **45** | **7978184** | | |
| 10:10, 10:12, | 103:16 | | |
| 102:12 | **7:** | | |
| **4:-cv--jke-dem** | 48:18 | | |
| 1:7 | **8** | | |
| **5** | **804.622** | | |
| **50** | 3:18 | | |
| 68:22, 70:11, | | | |