## UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF VIRGINIA
#### Newport News Division

TOWANDA R. FUTRELL,

               Plaintiff,

v.                                   ACTION NO. 4:23cv118

AV LEASING, LLC, et al.,

               Defendants.

---

TOWANDA R. FUTRELL,

               Plaintiff,

v.                                   ACTION NO. 4:24cv115

WDTC, LLC, et al.,

               Defendants.

### OPINION AND ORDER

Pending before the Court are plaintiff's, Towanda R. Futrell ("Futrell"), motions to consolidate *Futrell v. AV Leasing, LLC*, 4:23cv118 (E.D. Va. 2023) ("*Futrell I*"), ECF No. 147, and *Futrell v. WDTC, LLC*, 4:24cv115 (E.D. Va. 2024) ("*Futrell II*"), ECF No. 3. All defendants in both cases oppose the motions. Also pending before the Court are two related motions: defendants', Triton Logistics, Inc. ("Triton") and Daniel L. Cramer ("Cramer"), motions to strike Futrell's motion to consolidate. *Futrell I*, ECF Nos. 155, 159. As a hearing is not necessary, these matters are ripe for review. For the reasons discussed below, plaintiff's motions to consolidate, *Futrell I*, ECF No. 147; *Futrell II*, ECF No. 3, are **DENIED**, and Triton and Cramer's motions to strike, *Futrell I*, ECF Nos. 155, 159, are **DENIED AS MOOT**.

## I.    **BACKGROUND**

**A.**    *Futrell I*, **4:23cv118**

On August 28, 2023, Futrell sued Cramer and AV Leasing LLC ("AV Leasing"), Compl., ECF No. 1, and subsequently amended her complaint on June 3, 2024, adding Triton and WDTC, LLC ("WDTC") as defendants to the action, ECF No. 43 ("Futrell I Compl.").[1]  In the amended complaint, Futrell alleges that, on December 16, 2022, Cramer was operating a tractor trailer on Interstate 64 East in York County, Virginia, when it "slammed into" a party bus on which Futrell was a passenger.  *Id.* ¶ 8.  Futrell, and the other 21 passengers, were ejected from the party bus. *Id.*  Three passengers tragically passed away from their injuries and the other nineteen passengers, including Futrell, suffered serious injuries.  *Id.*  According to Futrell, AV Leasing owned, and Triton leased, the tractor trailer that Cramer was driving, and Cramer was acting in the scope of his employment for both Triton and WDTC at the time of the collision.  *Id.* ¶ 13.  Futrell also alleges that Triton allowed Cramer to operate the tractor trailer more than the prescribed number of hours allowed by regulation, and Cramer falsified his driving log records.  *Id.* ¶ 9.  Based on these allegations, Futrell asserts claims of *respondeat superior* against Triton, AV Leasing, and WDTC; and negligence against Cramer.  *Id.* ¶ 14.

The Court entered a Rule 16(b) scheduling order on February 14, 2024.  ECF No. 28.  That order provides for, among other things, trial to commence on October 15, 2024; fact discovery to

---

[1] Walleed Risheq, Esq., signed and filed Futrell's original complaint.  *See* ECF No. 1, at 6.  On October 3, 2023, however, Christopher M. Fitzpatrick, Esq., filed a notice of appearance on behalf of Futrell.  ECF No. 3.  From that point on, Mr. Fitzpatrick signed all filings and appeared alone on behalf of Futrell at a hearing on June 3, 2024.  ECF No. 41.  On November 26, 2024, Mr. Fitzpatrick moved to withdraw as counsel and "substitute" Mr. Risheq.  ECF No. 169.  The Court granted the motion that same day.  ECF No. 170.

be completed by June 11, 2024; expert discovery to be completed by August 6, 2024; and dispositive motions to be filed by August 20, 2024. *Id.* at 2–3.

Futrell sought leave to amend her complaint twice more. On July 16, 2024, after Futrell's counsel deposed Andrew Voveris ("Voveris"), the Chief Executive Officer of Triton, Futrell moved to amend her complaint to allege punitive damages. ECF No. 73, at 5. On August 23, 2024, the Court denied Futrell's motion because, among other things, discovery closed on August 6, 2024; trial was set to begin on October 15, 2024; and Futrell knew of the deposition evidence relied on as the basis to amend when she filed her first amended complaint. ECF No. 92, at 3–4.

In June 2024, Triton (ECF No. 49) and Cramer and WDTC (ECF No. 53) filed third-party complaints against Futrell's Party Adventures, LLC ("FPA"),[2] and Antonio Wiggins ("Wiggins") (the driver of the bus on which Futrell was a passenger) (collectively, the "third-party defendants"). The third-party defendants later moved to sever on September 17, 2024. ECF No. 114.

After AV Leasing moved for summary judgment, ECF No. 89, and the third-party defendants moved to sever, ECF No. 114, the Court cancelled the final pretrial conference and trial and stayed the deadlines outlined in parts IX–XIII of the scheduling order, ECF No. 28, to enable the Court to consider the pending motions.[3] ECF No. 128. On September 26, 2024, the Court ordered Futrell to show cause why the Court should not dismiss AV Leasing for failure to state a claim. ECF No. 135. Futrell filed a one sentence response, asking the Court to take "judicial

---

[2] As alleged in Cramer and WDTC's third-party complaint, "[t]he party-bus at issue was owned by Towanda Futrell and used in connection with her business, Futrells Party Adventures LLC." ECF No. 53, ¶ 28.

[3] The Court also noted that there were seven motions in limine pending. ECF No. 128, at 1 n.1 (citing ECF Nos. 101, 109, 111, 116, 118, 121, 127).

notice" of her opposition to AV Leasing's motion for summary judgment that she filed on August 28, 2024, nearly *one month before* the Court issued the show cause order.  ECF No. 151.

The Court dismissed without prejudice AV Leasing from *Futrell I* on October 7, 2024. ECF No. 152.  The Court, however, did not do so lightly.  *Id.* at 6 ("The Court takes no pleasure in arriving at this place.").  It noted that plaintiff's counsel's response to the show cause order was "not the first (or even second or third) foray into missing a deadline, responding insufficiently to a directive from the Court, or failing to comply with the requirements outlined in scheduling orders[.]"  *Id.* at 4.  The Court documented a pattern of plaintiff's counsel's failure to do so, not only on at least five occasions in this case, *id.* at 4–6, but also in a different case in which he appeared before the Court, *id.* at 4 n.1.  Given plaintiff's counsel's "perplexing inability to do what is asked[,]" and the lack of a substantive response to the show cause order, the Court concluded that "it ha[d] no choice but to dismiss this specific action  as to AV Leasing for failure to properly state a claim."  *Id.* at 7.

On October 9, 2024, Futrell *again* moved for leave of court to amend her complaint to "confirm and crystalize" her allegations against AV Leasing.  ECF No. 163, at 1.  The Court denied the motion, finding that Futrell did not meet the good cause standard.  ECF No. 164, at 3.

**B.**    *Futrell II*, **4:24cv115**

Futrell commenced a new lawsuit in this Court on October 2, 2024, relating to the December 16, 2022 vehicle collision.[4]  *Futrell II*, Compl, ECF No. 1 ("Futrell II Compl.").  Along with the defendants named in *Futrell I*—WDTC, Cramer, Triton, and AV Leasing—Futrell named 10 new defendants:  Triton Logistics Holdings, LLC; Universal Capacity Solutions Holdings, Inc.;

---

[4] Mr. Fitzpatrick signed and filed the complaint.  *See* ECF No. 1, at 25.  As in *Futrell I*, Mr. Fitzpatrick was Futrell's primary counsel until the Court granted his motion to withdraw and to substitute Mr. Risheq.  ECF No. 56.  Since then, Mr. Risheq has represented Futrell.

Universal Capacity Solutions, LLC; Universal Logistics, Inc. d/b/a Universal Logistics Solutions, Inc.; Matthew Moroun ("Moroun"); AV Logistics Management, Inc.; AV Repair, LLC; Triton Logistics UAB; Andrew Voveris; and Eva Voveris.  *Id.* at 1–3.

In short, apart from the regurgitation of the allegations in *Futrell I*, the allegations in *Futrell II* center on a large-scale fraudulent scheme to circumvent federal regulations that govern the maximum driving time for certain tractor trailer drivers.  *Id.* at 4–15; *see also* 49 C.F.R. § 395.3. This scheme, allegedly perpetrated to "fraudulently maximize and increase profits[,]" involves "The Triton Logistics Defendants" and Voveris maintaining a practice through which "its employees and agents knowingly falsified electronic logging devices from their offices in Lithuania[.]" Futrell II Compl. ¶ 38.  According to Futrell, at the time of the collision, Cramer had exceeded the number of hours regulations permitted him to drive, but "[t]he Triton Logistics Defendants" and Voveris "created a non-existent co-driver such to make it appear that . . . Cramer" was complying.  *Id.* ¶ 51.

The 101-paragraph complaint asserts the following causes of action:

(a) negligent hiring and supervision against the "Universal Logistics Defendants,"[5] the "Triton Defendants," Moroun, Triton, and Voveris;

(b) vicarious liability against Moroun;

(c) aiding and abetting against the "Universal Logistics Defendants," the "Triton Defendants," Triton, Voveris, and Moroun;

(d) joint venture/enterprise liability against the "Universal Logistics Defendants";

(e) negligence/*respondeat superior* against Cramer, WDTC, Triton, and the "Triton Logistics Defendants";

(f) gross negligence, willful wanton and reckless indifference against all defendants;

---

[5] The complaint defines "the Universal Logistics Defendants" as:  Universal Capacity Solutions, Inc. d/b/a Universal Corporate Creations Network, Inc.; Universal Logistics Holdings, Inc.; and Universal Logistics, Inc. d/b/a Universal Logistics Solutions, Inc.  Futrell II Compl. ¶ 6.

(g) vicarious liability against the "Triton Logistics Defendants"[6] and Triton;

(h) vicarious liability against the "Triton Logistics Defendants";

(i) vicarious liability against Voveris;

(j) aiding and abetting against the "Universal Logistics Defendants," the "Triton Logistics Defendants," Triton, Moroun, Voveris, and Eva Voveris.

*Id.* at 15–24.[7]

Five motions to dismiss are pending in *Futrell II* filed by: (a) Universal Capacity Solutions LLC, ECF No. 7; (b) Moroun, ECF No. 20; (c) Universal Capacity Solutions Holdings, Inc., ECF No. 22; (d) Voveris, ECF No. 48; and (e) Triton Logistics Holdings, LLC, AV Repair, LLC, AV Logistics Management, Inc., and Eva Voveris, ECF No. 58.[8]

\* \* \*

In October 2024, Futrell moved to consolidate *Futrell I* (Oct. 2, 2024, ECF No. 147) and *Futrell II* (Oct. 10, 2024, ECF No. 3), with an accompanying memorandum in support, Pl.'s Mem. of Law in Supp. of Mot. to Consolidate, *Futrell I*, ECF No. 148, *Futrell II*, ECF No. 4 ("Pl.'s Mem."). All defendants, (except for Triton Logistics UAB, which has yet to be served) opposed the motion. *Futrell I*, ECF Nos. 154 (Triton), 158 (Cramer); *Futrell II*, ECF Nos. 72 (Triton and

---

[6] The complaint defines "[t]he Triton Logistics Defendants" as: "Universal Capacity"; Triton Logistics Holdings, LLC; AV Logistics Management, Inc.; AV Repair, LLC; Triton Logistics UAB; and AV Leasing, LLC. Futrell II Compl. ¶ 8. It is unclear whether there is any distinction between "[t]he Triton Logistics Defendants" and the "Triton Defendants."

[7] At a January 2, 2025 status conference, Futrell stated that she would dismiss her claims against AV Leasing. *Futrell II*, ECF Nos. 63, 87. On January 22, 2025, the Court construed Futrell's "Stipulation of Dismissal of AV Leasing," ECF No. 65, as a motion to dismiss without prejudice (because AV Leasing had filed an answer, *see* ECF No. 46) and granted the motion. ECF No. 87. On January 16, 2025, Futrell dismissed her claims against Universal Logistics, Inc. ECF No. 78.

[8] Triton and Voveris (ECF No. 47) and Cramer and WDTC (ECF No. 28) filed third-party complaints against FPA and Wiggins. FPA and Wiggins did not move to sever this time.

Voveris), 74 (Cramer and WDTC), 75 (AV Logistics Management, Inc., AV Repair, LLC, Triton Logistics Holdings, LLC, and Eva Voveris), 76 (Matthew Moroun and Universal Capacity Solutions Holdings, Inc.), 77 (Universal Capacity Solutions, LLC). Triton and Cramer moved to strike the motion as well, incorporating their oppositions to the motion to consolidation in support. *Futrell I*, ECF Nos. 155, 159.

## II.    LEGAL STANDARD

A court may consolidate actions if they involve a "common question of law or fact." Fed. R. Civ. P. 42(a)(1). "Rule 42(a) gives the district court 'broad powers to consolidate actions involving *common questions of law or fact* if, in its discretion, such consolidation would facilitate the administration of justice.'" *Liberty Lincoln Mercury, Inc. v. Ford Mktg. Corp.*, 149 F.R.D. 65, 80 (D.N.J. 1993) (citation omitted); *see also R.M.S. Titanic, Inc. v. Haver*, 171 F.3d 943, 959 (4th Cir. 1999) (noting the discretion of the district court under Rule 42(a)). In exercising its discretion, a court must "weigh the saving of time and effort that consolidation under Rule 42(a) would produce against any inconvenience, delay, or expense that it would cause for the litigants and the trial judge." 9 Wright & Miller, *Federal Practice & Procedure: Civil* § 2383 (3d ed. 2008). The United States Court of Appeals for the Fourth Circuit has provided a list of factors to guide this determination:

> The critical question for the district court . . . [is] whether the specific risks of prejudice and possible confusion [are] overborne by the risk of inconsistent adjudications of common factual and legal issues, the burden on parties, witnesses and available judicial resources posed by multiple lawsuits, the length of time required to conclude multiple suits against a single one, and the relative expense to all concerned of the single-trial, multiple-trial alternatives.

*Arnold v. E. Air Lines, Inc.*, 681 F.2d 186, 193 (4th Cir. 1982) (first citing Fed. R. Civ. P. 42; and then citing Wright & Miller, § 2383), *rev'd on other grounds*, 712 F.2d 899 (4th Cir. 1983) (en banc); *see also Campbell v. Boston Sci. Corp.*, 882 F.3d 70, 74–75 (4th Cir. 2018).

Notably, "the mere fact that a common question is present, and that consolidation therefore is permissible under Rule 42(a), does not mean that the trial court judge must order consolidation." Wright & Miller, § 2383; *see also Laughlin v. Biomet*, No. ELH-14-1645, 2020 WL 1307397, at *6 (D. Md. March 18, 2020).

### III.    DISCUSSION

**A.    There are common questions of law and fact between *Futrell I* and *Futrell II*.**

Both *Futrell I* and *Futrell II* arise from the tragic motor vehicle collision that occurred on December 16, 2022. *See* Futrell I Compl. ¶ 8; Futrell II Compl. ¶ 20. Common questions of law and fact between the two include whether: (a) Cramer negligently operated the tractor trailer when it crashed into the party bus, Futrell I Compl. ¶ 15; Futrell II Compl. ¶ 80; (b) Cramer was acting in the scope of his employment with Triton while operating the tractor trailer at the time of the collision, Futrell I Compl. ¶¶ 10, 14; Futrell II Compl. ¶¶ 73–74; and (c) Triton falsified driving log records and permitted Cramer to operate the tractor trailer for longer than the maximum number of hours permitted, Futrell I Compl. ¶ 9; Futrell II Compl. ¶¶ 73–74, 78–79. Despite the differences discussed below, the cases share common issues of law and fact such that "consolidation is possible under the express terms of Rule 42(a)." *Laughlin*, 2020 WL 1307397, at *8.

**B.    Futrell's argument that she will suffer prejudice if the Court does not consolidate the cases is not persuasive.**

Futrell bears the burden to show that consolidation is desirable. *Joe Hand Promotions, Inc. v. Dock St. Enterprises, Inc.*, No. WMN-11-1973, 2011 WL 6141058, at *2 (D. Md. Dec. 8, 2011). She fails, however, to address any of the relevant factors that the Court must consider in deciding whether to consolidate the actions. Beyond a conclusory statement that there are common questions of law and fact, and that consolidation will not prejudice defendants, Futrell devotes

8

nearly all her brief to explaining why she will suffer prejudice if the Court declines to consolidate the cases. *See generally* Pl.'s Mem. What Futrell fails to recognize, however, is that any prejudice that may result from the Court's denial of her motion directly flows from her (or her previous counsel's) acts and omissions. Even though Futrell's arguments in favor of consolidation are sorely lacking structure, the Court gleans three and rejects each in turn.

First, Futrell places much emphasis on the fact that the National Transportation Safety Board's ("NTSB") Final Report ("NTSB Final Report" or "Final Report") was publicly released on August 28, 2024, a little more than three weeks after fact discovery closed in *Futrell I*. Pl.'s Mem. ¶¶ 6, 9–10, 14. She contends that she did not have evidence of Triton's alleged log-falsification practices before then. *Id.* ¶¶ 9–10, 14. As discussed below, this contention cannot survive close scrutiny. Futrell seems to regard the NTSB Final Report as some smoking gun paramount to proving her case. *Id.* ¶ 13 ("Now eyes are certainly wide open, and evidence [in the NTSB Final Report] is clearly transparent for the first time"). But the Court does not see the particular significance of the NTSB Final Report, nor does it see how Futrell can claim that she did not know of its *content* before it was released in its final form. Although not dispositive of the pending motion, the Court finds it prudent to briefly explain.

As part of the NTSB's investigative process,[9] numerous "Group Chair's Factual Reports" were issued before the NTSB released the Final Report on August 28, 2024. *Futrell I*, ECF Nos. 175-1, 175-2.[10] These reports, many dated October 17, 2023, appear to have become publicly

---

[9] For an overview of the NTSB's investigative process, see NTSB, *Information and Guidance for Parties to NTSB Accident and Incident Investigations*, available at https://perma.cc/8S7T-FL6U.

[10] On July 30, 2024, Triton disclosed Matthew C. Dwyer as its accident reconstruction expert and provided a copy of Dwyer's expert report—dated July 28, 2024—to Futrell. *Futrell I*, ECF No. 127-1. That disclosure indicates that Dwyer considered the "NTSB Report" in preparing his report. *Id.* at 15. While preparing for a hearing on Futrell's motion to exclude Dwyer, ECF No.

available on December 20, 2023, when the NTSB released the docket for this investigation on its

website.[11]  https://data.ntsb.gov/Docket/?NTSBNumber=HWY23MH004.  Based on the content

and timing of these reports, the Court rejects the notion that Futrell was somehow blindsided by

any critical unknown information when the NTSB released the Final Report.

    One Group Chair's Factual Report—titled "Human Performance Factors" ("HPF

Report")— contains much of the information Futrell now contends she did not know until eight

months later when the NTSB released the Final Report in August 2024.  For example, the HPF

Report states:

> The truck driver [Cramer] was subsequently interviewed by NTSB investigators on
> May 12, 2023.  In that interview, the driver stated he was traveling alone; he did
> not have a co-driver.  He further stated his employer would manipulate the digital
> logs to indicate there was a second driver.  His employer also instructed him to state
> he had recently dropped his co-driver off when inspected roadside or when stopped
> at scales.

---

127, the Court ordered Triton to file "a notice identifying which NTSB report(s) . . . Dwyer
reviewed in preparing his July 28, 2024 report and to file such NTSB report(s) as an exhibit[.]"
*Futrell I*, ECF No. 171.  Triton did just that.  *Futrell I*, ECF No. 175.  The exhibits to its filing
include, among other things, the Group Chair's Factual Reports from the NTSB's investigation.
*Futrell I*, ECF Nos. 175-1, 175-2.

[11] Although the NTSB's docket does not indicate the date on which each entry was made publicly
available, the Court observes that a March 30, 2024 Wayback Machine capture of the docket's
web page (the earliest available capture of the web page) indicates that many of the Group Chair's
Factual Reports, including those discussed here, were publicly available at that time.  *See*
https://web.archive.org/web/20240330152430/https://data.ntsb.gov/Docket/?NTSBNumber=HW
Y23MH004#expand.  "The Wayback Machine is an online digital archive of webpages." *Valve
Corp. v. Ironburg Inventions, Ltd.*, 8 F.4th 1364, 1374 (Fed. Cir. 2021) (citation omitted).  It can
be used "as a source of information to determine when a Web reference was first made available
to the public." *Id.* (citation and internal quotation marks omitted).  The United States Court of
Appeals for the District of Columbia Circuit held that a district court can take judicial notice of
the content of webpages available through the Wayback Machine. *New York v. Meta Platforms,
Inc.*, 66 F.4th 288, 303 (D.C. Cir. 2023).  And, one court in this circuit has concluded that Wayback
Machine evidence is admissible. *OptoLum, Inc. v. Cree, Inc.*, 490 F. Supp. 3d 916, 938 (M.D.N.C.
2020) ("[T]here are several ways [the Wayback Machine evidence] could be admissible[.]").  The
Court, however, need not address such questions at this juncture.

*Futrell I*, ECF No. 175-1, at 75, 85–86. In support of this summary, the HPF Report cites directly to the "*Truck Driver Interview Transcript* in the docket for this investigation." *Id.* at 85 n.17. Even more, a footnote to the paragraph quoted above states: "For additional details on the *reported manipulation of log data*, please see the *Motor Carrier Group Chairman's Factual Report* in the docket for this investigation." *Id.* at 86 n.18 (first emphasis added).

Heading there next, the Motor Carrier Group Chair's Factual Report ("Motor Carrier Report") contains even more of the "new" information central to Futrell's consolidation motion. *Id.* at 233–53. One section of the Motor Carrier Report documents Triton's corporate structure:

> Triton Logistics, Incorporated is a subsidiary of Triton Logistics Holding LLC. Other subsidiaries are Triton Express LLC (brokerage), AV Logistics Management, Inc (asset management), AV Leasing LLC (vehicle and trailers), AV Estates LLC (real estate company), Triton Portsmouth LLC (Virginia based location), AV Repair LLC (Maintenance) and Triton Logistics UAB (Offices in Lithuania).

*Id.* at 238. As discussed below, Futrell's apparently limited discovery practice appears to have hamstrung her efforts to decipher the relationship between Voveris and those entities. Futrell did not effectively use this information to uncover the facts necessary for her to timely amend her *Futrell I* complaint. Instead, she named many of these entities as defendants in *Futrell II* and then moved to consolidate.

And, if that was not enough, another section of the Motor Carrier Report—titled "Hours of Service Issues"—appears to document the *precise scheme* that Futrell now argues "was fraudulently concealed by Andrew Voveris and [Triton,]" Pl.'s Mem. ¶ 6:

> Examination of the [electronic logging device ("ELD")[12]] data showed the driver to be operating in a driver/co-driver operation. The data contained the driver's information, driver's license number and driver's log-in. The driver and co-driver information was very similar. The driver's license number and state were the same for the driver and co-driver. The driver's log-in was his last name followed by his

---

[12] "An ELD is a device or technology that automatically records a driver's driving time and facilitates the accurate recording of the driver's hours of service." ECF No. 175-1, at 241.

11

first name and the number 2 with no spaces. The co-driver's log-in was also the same with the addition of letters "tl" at the end of the driver's log-in. The driver had told the Virginia State Police that he had dropped his co-driver off at truck stop just prior to the crash.

Interviews and evidence developed determined that the alleged co-driver was no longer an employee of the carrier and had been dismissed on December 8, 2022. A phone interview with the alleged "co-driver["] revealed that he did not know the driver, had never occupied the truck with him or driven over-the-road for Triton.
. . .

Triton officials stated this discrepancy was due to the carrier reviewing and editing improper information to ensure it was compliant and correct. Even though the driver was using a fictitious or "ghost" co-driver, the ELD was functioning and connected to the truck tractor and showed accurate driving and stopped times, location, and other telematics information.
. . .

NTSB investigators were able to interview the truck driver [Cramer]. He stated that he had stopped for a rest break at the rest area the evening prior to the crash (December 15). After his break, he went to the Pilot truck stop and fueled his truck. The driver stated he had no co-driver and was not assigned to a team. *He explained that the carrier[Triton] had given him instructions during his orientation where if he was running out of driving hours, to stop, log out of his ELD and call the carrier's hours-of-service department. The hours-of-service department would change his ELD to another driver, he would log back in and would then have additional hours to drive. He stated that his ELD would show his information, but the hours would be attributed to another "driver."*

*Futrell I*, ECF No. 175-1, at 248–50 (emphasis added).

The NTSB Final Report contains substantially the same information, and at times uses identical language.[13] *See Futrell I*, ECF No. 148-4. With minimal additional or differing factual or investigatory findings from the relevant Group Chair Factual Reports—available long *before* Futrell moved to amend her complaint on May 21, 2024, and *well before* fact discovery closed on June 11, 2024—the NTSB used the Group Chair Factual Reports to make findings and determine

---

[13] The Final Report states that the NTSB and the Federal Motor Carrier Safety Administration spoke with four former Triton drivers who stated that "Triton had provided them a similar process to use when they were out of allowable driving hours." ECF No. 148-4, at 33.

the probable cause of the collision in the Final Report.  In the conclusion of the Final Report, the

NTSB made the following relevant findings:

> The truck driver's lack of response to the slow-moving bus in his travel lane was due to his fatigue caused by excessive driving time and limited sleep opportunity.
> …
> Triton Logistics Incorporated created fictitious driver accounts in the electronic logging device system, which enabled drivers to operate their vehicles for hours beyond those allowable by federal regulations, leading to the drivers driving in a likely fatigued condition, as occurred with the crash-involved driver.

*Id.* at 55.  It also made the following probable cause determination:

> The [NTSB] determines that the probable cause of the [collision] was the truck driver's fatigue, due to excessive driving time and limited sleep opportunity, which resulted in his lack of response to the slow-moving bus ahead.  Contributing to the truck driver's fatigue was the motor carrier, [Triton], which created fictitious driver accounts in the [ELD] system and enabled drivers to operate their vehicles for hours in excess of federal regulations.  Contributing to the severity of the crash was the operation of the bus at a significantly slower speed than other highway traffic.

*Id.* at 56.

In the unlikely event that Futrell was unaware of any of the information outlined above, at

a minimum she appears to have possessed the same, or substantially the same, information no later

than May 8, 2024, when her counsel deposed Cramer.  *Futrell I*, ECF No. 102-4.  At his deposition,

Cramer testified that his log for the day of the accident was a "split log"[14] with a co-driver, David

Sykes, who was not in the vehicle at the time of the accident.  *Id.* at 35:7–18.  He also testified that

Sykes was never in the tractor trailer with him at any time before the accident, *id.* at 35:19–21, and

that he had never met Sykes, *id.* at 53:20–54:1.  When asked why he brought up a co-driver, Cramer

stated "that's how Triton runs their electronic logs."  *Id.* at 53:15–19.  This testimony tracks with

Cramer's testimony before the NTSB.

---

[14] According to Cramer, "[a] split log is if you have a co[-]driver, then you can drive with a smaller break and . . . utilize those hours."  *Futrell I*, ECF No. 102-4, at 35:7–9.

Notably, on June 14, 2024, Futrell also deposed Voveris as the 30(b)(6) designee of AV Leasing. *See Futrell I*, ECF No. 102-5. Voveris testified that he was the president of AV Leasing and Triton. *Id.* at 6:15–17, 12:8–9. The rest of the deposition was contentious. In short, Futrell's counsel's persistent questioning of Voveris about Triton, *see, e.g.*, *id.* at 79:15–16 ("I'm asking about Triton now.")—questions that were allegedly outside the scope of the notice to AV Leasing—prompted AV Leasing's counsel to instruct Voveris not to respond to any further questioning on the same. *Id.* at 17:19–22. Futrell's counsel repeatedly asked Voveris about a Virginia State Police investigation into whether there was a practice to falsify driver log records. *Id.* at 128:5–11.

On July 10, 2024, Futrell moved to compel Voveris to sit for a deposition as the President and Chief Executive Officer of Triton, despite not noticing Triton with the deposition. *Futrell I*, ECF Nos. 68, 74. The Court finds two portions of that motion fatal to her "blindsided" argument:

> Based on the fact that the Virginia State Police investigated [Voveris'] company *for allegedly altering logbooks as to the number of hours drivers were permitted to drive* . . . Voveris refused to answer any questions. [Voveris'] attorney . . . knowing that the truth is paramount to any thing when pursuing the interests of justice, directed [Voveris] not to answer questions in a capacity with respect to his position at [Triton]. This was in light of the fact that [Triton] was an extensive focus of the VA State Police investigation and knowing that the driver he employed cannot account or has no memory of how his vehicle slammed into the Party Bus just prior to this incident with clear visibility.
>
> . . .
>
> [C]ounsel for . . . Cramer has also participated in uniform with [Voveris' counsel] at . . . Voveris's deposition blocking questions and using inappropriate vernacular that is sanctionable in attempting to obfuscate the plaintiff from obtaining facts as to . . . Voveris's knowledge of how long . . . Cramer had been on the road and whether any logbooks had been altered which was a focus of the Virginia State Police's initial investigation. . . . *The altering of records was known by Triton's data call center in Lithuania where Defendant Cramer could call to alter his logbook to make it appear tht [sic] he had more time for rest which was allegedly known and controlled by . . . Voveris and [Triton].*

*Id.* at 3–4 (emphasis added).

14

Despite Futrell including some of the information set forth above in her motion for leave to amend her complaint, *none* of it made its way into her proposed second amended complaint filed on July 16, 2024. *Futrell I*, ECF Nos. 73, 73-1. Instead, Futrell's proposed amendment sought punitive damages, with bare factual allegations in support. *Id.* Futrell had most, if not all, of the pieces to the puzzle. Rather than assemble them, she delayed seeking to assert new claims in *Futrell II* until five weeks after the NTSB issued its Final Report. For these reasons, the Court rejects Futrell's argument that consolidation of *Futrell I* and *Futrell II* is necessary or desirable to cure any perceived prejudice related to the timing of the release of the NTSB Final Report.

Second, Futrell contends that defendants' conduct throughout discovery warrants consolidation. For example, Futrell contends that: (a) she "was thwarted by . . . Voveris' evasive conduct and games throughout depositions and discovery"; (b) "Voveris, systemically even during depositions continued through the discovery in this underlying action to attempt in a sinister, evasive as well as fraudulent manner to cover up the fraud and allegedly suppressed information"; (c) she "was heavily thwarted in depositions and discovery in obtaining answers"; and (d) before the release of the NTSB Report, Voveris denied "any allegations of falsifying documents" and Cramer denied that he was fatigued when operating the tractor trailer on the day of the collision. Pl.'s Mem. ¶¶ 6, 8, 10. But filing the lawsuit anew and then moving for consolidation was not the proper way to cure that frustration. If the defendants in *Futrell I* violated the rules of discovery, Futrell should have pursued vigorously the recourse mechanisms provided by the Federal Rules of Civil Procedure and the Local Rules.

Indeed, on August 23, 2024, in response to Futrell's motion to compel, the Court permitted her to notice a 30(b)(6) deposition of Triton and ordered Triton to produce its designee within two weeks. *Futrell I*, ECF No. 92, at 4. And so, Futrell deposed Voveris as Triton's 30(b)(6) designee

on September 5, 2024. *Futrell I*, ECF No. 105-2. If Futrell believed that Voveris, during either deposition, "fail[ed] to answer a question asked under Rule 30[,]" Fed. R. Civ. P. 37(a)(3)(B)(i), or provided "an evasive or incomplete disclosure, answer, or response" Fed. R. Civ. P. 37(a)(4), then she could have moved to compel such a response under Rule 37. And, if the Court had granted that motion, and Triton violated the Court's order, Rule 37 provides a host of sanctions. But Futrell did not do so. At bottom, whether Voveris and Cramer were forthcoming at their depositions has no bearing on whether consolidation is appropriate.

The Court would also be remiss to look past Triton's statement in a previous filing dated September 26, 2024, that Futrell "failed to propound any discovery on AV Leasing or Triton." *Futrell I*, ECF No. 137, at 9. This appears to be borne out by the extensive documents Futrell sought Triton produce through its 30(b)(6) deposition notice issued almost three months after fact discovery closed. Among other things, Futrell requested:

(a) "[a]ll documents, contracts, writings, and emails relating to the accident";

(b) "[a]ll documents, photographs, videos of footage of the front of the Triton vehicle on December 16, 2024 [sic] 30 minutes and up to the collision and impact with the party bus";

(c) "[a]ll documents, log records of . . . Cramer from" the relevant period;

(d) "[a]ll documents, texts, emails writing and inter-company communications regarding allegedly altering log records for drivers and any communications, emails and writings sent from Triton Logistics, Inc. as well as from . . . Voveris allegedly to Lituania [sic] or a Lituanian [sic] data bank overseas";

(e) "[a]ll documents regarding training and safety procedures of all truck drivers from Triton";

(f) "[a]ll documents regarding all inter company reports and writings concerning this incident";

(g) "[a] copy of all declaration sheets and insurance policies that covered the 18-wheel truck driven by . . . Cramer on December 16, 2022";

    (h) "[a]ll documents regarding the background check performed on both . . . Cramer and . . . Voveris"; and

    (i) "[a]ll documents and photographs of the damage to the Triton Logistics Truck damage estimates or if the truck was totaled the amount that Triton . . . recovered."

*Futrell I*, ECF No. 137-3, at 4–9. Despite objecting to this extensive document production request, Triton produced Cramer's background records, and the dashcam footage from, and photographs of, the tractor trailer. If this production contained new information not known to Futrell when she first moved to amend her complaint, the proper course of conduct would have been for Futrell to seek leave do so again.

    Third, Futrell argues that it would be "fundamentally unfair and prejudicial" for the Court to deny consolidation because the other individuals injured in the accident who opted to file actions in York County Circuit Court have 9–12 months longer than Futrell to "explore the NTSB report." Pl.'s Mem. ¶ 9. Essentially, Futrell contends that it would be unfair for the Court to require her to adhere to the scheduling practices of this Court, when in fact, *she* was the one who chose to bring her case here. The Court disagrees.

**C.**    **The Court declines to consolidate *Futrell I* and *Futrell II* because the substantial risk of delay, significant confusion, and prejudice far outweigh the potential benefits.**

    Having rejected Futrell's arguments in favor of consolidation, the Court declines to exercise its discretion to consolidate these cases. Rather than promote any real efficiency and judicial economy, consolidation of *Futrell I* and *Futrell II* would result in significant delay and confusion. And, contrary to Futrell's lone, unsupported, and unexplained statement otherwise, consolidation would cause substantial prejudice to the defendants named in both cases. *See* Pl.'s Mem. ¶ 12.

    To begin, despite the Court finding that Futrell has made a preliminary showing of commonality such that consolidation under Rule 42(a) is possible, the *Futrell II* defendants'

arguments as to the stark distinctions between the cases are well taken. *Futrell II*, ECF No. 76, at 4–6; ECF No. 77, at 4. *Futrell I* involves one negligence claim against Cramer, with attendant *respondeat superior* claims against Triton and WDTC: Cramer negligently operated a tractor trailer that collided with the bus Futrell was a passenger in on December 16, 2022; and Triton and WDTC are liable for Cramer's negligence through *respondeat superior* because Cramer was working within the scope of his employment when the collision occurred. *Futrell I*, ECF No. 43, at 3–5. Thus, for Futrell to prevail against Cramer, she must prove the traditional negligence elements: (a) Cramer owed Futrell a legal duty; (b) Cramer breached that duty; (c) Cramer's breach of that duty both factually and proximately caused Futrell's harm; and (d) Futrell suffered damages as a result of that harm. *Al-Saray v. Furr*, 910 S.E.2d 320, 324 (Va. 2025). If she proves these elements, then she next needs to prove that Cramer was acting in the course of his employment with either Triton or WDTC, or both, when the collision occurred. *Kensington Associates v. West*, 362 S.E.2d 900, 901 (Va. 1987). In short, the resolution of *Futrell I* requires the fact finder to determine whether Cramer was negligent and whether he was acting within the scope of his employment.

Futrell asserts nearly identical claims against Triton, WDTC, and Cramer in *Futrell II*. The divide—both factually and legally—between the cases, however, deepens when one looks, not only at the 10 new defendants, but also at the claims asserted against them.[15] *Futrell II* involves a

---

[15] The Court rejects the notion that consolidation is the appropriate recourse to address the fact that Futrell's claims against Triton, WDTC, and Cramer in *Futrell I* are nearly identical to her claims against them in *Futrell II*. These similarities do not outweigh other significant differences between the cases to warrant consolidation. Instead, "the well-settled principle of federal litigation embodied in the rule against claim splitting[,]" would appear to be the means to address any such concerns. *Bloch v. Exec. Off. Of the President*, 164 F. Supp. 3d 841, 854 (E.D. Va. 2016). At bottom, "this rule bars a second lawsuit (i) that 'arises out of the same transaction or series of transactions' as a previous lawsuit and (ii) that 'involves the same parties.'" *Id.* at 854–55 (quoting *Sensormatic Sec. Corp. v. Sensormatic Elecs. Corp.*, 273 F. App'x 256, 265 (4th Cir. 2008).

complex web of questions of fact and law that require different, and substantially more, evidence than the claims and defenses in *Futrell I*. For example, Futrell alleges that "The Universal Logistics Defendants[,]" which includes Universal Capacity Solutions, LLC ("UCS"), were negligent when they arranged for Triton to transport cargo for a customer shipper. Futrell II Compl. ¶¶ 26, 53–60. UCS argues that it is a freight broker, and thus the Federal Aviation Authorization Administration Act ("FAAAA") preempts Futrell's claims against it.[16] *See Futrell II*, ECF No. 8; *see also* ECF No. 77, at 4.

The resolution of this preemption issue and UCS's connection, if any, to the collision and its role in the transportation of cargo appears to be entirely distinct from the negligence claims asserted in *Futrell I*. This, along with the voluminous additional evidence necessary to prove the existence of the fraudulent scheme and the other claims in *Futrell II* (negligent hiring and supervision, vicarious liability, aiding and abetting, and willful wanton and reckless indifference), garner a significant risk of confusion for the fact finder should the Court consolidate the cases. When, as here, the common issues are not central to the resolution of the actions or consolidation will lead to delay in the processing of one of the cases, the Court may deny consolidation. *See* Wright & Miller, § 2383.

The vast difference in the posture of each case also counsels against consolidation. *Futrell I* has been pending since August 28, 2023; the parties have fully engaged in and completed discovery, including taking many depositions; and have fully briefed several motions to compel, motions to dismiss, and motions for summary judgment. Not only have the parties devoted significant resources to resolve this case, but so has the Court. To date, the Court has:

---

[16] Moroun, allegedly the "majority shareholder" and "Chair of the Board of Directors of Universal Logistics Holdings, Inc," Futrell II Compl. ¶ 11, also has moved to dismiss on the same grounds as UCS. *Futrell II*, ECF No. 21, at 5–13.

(a) addressed several motions to compel, ECF Nos. 29, 31, 68, 78; (b) imposed sanctions attendant to those motions to compel, ECF Nos. 92, 124; (c) held three motions hearings, ECF No. 41, 93, 178; (d) conducted a settlement conference, ECF No. 70; and (e) issued two opinions on motions *in limine* relating to Futrell's expert witnesses, limiting the scope of one, ECF No. 166, and entirely excluding another, ECF No. 168. Consolidation would effectively wipe these efforts away.

And, although the Court cancelled the trial scheduled to begin on October 15, 2024, and stayed the remaining deadlines in the scheduling order, the bases for that stay have been, or will shortly be, resolved. The Court's dismissal of AV Leasing without prejudice, mooted AV Leasing's motion for summary judgment, ECF No. 89, and the Court will rule on the third-party defendants' motion to sever shortly. The only impediments to trial that remain in *Futrell I* are four motions *in limine* and a final pretrial conference. In contrast, *Futrell II* is in its infancy. Filed over one year after *Futrell I*, five motions to dismiss encompassing nine defendants are pending, ECF Nos. 7, 20, 22, 48, 58, one defendant, Triton Logistics UAB, has yet to be served, and the parties have yet to have a Rule 26(f) conference (meaning the Court has not entered a Rule 16(b) scheduling order and the parties have not started discovery).

## IV.    CONCLUSION

The Court concludes that the overwhelming risks of unfair prejudice, delay, and confusion far outweigh the benefits of any modest increase in judicial efficiency that might actualize should it consolidate these cases. In essence, Futrell seeks a do over and to proceed anew in *Futrell II*. The Court will not bless such an endeavor.

Therefore, it is hereby **ORDERED** that:

1.    Futrell's motions to consolidate, filed in *Futrell I* (ECF No. 147) and *Futrell II* (ECF No. 3), are **DENIED**.

2.  Triton's motion to strike Futrell's motion to consolidate, *Futrell I* (ECF No. 155), is **DENIED AS MOOT**.

3.  Cramer's motion to strike Futrell's motion to consolidate, *Futrell I* (ECF No. 159), is **DENIED AS MOOT**.

The Clerk is directed to deliver a copy of this opinion and order to all counsel of record.

_____
/s/
Robert J. Krask
United States Magistrate Judge

Norfolk, Virginia
February 18, 2025